# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER; E.G., a minor, by and through his parent and next friend MEGAN JEBELES; E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense, <br><br> Defendants. | Case No. 1:25-cv-00637-PTG-IDD <br><br> Hon. Patricia Tolliver Giles |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS'
# MOTION FOR A PRELIMINARY INJUNCTION

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

    A.    DoDEA schools provide high-quality education in multi-cultural environments. ............................................................................................. 2

    B.    Plaintiffs attend DoDEA schools in the United States and abroad. ...................... 4

    C.    The President issues executive orders targeting "gender ideology" and "discriminatory equity ideology." ......................................................... 4

    D.    DoDEA requires schools to immediately quarantine library books in response to the Executive Orders. ........................................................ 7

    E.    DoDEA cancel and remove curriculum to comply with the Executive Orders. .................................................................................................. 10

PROCEDURAL BACKGROUND ..................................................................... 13

LEGAL STANDARD ......................................................................................... 13

ARGUMENT ...................................................................................................... 14

I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS. ............................................................. 14

    A.    DoDEA book removals violate students' First Amendment rights. ................... 15

        i.    Students have a First Amendment right to access books in public school libraries. ............................................................... 15

        ii.    DoDEA's book quarantines are violating Plaintiffs' First Amendment rights. ................................................................. 20

    B.    DoDEA has violated students' right to receive information in school curriculum. ......................................................................................... 21

        i.    Students have a First Amendment right to receive information in the classroom. ................................................................. 21

        ii.    DoDEA's curricular removals violate Plaintiffs' First Amendment rights. ................................................................. 23

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM AS A RESULT OF DEFENDANTS' BOOK AND CURRICULUM REMOVALS ABSENT INJUNCTIVE RELIEF. ........................................................................... 24

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVORS GRANTING PRELIMINARY INJUNCTIVE RELIEF. ............................... 25

CONCLUSION ................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ..............................................................................19

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ..................................................................................22

*Associated Press v. Budowich*,
  No. 1:25-CV-00532 (TNM), 2025 WL 1039572 (D.D.C. Apr. 8, 2025) ................14

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ..............................................................................24

*Bd. of Educ. v. Pico*,
  457 U.S. 853 (1982).......................................................................................... *passim*

*Black Emergency Response Team v. Drummond*,
  737 F. Supp. 3d 1136 (W.D. Okla. 2024) .................................................................6

*Campbell v. St. Tammany Par. Sch. Bd.*,
  64 F.3d 184 (5th Cir. 1995) .....................................................................................19

*Case v. Unified Sch. Dist. No. 233*,
  908 F. Supp. 864 (D. Kan. 1995)........................................................................19, 25

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) ...................................................................................25

*Counts v. Cedarville Sch. Dist.*,
  295 F. Supp. 2d 996 (W.D. Ark. 2003).....................................................................20

*Davison v. Randall*,
  912 F.3d 666 (4th Cir. 2019), *as amended* (Jan. 9, 2019) .......................................19

*Epperson v. Arkansas*,
  393 U.S. 97 (1968).....................................................................................................21

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ...............................................................................14, 25

*Gonzalez v. Douglas*,
  269 F. Supp. 3d 948 (D. Ariz. 2017) ........................................................................22

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988)................................................................................2, 21, 22, 23

*Honeyfund.com, Inc. v. DeSantis*,
    622 F. Supp. 3d 1159 (N.D. Fla. 2022).....................................................................5

*Lamont v. Postmaster Gen.*,
    381 U.S. 301 (1965)...............................................................................................15

*Loc. 8027 v. Edelblut*,
    No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024) .............................6

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)...............................................................................................21

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ..............................................................................24

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)...............................................................................................14

*Nken v. Holder*,
    556 U.S. 418 (2009)...............................................................................................25

*Crookshanks as parent and next friend of C.C. v. Elizabeth Sch. Dist.*,
    No. 1:24-CV-03512-CNS-STV, 2025 WL 863544 (D. Colo. Mar. 19, 2025) ......20

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022)...............................................................5, 23

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*,
    670 F.2d 771 (8th Cir. 1982) ......................................................................22, 23, 24

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ..................................................................................13

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)..................................................................................................14

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ......................................................................5

*Sheck v. Baileyville Sch. Comm.*,
    530 F. Supp. 679 (D. Me. 1982) .............................................................................20

*Stanley v. Georgia*,
    394 U.S. 557 (1969)...............................................................................................15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ..........................................................................................15

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ..........................................................................................14

*Virden v. Crawford Cnty., Arkansas*,
    No. 2:23-CV-2071, 2024 WL 4360495 (W.D. Ark. Sept. 30, 2024) ....................20

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*,
    862 F.2d 1517 (11th Cir. 1989) .....................................................................22, 23

*W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) .........................................................................14, 24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................13

## Statutes & Other Authorities

10 U.S.C. § 101(a)(12)(A)–(B) .........................................................................................2

10 U.S.C. § 2164(a)(1) ......................................................................................................2

20 U.S.C. § 921(a) .............................................................................................................2

Annie E. Casey Found., *The Changing Child Population of the United States,*
    *Child Population Data From the 2020 Census* (Apr. 3, 2023),
    https://perma.cc/P9QS-EHYK ............................................................................3

Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020) .........................................5

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) .................................1, 4, 10, 21, 25

Exec. Order No. 14185, 90 Fed. Reg. 8763 (Jan. 27, 2025) .................................1, 5, 10, 21, 25

Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025) .................................1, 6, 10, 21, 25

## INTRODUCTION

In public schools serving military families around the globe, the Government is quarantining books from school libraries and scrubbing references to race and gender from the curriculum. In January 2025, President Trump issued Executive Order Nos. 14168, 14185, and 14190 targeting "gender ideology" and "discriminatory equity ideology" across federal agencies, the military, and K-12 schools. The Department of Defense Education Activity ("DoDEA"), the civilian subagency tasked with running schools on military bases, moved swiftly to comply. DoDEA has removed hundreds of books from circulation, including canonical and award-winning titles like *To Kill a Mockingbird* and *Julian Is a Mermaid*. DoDEA has also prohibited teaching curricular materials related to race and gender, including anything related to Black History Month or Women's History Month. DoDEA has even required teachers to remove posters featuring quotes by Rev. Dr. Martin Luther King, Jr. and photos of Frida Kahlo from classroom walls. Plaintiffs, twelve DoDEA students ranging from pre-kindergarten to eleventh grade, are suffering ongoing and irreparable harm because of this egregious Government censorship.

The Supreme Court has long recognized that public school students maintain their constitutional rights to freedom of speech within "the schoolhouse gate," and students also have a First Amendment right to access information in public libraries and in school curricula. In *Board of Education v. Pico*, ("*Pico*"), the Supreme Court, in a plurality opinion, set forth the principle that the First Amendment provides guardrails against Government attempts to turn public school libraries into "partisan or political" battlegrounds. *Bd. of Educ. v. Pico*, 457 U.S. 853 (1982). The Court has subsequently made clear in *Hazelwood School District v. Kuhlmeier*, that the First Amendment prohibits the government from restricting students' access to curricular information for ideological, rather than pedagogical, reasons. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260

(1988). So judges must act when ideological censorship by political actors overtakes sound pedagogy and infringes on student access to knowledge in public schools.

Plaintiffs seek a preliminary injunction to protect students' First Amendment right to receive information and ideas free from political and ideological censorship. The Court should declare DoDEA's actions to enforce the Executive Orders unconstitutional and order DoDEA to: (a) revoke its memoranda implementing EO guidance; (b) restore quarantined books to school shelves; (c) permit DoDEA educators to once again teach and use the withdrawn curricular materials, and (d) prohibit further book and curricular removals based on those materials' perceived connection to "gender ideology" and "discriminatory equity ideology."

## STATEMENT OF FACTS

### A.    DoDEA schools provide high-quality education in multi-cultural environments.

The DoDEA is the subagency of the Department of Defense responsible for educating the children of servicemembers stationed on military bases in the United States and abroad.[1] Worldwide, DoDEA provides elementary and secondary education to approximately 67,000 children in 161 accredited schools. Preliminary Injunction Attorney Declaration of Matt Callahan ("PI Decl."), Ex. 1. This ranks DoDEA among the nation's 60 largest school districts by enrollment.[2] For the 2024-2025 school year, DoDEA reports the student population was 41% white, 26% Hispanic/Latino, 14% multiracial, 10% Black/African American, and 6% Asian.

---

[1] *See* 10 U.S.C. § 101(a)(12)(A)–(B); 10 U.S.C. § 2164(a)(1); 20 U.S.C. § 921(a). DoDEA policy is set by DoDEA Director Dr. Beth Schiavino-Narvaez under the supervision of United States Secretary of Defense Peter Brian Hegseth. DoDEA, Dr. Schiavino-Narvaez, and Secretary Hegseth are each Defendants in this action.

[2] U.S. Dep't of Educ., Inst. of Educ. Scis., Nat'l Cent. For Educ. Stat., *Table 215.30. Enrollment, Poverty, and Federal Funds for the 120 Largest School Districts, by Enrollment Size in 2019: 2018-19 and Fiscal Year 2021*, Dig. of Educ. Stat. 2020 (Apr. 2022).

*See id.* This is broadly reflective of the diversity of young Americans, except that DoDEA is more Latino and less white than the country as a whole.[3]

DoDEA schools frequently win awards for providing high-quality education, and DoDEA students lead the nation in math and reading proficiency exams. *See* PI Decl., Ex. 1 (2024-2025 DoDEA By the Numbers Fact Sheet), Ex. 2 (DoDEA School Awards page), Ex. 3 (DoDEA NAEP press release). For example, in 2024, three DoDEA schools were recognized as National Blue Ribbon Schools, a Department of Education award based on overall academic performance bestowed upon less than 1% of public schools. PI Decl. Ex. 1. That same year, 30 DoDEA schools were recognized as "Platinum" level of Advanced Placement ("AP") Honor Roll, meaning that 80% or more of graduating students took at least one AP exam, 50% or more scored a 3 or higher on at least one AP exam, and 15% or more took five or more AP exams during high school. *Id*. This high-quality education is evident in primary DoDEA schools as well: In 2024, the average math and reading scores on the National Assessment of Education Progress exams for fourth- and eighth-grade students in DoDEA schools were 14 to 25 points higher than the national average. PI Decl., Ex. 1.

As the U.S. Army recently summarized, military families value "the exceptional performance of DoDEA." *Id.*, Ex. 4. While "[f]requent relocations, deployments, and the unique demands of military life create educational challenges for children of service members[,]" "DoDEA's unwavering dedication to continuity in education ensures these students receive top-tier academic instruction regardless of location." *Id.*, Ex. 4.

---

[3] The Annie E. Casey Found., *The Changing Child Population of the United States, Child Population Data From the 2020 Census* (Apr. 3, 2023), https://perma.cc/P9QS-EHYK.

**B.    Plaintiffs attend DoDEA schools in the United States and abroad.**

Plaintiffs are twelve children from six families enrolled in DoDEA schools around the world. The student Plaintiffs range in age from pre-kindergarten to eleventh grade, *see* Henninger Decl. ¶ 4; Young Decl. ¶ 3, and attend schools in Virginia, Kentucky, Italy, and Japan. *See* Henninger Decl. ¶ 4; Keeley Decl. ¶ 4; Kenkel Decl. ¶ 4; Tolley Decl. ¶ 5; Young Decl. ¶ 3. If and when their servicemember parent is assigned to a new location, Plaintiffs anticipate enrolling in other DoDEA schools. *See* Henninger Decl. ¶ 5; Keeley Decl. ¶ 5. Wherever they are stationed, Plaintiffs and their families value the high-quality education that DoDEA provides. *See* Henninger Decl. ¶¶ 6–7; Keeley Decl. ¶ 6; Kenkel Decl. ¶¶ 6–7; Tolley Decl. ¶ 6; Young Decl. ¶ 5. Each Plaintiff particularly appreciates the opportunity to learn from the diverse and multicultural experiences of both their classmates and, when stationed abroad, their host countries. *See* Henninger Decl. ¶ 8; Keeley Decl. ¶ 32; Kenkel Decl. ¶ 7; Tolley Decl. ¶ 13; Young Decl. ¶ 10.

**C.    The President issues executive orders targeting "gender ideology" and "discriminatory equity ideology."**

On the day he was sworn into office, January 20, 2025, the President issued Executive Order No. 14168 ("EO 14168"). PI Decl., Ex. 5. EO 14168, titled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, *id.*, defines "gender ideology" as an "internally inconsistent" set of ideological beliefs, including "the idea that there is a vast spectrum of genders that are disconnected from one's sex[,]" labeling as a "false claim" the viewpoint that transgender and nonbinary gender identities exist. 90 F.R. 8615 § 2(f) (Jan. 20, 2025). EO 14168 directs all federal agencies, including the Department of Defense, to remove statements and cease communicating about what the government deems to be "gender ideology" and "gender identity." *Id.* § 3(e); *accord* § 2(f)–(g).

4

Over the following 10 days, the President issued two more Executive Orders that implicate DoDEA's mission and Plaintiffs' education. PI Decl., Exs. 6, 7. Executive Order No. 14185 ("EO 14185"), titled *Restoring America's Fighting Force*, *id.*, Ex. 6, prohibits the Department of Defense and its educational institutions from promoting or teaching so-called "divisive concepts" about race or sex. *Id.* at § 6. The list of divisive concepts comes from Executive Order No. 13950 ("EO 13950"), *Combatting Race and Sex Stereotyping*, which was signed during President Trump's first term in office. Those concepts include:

> (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "divisive concepts" also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

Exec. Order No. 13950, 85 Fed. Reg. 60683, 60685 § 2(a) (Sept. 22, 2020).

This list of divisive concepts has appeared in slightly varied form in state and local laws and policies and have been successfully challenged on vagueness and First Amendment grounds. *See, e.g.*, *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 545 (N.D. Cal. 2020) (enjoining EO 13950 on vagueness grounds); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1180 (N.D. Fla. 2022) (preliminarily enjoining the Stop W.O.K.E. Act, which includes nearly identical divisive concepts on vagueness and First Amendment grounds); *Pernell v. Fla. Bd.*

*of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218, 1278 (N.D. Fla. 2022) (same with regard to public colleges and universities); *Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254, at *13–14 (D.N.H. May 28, 2024) (permanently enjoining a law applying similar concepts to K-12 schools on vagueness grounds); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1156 (W.D. Okla. 2024) (partially enjoining a law applying similar concepts to K-12 schools on vagueness grounds).

On January 29, 2025, the President issued Executive Order No. 14190, titled *Ending Radical Indoctrination in K-12 Schooling*, PI Decl., Ex. 7, which instructs the Secretary of Defense to formulate a plan to eliminate "support for" and "indoctrination in" "gender ideology and discriminatory equity ideology" in its K-12 schools. *Id.* § 3(i).[4] "Discriminatory equity ideology" is defined as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations" and includes the following list of nearly identical concepts including that:

> (i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;
>
> (ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
>
> (iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;
>
> (iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;
>
> (v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive

---

[4] EO 14190 also restricts any educational support of "social transition," including educators referring to children as "nonbinary" or by their requested names or pronouns. *Id.* § 2(e); 3(b)(iii). That provision is not at issue in this case.

adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;

(vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;

(vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or

(viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

90 Fed. Reg. 8853, 8854 § 2(b) (Jan. 29, 2025).

In his March 4, 2025, address to a Joint Session of Congress, the President explained the ideological objective behind these Executive Orders, proclaiming, "We're getting wokeness out of our schools and out of our military, and it's already out, and it's out of our society. We don't want it. Wokeness is trouble. Wokeness is bad. It's gone. It's gone." PI Decl., Ex. 8.

**D.    DoDEA requires schools to immediately quarantine library books in response to the Executive Orders.**

Citing the need to comply with these three Executive Orders, DoDEA has instructed teachers and librarians to scrutinize and then "remove[] from circulation any books that are related to gender ideology or discriminatory equity ideology topics." *See* PI Decl., Ex. 9; *id.* at Exs. 10–12. On February 5, 2025, Lori Pickel, Acting Chief Academic Officer for DoDEA, circulated a memorandum directing school librarians to "immediately" begin relocating books in response to the recent Executive Orders. PI Decl., Ex. 10. The memorandum instructed that any library books "potentially related to gender ideology or discriminatory equity ideology topics . . . will be relocated to the professional collection for evaluation." *Id.* DoDEA subsequently communicated similar information about its ongoing book removal process to both schools and parents. PI Decl.,

Exs. 11–12. DoDEA's directive to remove books even "potentially related to" a prohibited concept seems to dramatically expand the scope of the Executive Orders' application beyond their terms.

Journalists and other sources have attempted to compile information about the books being "quarantined" from DoDEA libraries and classrooms. PI Decl., Exs. 14 and 20. Those sources indicate that the removed books include: *To Kill a Mockingbird* by Harper Lee, a Pulitzer Prize-winning novel about the trial of a Black man falsely accused of a crime; *No Truth Without Ruth*, a picture book biography about the late Justice Ruth Bader Ginsburg and her advocacy for women's equality; *Julian Is a Mermaid*, a picture book about a boy who makes a mermaid costume and participates in a parade that received the Stonewall Book Award in 2019; *New York Times* bestseller *Freckleface Strawberry*, a picture book about "learning to love the skin [you're] in" written by Academy Award-winning actress Julianne Moore; *Hillbilly Elegy: A Memoir of a Family and Culture in Crisis* by J.D. Vance, a memoir detailing the struggles of working-class white Americans; and *Well-Read Black Girl: Finding Our Stories, Discovering Ourselves* by Glory Edim, an anthology of essays from prominent Black women writers reflecting on the impact of literature on their lives. *Id.*

Plaintiffs have compiled the current reported lists of books removed in response to the Executive Orders because none is publicly available. *Id.* Some Plaintiffs and their parents are aware of specific book removals through their own observation, s*ee* Kenkel Decl. ¶ 9, Young Decl. ¶ 12, and other Plaintiffs and their parents have repeatedly attempted to learn the titles of quarantined books, to no avail. *See* Tolley Decl. at ¶ 12; Keeley Decl. ¶¶ 20–22; Henninger Decl. ¶ 18.

DoDEA Europe updated parents on March 7, 2025, that "[s]chools have completed their review of library materials," PI Decl., Ex. 15, and "potentially" divisive books had been

quarantined. *Id.*, Exs. 10–12. DoDEA Europe explained that the relocated materials were "currently being reviewed at the Region/HQ levels" in more depth for references "to gender ideology or discriminatory equity ideology," *id.*, Ex. 15. As of the date of this motion, the Young and Tolley families, whose children are enrolled in DoDEA Europe schools, have received no further communication regarding the book removal process. Tolley Decl. ¶ 12; Young Decl. ¶ 12.

The principal of M.T.'s school, Aviano Middle-High School in Italy, informed parents that approximately eighteen books would be removed from the school library in compliance with the Executive Orders and DoDEA guidance. Tolley Decl. ¶ 10. M.T.'s parent requested a list of books removed from the library, but she has not received answers. *Id.* at ¶ 12. Also at Aviano, an administrator told E.Y.'s parent that removed books were still available, but only to DoDEA employees. Young Decl. ¶ 12. Plaintiffs expect that as the system-wide removal process advances, more books at their schools may be removed from circulation. Kenkel Decl. ¶ 19.

Meanwhile in Japan, Plaintiff L.K. 3, has been unable to check out books from her school library because of DoDEA's removals in response to the Executive Orders. Kenkel Decl. ¶¶ 9, 11. Her favorite book, *A Handmaid's Tale* by Margaret Atwood, has been removed. Kenkel Decl. ¶ 9. The school librarian has scolded L.K. 3 for trying to check out books subject to removal. *Id.* Since then, L.K. 3 has not been able to check out *The Giver* by Lois Lowry, *Nineteen Eighty-Four* by George Orwell, or *Ground Zero* by Alan Gratz as a result of DoDEA's book purge. *Id.* L.K. 1 and L.K. 2 have also had several books related to "gender ideology" removed from their school library. Some of the missing books include: *No Truth Without Ruth: The Life of Ruth Bader Ginsburg*, and *Finding Wonders: Three Girls Who Changed Science*. *Id.* at ¶ 10.

Plaintiffs and their families are concerned that DoDEA is trying to limit their knowledge and learning rather than expand it. Well-stocked, age-appropriate libraries are a valued part of the

DoDEA student experience, especially for Plaintiffs L.K. 3, E.K., M.T., and E.Y., who are avid readers and library users and who value having a broad range of books available to explore. Kenkel Decl. ¶ 11; Keeley Decl. ¶ 9; Tolley Decl. ¶ 7; Young Decl. ¶ 7. Without access to books related to race and gender, Plaintiffs fear that they and other DoDEA students will be especially ill-equipped to engage with these difficult topics within their vibrantly diverse schools and in the broader society. Henninger Decl. ¶¶ 15, 21.

### E.    DoDEA cancel and remove curriculum to comply with the Executive Orders.

In an immediate effort to implement Executive Orders 14168, 14185, and 14190, on January 29, 2025, Defense Secretary Hegseth released guidance titled, "Restoring America's Fighting Force." The Secretary of Defense's memorandum, in relevant part, prohibited any part of the Department of Defense, including DoDEA, from "provid[ing] instruction on Critical Race Theory (CRT), DEI, or gender ideology as part of a curriculum[.]" *Id.* Two days later, the Secretary of Defense issued further guidance titled "Identity Months Dead at DoD." PI Decl., Ex. 16. The guidance instructs DoDEA not to "host celebrations or events related to cultural awareness months, including National African American/Black History Month, Women's History Month," and "Pride Month," among others. *Id.* In response, DoDEA instructed schools to "cancel all planned special activities" related to cultural awareness months and stated that guest speakers from diverse backgrounds were allowed only "if the speaker's focus is on military service, leadership, or history rather than cultural identity awareness." PI Decl., Ex. 17.

Plaintiffs have suffered harms to their education as a result of the cancellation of cultural awareness months. For example, Plaintiff O.H. chose Maya Angelou, a renowned author and poet, as the subject of her Black History Month presentation prior to its abrupt cancellation. Henninger Decl. ¶ 14. After she completed her research and preparation, Black History Month was cancelled along with all corresponding presentations. *Id.* The revocation of Black History Month

programming denied O.H. the opportunity to present her research and to learn from her peers. *Id.* Further, O.H.'s experience indicates that DoDEA's policy also prohibits any student work potentially related to a banned concept, even self-directed research projects.

Likewise, Plaintiff M.T.'s school also cancelled cultural history months. Tolley Decl. ¶ 13. Black History Month lessons once included biographical studies on Ruby Bridges, Rosa Parks, and Martin Luther King, Jr. *Id.* But this year, no events were held for Black History Month or Women's History Month. *Id.* M.T. also identifies as Asian American and expects no celebrations or curricula for Asian American and Pacific Islander Heritage Month in May. *Id.* This erasure of M.T.'s heritage from the curriculum sends a message that her culture is not valued or worthy of study. In addition to the cancellation of various cultural history months, teachers at Aviano Middle-High School have also been forced to remove wall decorations and posters of Malala Yousafzai and Frida Kahlo, two powerful, historic women figures. *Id.* at 14.

Plaintiff E.K. has also expressed concern regarding the cancellation of Black History Month. Keeley Decl. ¶ 29. E.K. noticed that Black History Month displays were taken down in her school partway through February. *Id.* at ¶ 30. This upset E.K. because she enjoys learning about historically and culturally significant art, literature, and events associated with the Black community during the school year. *Id.* E.K. also noticed that her school did not acknowledge Women's History Month this year. *Id.* at ¶ 31. E.K.'s mother worries that by cancelling Women's History Month, Crossroads is "telling [her] children that the accomplishments of women no longer matter or that there is something wrong, or discriminatory, with celebrating achievements made by women throughout history, even in the face of adversity." *Id.*

The Kenkel family has been affected by the cancellation of multicultural performances, which served to bring students, parents, and families together to celebrate diversity and engage

with different cultures. Kenkel Decl. ¶ 14. The cancellation of Black History Month and Juneteenth has negatively impacted the Kenkel family because Plaintiffs L.K. 1, L.K. 2, and L.K. 3 have a biracial brother; it is important to them to celebrate Black history and culture. Kenkel Decl. ¶ 17. Also because of their family history, the cancellation of Holocaust Remembrance Day was especially difficult for L.K. 1, L.K. 2, and L.K. 3; they were and continued to be denied opportunities to see their family history reflected in their classroom educational experiences. Kenkel Decl. ¶ 16.

When E.K.'s father attended a Quantico School Board meeting, he was told that the school could not "celebrate cultural things." Keeley Decl. ¶ 20. And yet, after cancelling Black History Month and Women's History Month, E.K.'s school commemorated Valentine's Day, St. Patrick's Day, and Easter. *Id.* at ¶ 35. Notably, commemorations for Lunar New Year, which existed in previous school years, were missing this year. *Id.* Days and months of Western Christian significance continue to be celebrated, while others disappear. *Id.* at ¶ 36.

Plaintiffs have also suffered harms to their education as a result of the cancellation of specific lessons and course materials. On February 5, Lori Pickel, Acting Chief Academic Officer for DoDEA, circulated a memorandum directing educators to "immediately" cease use of specific instructional resources related to race and gender, listed in a table attached to the memorandum. PI Decl., Ex. 19.  The list requires educators to stop teaching: (a) high school lessons on gender and sexuality in AP Psychology, (b) middle school lessons on Black History Month and human health, and (c) elementary school lessons on immigration and the civil war veteran Albert Cashier. *See id.* at Attachment A.

M.T. is enrolled in AP Psychology, where DoDEA Europe has mandated that a unit on gender no longer be taught, despite the fact that the AP examination M.T. will soon take will cover

that material. Tolley Decl. ¶ 9. C.Y. has also lost the opportunity to fully prepare for her AP Psychology exam because of the removal of Module 32 (on gender and sex) in all DoDEA schools. Young Decl. ¶ 13. Plaintiffs L.K. 1, L.K. 2, and L.K. 3 have likewise had their curricula changed in response to the Executive Orders. For example, L.K. 1 had curricular materials relating to immigration removed from her class, meaning she continues to be denied the opportunity to learn about important American history. Lesson 3, titled "The Peopling of the United States," was removed, and the reading associated with this lesson (*A Nation of Immigrants* by John F. Kennedy) was also not part of the L.K. 1's class material this year. Kenkel Decl. ¶ 12.

As a group, Plaintiffs are concerned about the adverse effect of these sweeping curriculum changes on their multicultural experience within DoDEA schools. *See* Young Decl. ¶ 10. The Henninger family, who expect that their children will remain in DoDEA schools for the next decade, are concerned that O.H., S.H., and H.H. will be left behind when compared to their peers at non-DoDEA schools who are exposed to public educational offerings not constrained by racial, gender-based, or political viewpoints. Henninger Decl. ¶¶ 15–20. Similarly, E.K. and S.K.'s family worry about the curricular and book removal impacts on their future education. Keeley Decl. ¶ 7.

## PROCEDURAL BACKGROUND

Plaintiffs filed suit on April 15, 2025, claiming that the Government's ideological suppression of books and curriculum violates their First Amendment right to receive information. The Government has been timely served, and Plaintiffs now move for preliminary injunctive relief.

## LEGAL STANDARD

Plaintiffs seeking preliminary injunctive relief must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Roe v. Dep't*

*of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("*Musgrave*"). The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Likewise, the balance of equities and public interest is intertwined with the First Amendment merits analysis; this Circuit's binding precedent says that injunctions to protect First Amendment rights are always in the public interest. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

## ARGUMENT

## I.    Plaintiffs are likely to prevail on the merits of their First Amendment claims.

"Our Constitution does not permit the official suppression of *ideas*." *Pico*, 457 U.S. at 871 (plurality op.). When the government singles out specific ideas for suppression, just for the sake of suppressing disfavored views, courts are required to intervene. *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024) ("[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech[.]"); *Associated Press v. Budowich*, No. 1:25-CV-00532 (TNM), 2025 WL 1039572, at *8 (D.D.C. Apr. 8, 2025) (recognizing the government cannot wield its discretionary powers as "a subterfuge 'to suppress expression merely

14

because public officials oppose the speaker's view'") (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)).

As a corollary to the First Amendment's protection against government censorship of speech, it also protects listening and learning. It is long-established that the Government may not infringe on "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 306–07 (1965) (holding that the First Amendment protects Americans' right to receive "communist political propaganda" through the mail). Since students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), it follows that students also maintain their First Amendment right to access information at school. Indeed, while "all First Amendment rights accorded to students must be construed in light of the special characteristics of the school environment," *Pico*, 457 U.S. at 868, the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Tinker*, 393 U.S. at 512 (citing *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

A.    **DoDEA book removals violate students' First Amendment rights.**

i.    *Students have a First Amendment right to access books in public school libraries.*

For more than forty years, the First Amendment has constrained public schools' libraries from removing books based on political disagreements. In its only case addressing public school library holdings, the Supreme Court made clear that "school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Pico*, 457 U.S. at 879–80 (J. Blackmun, concurring) (emphasis added); *id*. at 872 (plurality op.). In *Pico*, parents in a New York school district had obtained a list of "objectionable" books at a conservative

education conference. *Id.* at 856. Upon learning that some of the listed books were present in the district's libraries, members of the school board aligned with the concerned parents directed the removal of nine books. *Id.* at 857. Students who had been denied access to the library books sued to vindicate their First Amendment rights.

A plurality of the Supreme Court held that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id*. at 872 (plurality opinion) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).[5] In so doing, the plurality made clear that "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Pico*, 457 U.S. at 866. The plurality opinion recognized that "just as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868.

It is hard to overstate the reverence for school libraries held by the members of the *Pico* court. The plurality highlighted that "the special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students." *Id.* It recognized that "[a] school library, no less than any other public library, is 'a place dedicated to quiet, to knowledge, and to beauty.'" *Id*. (quoting *Brown v. Louisiana*, 383 U.S. 131, 142 (1966)). The plurality further emphasized that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding" and that "[t]he school library is

---

[5] In *Pico*, Justices Brennan, Marshall, and Stevens joined the plurality opinion of the court. Justice Blackmun concurred in part and concurred in the judgment. Justice White concurred in the judgment. Chief Justice Burger and Justices Power, Rehnquist, and O'Connor dissented.

the principal locus of such freedom." *Pico*, 457 U.S. at 868–69 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). In a school library "a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum . . .. The student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom." *Pico*, 457 U.S. at 869 (quoting *Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (Mass. 1978)).

At the same time, the plurality recognized that school officials "rightly possess significant discretion to determine the content of their school libraries." *Pico*, 457 U.S. at 870. Government defendants had "argue[d] that they must be allowed *unfettered* discretion to 'transmit community values' through the Island Trees schools." *Id.* at 869. The plurality recognized that it could "not deny that local school boards have a substantial legitimate role to play in the determination of school library content," but explicitly rejected their "claim of absolute discretion to remove books from their school libraries." *Id.* at 869.

The plurality opinion stands for the proposition that the discretion necessarily afforded to school officials to decide on school library contents "may not be exercised in a narrowly partisan or political manner." *Id.* at 870. As such, whether school officials' "removal of books from their school libraries denied [student plaintiffs] their First Amendment rights depends upon the motivation behind petitioners' actions." *Id.* at 871. The plurality then outlined constitutional versus impermissible motivations for removing books. "If [government defendants] *intended* by their removal decision to deny [student plaintiffs] access to ideas with which [the government] disagreed, and if this intent was the decisive factor in [the government's] decision, then [government defendants] have exercised their discretion in violation of the Constitution." *Id.* Perhaps anticipating an ideological purge akin to what is happening in DoDEA schools, the

plurality provided the hypothetical example of "an all-white school board, motivated by racial animus, decid[ing] to remove all books authored by blacks or advocating racial equality and integration." *Id.* 870-71. In such a situation, the plurality said, "few would doubt that the order violated the constitutional rights of the students denied access to those books." *Id.*

By contrast, the plurality recognized that "an unconstitutional motivation would *not* be demonstrated if it were shown that [government defendants] had decided to remove the books at issue because those books were pervasively vulgar [. . . or] the removal decision was based solely upon the 'educational suitability' of the books in question." *Id.* at 871. The plurality opinion pointed out that it "would be a very different case if the record demonstrated the [government] had employed established, regular, and facially unbiased procedures for the review of controversial materials." *Id.* at 874. Instead, the school board's "removal procedures were highly irregular and ad hoc–the antithesis of those procedures that might tend to allay suspicions regarding [government officials'] motivations." *Id.* at 875. Ultimately, the plurality concluded that the Island Trees School Board's "decision to remove the books rested decisively upon disagreement with the constitutionally protected ideas in those books, or upon a desire on [the School Board's] part to impose upon the students of the Island Trees High School and Junior High School a political orthodoxy to which petitioners and their constituents adhered." *Id.*

Even though *Pico* yielded four separate opinions, none of which is joined by five justices, a majority of Justices on the *Pico* Court agreed that removing books from school libraries implicates students' First Amendment rights. Justice Blackmun's concurrence noted that the Supreme Court's cases "command" a First Amendment limitation on why government officials may remove a library book. *Id.* at 878–79 (Blackmun, J., concurring). Justice White, in his concurrence with the judgment, thought that the case should be remanded for further fact-finding

18

about the school board's specific reasons—an exercise that would have been pointless if no facts could have established a First Amendment violation. *Id.* at 883–84. And Justice Rehnquist, joined by Chief Justice Burger and Justice Powell in dissent, "cheerfully concede[d]" that "[o]ur Constitution does not permit the official suppression of *ideas*," including in libraries. *Id.* at 907 (Rehnquist, J., dissenting (quoting plurality op.) (emphasis in original)).

Post-*Pico*, circuit courts have noted the fractured opinions, but the plurality's holding continues to be applied by circuit courts. Even courts that emphasize that *Pico* is technically nonbinding stop short of rejecting its guidance. *See, e.g.*, *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) ("Even though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives."). *See also*, *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200, 1227 (11th Cir. 2009) (writing that "*Pico* is of no precedential value," but concluding that "the real issue for the federal courts . . . is whether the Board's decision to remove the book from school library shelves was motivated by . . . a desire to promote political orthodoxy and by opposition to the viewpoint of the book"). Indeed, the Fourth Circuit has, in dicta, quoted *Pico* for the proposition that "few would doubt that [an] order [to remove all books for a partisan reason] violated the constitutional rights of the students denied access to those books." *Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019), *as amended* (Jan. 9, 2019).

District courts have also repeatedly granted injunctions restoring controversial books to school shelves where the government's motivation for removal was disagreement with the ideas contained in the books. *See, e.g.*, *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 877 (D. Kan. 1995) (granting injunction to restore to school library a book about a romantic relationship

between teenage girls); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 693 (D. Me. 1982) (granting preliminary injunction to restore to high school library a book with objectionable language). One Arkansas district court granted summary judgment against a school district for moving the *Harry Potter* books to a special area for students who presented signed parental permission slips. *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004–05 (W.D. Ark. 2003). That court recognized that "[r]egardless of the personal distaste with which [school board members] regard 'witchcraft,' it is not properly within their power and authority . . . to prevent the students at Cedarville from reading about it." *Id.*[6] And just last month, the District of Colorado ordered the "immediate[] return" of nineteen books to library shelves, after a school board had deemed them "too sensitive" to display. *Crookshanks as parent and next friend of C.C. v. Elizabeth Sch. Dist.*, No. 1:24-CV-03512-CNS-STV, 2025 WL 863544, at *1 (D. Colo. Mar. 19, 2025).

Because the First Amendment prohibits ideological book removals in public school libraries, DoDEA's censorship pursuant to the Executive Orders and implementing instructions must be enjoined.

> ii.    *DoDEA's book quarantines are violating Plaintiffs' First Amendment rights.*

Plaintiffs seek an injunction against the Government's removal of books based on political disagreements with what the government refers to as "gender ideology" and "discriminatory equity ideology"—*i.e.*, exactly the sorts of "partisan or political" reasons that *Pico* forbids. Whether Plaintiffs have a specific list of removed books for their schools or not, DoDEA's standing directive to purge libraries of ideologies that the current presidential administration deems to be politically

---

[6] In a closely related context, another Arkansas district court enjoined the segregation of "all books containing LGBTQ themes" to a special "social section" of a public library. *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2024 WL 4360495, at *1, *4 (W.D. Ark. Sept. 30, 2024). The court recognized that "suppressing ideas or opinions on the grounds that 'certain elements of the populace object' to them is not a legitimate governmental interest at all." *Id.* at *4.

incorrect looms over them and their school libraries. Like the school censors before them, *see supra* Section I-A, Defendants here cannot constitutionally restrict student access to books based on political disagreements with viewpoints on race and gender. The Court should enjoin Defendants from removing more books from DoDEA libraries pursuant to Executive Orders 14168, 14185, and 14190 and restore the prior *status quo* on January 19, 2025, by ordering that all quarantined books be restored to circulation.

**B.    DoDEA has violated students' right to receive information in school curriculum.**

*i.    Students have a First Amendment right to receive information in the classroom.*

Plaintiffs also seek an injunction against DoDEA's removal of school curricula related to "gender ideology" or "discriminatory equity ideology." First Amendment protections for students extend beyond access to library books, limiting governmental efforts "to control even the curriculum and classroom." *Pico*, 457 U.S. at 861. Historically, courts have acknowledged that "[b]y and large, public education in our Nation is committed to the control of state and local authorities." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). But the "state's power to prescribe a curriculum" must still be constitutionally "reasonable." *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923). For example, generations ago, the Supreme Court held that a state cannot, consistent with the Constitution, "forbid[] the teaching in school of any subject except in English[.]" *See id.* at 400. Similarly, the Court has held that "the First Amendment does not permit the State" to prohibit teaching the theory of evolution "for the sole reason that it is deemed to conflict with a particular religious doctrine" held by those in power. *See Epperson*, 393 U.S. at 103, 106.

The Supreme Court explained in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), that "educators do not offend the First Amendment by exercising editorial control" over school-sponsored curriculum "so long as their actions are reasonably related to legitimate

21

pedagogical concerns." *Id.* at 273. Federal circuit courts applying this principle have repeatedly reaffirmed that public school students possess a First Amendment right to receive curricular information, safeguarding them from official acts of curricular censorship that are unjustified by legitimate pedagogical concerns. *See, e.g.*, *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015); *Virgil v. Sch. Bd. of Columbia Cnty.*, *Fla.*, 862 F.2d 1517 (11th Cir. 1989); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982).

In *Arce*, public school students challenged a statute barring school districts from providing curriculum that, *inter alia*, "[is] designed primarily for pupils of a particular ethnic group"—a restriction that led to the elimination of a school district's Mexican American Studies program. 793 F.3d at 973. The Ninth Circuit concluded that the students' First Amendment right to receive barred the state from removing "materials otherwise available in a . . . classroom unless its actions are reasonably related to legitimate pedagogical concerns." *Id.* at 983. On remand, the District of Arizona ultimately determined that the challenged statute violated students' First Amendment right to receive curricular information. *Gonzalez v. Douglas*, 269 F. Supp. 3d 948 (D. Ariz. 2017). The district court held that the statute's stated goal of "reduc[ing] racism in schools" was "a legitimate pedagogical objective," but the court concluded that the statute in fact amounted to unconstitutional curricular censorship "enacted and enforced for narrowly political, partisan, and racist reasons." *Id.* at 973.

In *Pratt*, public high school students challenged the removal of certain films taught in an American literature course. 670 F.2d at 773–74. The Eighth Circuit determined that the school board violated students' First Amendment right to receive information because it removed the films "not because they contain scenes of violence or because they distort the[ir source material], but

rather . . . because the majority of the board  . . . considered the films' ideological and religious themes to be offensive." *Id.* at 778.

Likewise, the Eleventh Circuit in *Virgil* applied *Hazelwood* to determine that the First Amendment requires public school officials to advance legitimate pedagogical interests where they remove material from school classrooms. *Virgil*, 862 F.2d at 1521–22.[7] While legitimate pedagogical interests may include ensuring curricular materials are age appropriate, *id.* at 1522–23, mere objections to the ideological or political viewpoint cannot justify removal. The Eleventh Circuit ultimately determined that the school board acted out of a legitimate pedagogical concern when it removed the sexually explicit passages from mandatory curriculum based on the interest of ensuring age appropriateness of the materials. *Id.*

Because the First Amendment prohibits the ideological, rather than pedagogical, removals of student curriculum, the curricular removals pursuant to Executive Orders and implementing instructions must be enjoined.

ii.    <em>DoDEA's curricular removals violate Plaintiffs' First Amendment rights.</em>

DoDEA's curricular removals have been motivated by anti-"woke" partisanship and not by any legitimate pedagogical purpose, and therefore violate Plaintiffs' right to receive information. *See Hazelwood*, 484 U.S. at 273. DoDEA's widespread forced removal of curricular resources and cultural programs is a blatant attempt to impose a pall of political orthodoxy over DoDEA schools. Plaintiffs are experiencing harms from the cancelled lessons and learning opportunities, including being impeded in their ability to study for the AP Psychology exam, which is just days away as of this filing. Young Decl. ¶ 13; Tolley Decl. ¶ 9. Meanwhile, all Plaintiffs are suffering from the

---

[7] In *Pernell*, a challenge to Florida's Stop W.O.K.E. Act, the Northern District of Florida recognized a student plaintiff at a public university's First Amendment right to receive information about race and gender as part of the curriculum, citing *Gonzalez*. 641 F. Supp. 3d at 1268 n.47.

removals of cultural history months, including the ability to learn from historical figures and the diversity of their classmates and host nations–especially O.H., whose Black History Month research project was terminated. *See* Tolley Decl. ¶¶ 13–15; Henninger Decl. ¶ 14; Keeley Decl. ¶¶ 29–32, 35–36; Kenkel Decl. ¶¶ 14–18; Young Decl. ¶ 10.

Defendants do not and cannot offer any legitimate pedagogical interest to justify DoDEA's removal of the Gender and Sexuality module of AP Psychology, health education, and curriculum related to cultural awareness months. DoDEA has not put forward any purported pedagogical interests around the effectiveness or age appropriateness of curriculum to justify removal, merely asserting that the disfavored ideologies and concepts laid out in the Executive Orders and implementing guidance are politically "divisive." Even if DoDEA were to assert legitimate pedagogical concerns over the educational effectiveness or age appropriateness of curriculum, possessing the discretion to "determine the curriculum that is most suitable for students and teaching methods to be employed," its censorship here is not reasonably related to achieving that goal. *Pratt*, 670 F.2d at 775.

## II.   Plaintiffs will suffer irreparable harm as a result of Defendants' book and curriculum removals absent injunctive relief.

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *See, e.g.*, *Musgrave*, 553 F.3d at 298; *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Indeed, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)). Even if books and educational resources are available in some form to Plaintiffs from sources outside of school, that "does not cure defendants' improper motivation for removing the book."

24

*Case*, 908 F. Supp. at 876. The Government's suppression of Plaintiffs' ability to receive information at school, where that suppression is grounded purely in differences of political ideology, constitutes irreparable harm.

### III. The balance of equities and public interest favors granting preliminary injunctive relief.

When the Government is the party opposing injunctive relief, the balance of equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "When a plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to [the Government] and that a preliminary injunction should issue." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2 (3d ed. 1998). Here, DoDEA's removal of books from their classrooms and libraries heavily burdens Plaintiffs' First Amendment rights. *See supra*, Section I-A.

Restoring books and curricula will cause no injury to DoDEA. As the Fourth Circuit has recognized, the government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *See Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd.*, 303 F.3d at 521). "[U]pholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd.*, 303 F.3d 507 at 521.

## CONCLUSION

The Court should grant a preliminary injunction prohibiting Defendants from enforcing Executive Order Nos. 14168, 14185, and 14190 and related memoranda, directives, and guidance in DoDEA schools. The Court should order DoDEA to cease its classifications and removals of educational books and curricular content related to "gender ideology" and "discriminatory equity

ideology." The Government should further be ordered to restore the status quo to how it existed on January 19, 2025, by returning all books and curriculum already quarantined or removed based on potential violation of the Executive Orders to their preexisting shelves, classrooms, and instructional units.

Dated: May 7, 2025                              Respectfully submitted,

                                               /s/ Matthew Callahan
                                               Matthew Callahan, VSB No. 99823
                                               Eden Heilman, VSB No. 93554
                                               ACLU OF VIRGINIA FOUNDATION
                                               P.O. BOX 26464
                                               RICHMOND, VA 23261
                                               (804) 644-8080
                                               mcallahan@acluva.org
                                               eheilman@acluva.org

                                               Emerson J. Sykes*
                                               Tyler Takemoto*
                                               ACLU FOUNDATION
                                               125 Broad Street, 18th Floor
                                               New York, NY 10004
                                               (212) 549-2500
                                               esykes@aclu.org
                                               ttakemoto@aclu.org

                                               Corey M. Shapiro*
                                               William E. Sharp*
                                               ACLU OF KENTUCKY FOUNDATION
                                               325 W. Main Street, Suite 2210
                                               Louisville, KY 40202
                                               (502) 581-9746
                                               corey@aclu-ky.org
                                               wsharp@aclu-ky.org

                                               Attorneys for Plaintiffs

                                               * Motions for pro hac vice admission forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2025, I electronically filed the foregoing Memorandum in Support of Preliminary Injunction with the Clerk of the Court using the CM/ECF system. I have arranged for the following, who have not yet entered an appearance in the case to be registered participants of the Electronic Case Filing System, to also be served by U.S. Mail:

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Peter Brian Hegseth, Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301

Department of Defense Education Activity
4800 Mark Center Drive
Alexandria, VA 22350

Dr. Beth Schiavino-Narvaez
4800 Mark Center Drive
Alexandria, VA 22350

/s/ Matthew Callahan
Matthew Callahan
ACLU OF VIRGINIA FOUNDATION
*Attorney for Plaintiffs*