# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| E.K. and S.K., minors, by and through their parent and next friend, LINDSEY KEELEY, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:25-cv-637 (PTG/IDD) |
| v. | ) ) ) | |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

ERIK S. SIEBERT
United States Attorney

MEGHAN E. LOFTUS
MATTHEW J. MEZGER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3757/3741
Fax:    (703) 299-3983
Email: meghan.loftus@usdoj.gov
           matthew.mezger@usdoj.gov

*Counsel for Defendants*

## INTRODUCTION

In America's federalist system, it is the public authorities, like school boards, that are charged with administering the nation's public schools. Moreover, the Supreme Court has repeatedly cautioned that federal courts do not have a role in refereeing the conflicts that might arise regarding educational matters in the school system as those can and should be worked out at the local level. Yet, despite these well-entrenched principles in American jurisprudence, Plaintiffs invite this Court to serve as the Superintendent of five schools within the Department of Defense Education Activity ("DoDEA") school system for choices concerning their curricula and the books in their libraries. Invoking the First Amendment's Free Speech Clause, twelve schoolchildren in five DoDEA schools come to the Court seeking a mandatory preliminary injunction—on the eve of the end of the school year on June 10, 2025—for conduct that unfolded two to three months ago. They cannot meet the heightened showing to obtain such extraordinary relief, that is, asking this Court to make specific curriculum and library curation decisions that, as courts have repeatedly recognized, are left to educators, not the judiciary.

Plaintiffs cannot establish a clear likelihood of success on the merits of their Free Speech claims. As ample case law shows, curating a library collection or developing a teaching curriculum is an act of government speech. It is therefore not subject to rigorous scrutiny under the First Amendment's Free Speech Clause. Even if that were not the case, Plaintiffs cannot establish that DoDEA schools' reviews were motivated by any impermissible reason other than a pedagogical concern for its schoolchildren. Pursuant to President's Executive Orders and the educational objectives of the Department, the curriculum and book reviews were undertaken to implement DoDEA's current pedagogical approach to teaching schoolchildren regarding gender and sexuality and to better promote an inclusive environment. There is nothing constitutionally improper in that decision. Furthermore, because Plaintiffs cannot establish a likelihood of success on the merits,

and the school year is drawing to a close, thus obviating the immediacy of any alleged harm, the public interest and balance of equities favor DoDEA.

As with any state or local school system, the responsibility to educate military-connected children should remain with DoDEA as Congress intended. Thus, this Court should deny Plaintiffs' request for mandatory preliminary injunctive relief.

## BACKGROUND

### I.    Department of Defense Education Activity[1]

The Department of Defense Education Activity ("DoDEA") was created to educate the dependents of military-connected families. It "is responsible for planning, directing, coordinating, and managing prekindergarten through 12th grade educational programs on behalf of the Department of Defense." DoDEA has two statutory sources of authority: 10 U.S.C. § 2164, which grants the Secretary of Defense the discretion to establish elementary or secondary education in the contiguous United States (including territories, possessions, and commonwealths), should "appropriate education programs" not be available through local authorities, and 20 U.S.C. § 921, *et seq.*, which directs the Secretary of Defense "to provide a free public education through secondary school for dependents in overseas areas." 20 U.S.C. § 921(a). The Secretary of Defense "shall ensure" that individuals entitled to an education under § 921(a) "receive an education of high quality." *Id.* § 921(b)(1). To that end, the "Secretary of Defense shall issue regulations" to, among other goals, "prescribe the educational goals and objectives of the defense dependents' education system," "establish standards for the development of curricula for the system and for the selection of instructional materials," and "provide for such other matters as may be necessary to

---

[1] Unless otherwise noted, the information provided in this section comes from *About DoDEA*, available at https://www.dodea.edu/about/about-dodea.

ensure the efficient organization and operation" of DoDEA. *Id.* § 931(1), (2), (6).

The Secretary established DoDEA as a Department of Defense Field Activity pursuant to 10 U.S.C. § 191 to operate both the domestic school system and the overseas school system. DoDEA operates "under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, through the Assistant Secretary of Defense for Manpower and Reserve Affairs," Department of Defense Directive ("DoDD") 1342.20 § 1.3(a) (July 20, 2020).[2] It is led by a civilian director who is appointed by the Secretary of Defense and who reports directly to the Assistant Secretary of Defense for Manpower and Reserve Affairs. 20 U.S.C. § 922(a). Congress has authorized the Secretary of Defense to delegate DoDEA's operation to the Director of DoDEA. *Id.*

DoDEA operates 161 accredited schools in 11 foreign countries, 7 states, Guam, and Puerto Rico. Its schools are divided into three geographic areas: Europe, the Pacific, and the Americas. Its mission "is to provide an exemplary education by effectively and efficiently planning, directing, and overseeing the management, operation, and administration of DoDEA, which provides instruction from preschool through grade 12 to eligible dependents as prescribed by law and policy." DoDD 1342.20 § 1.2.

## II.     DoDEA Libraries' Curation and Curriculum Development

The content of DoDEA's curriculum is controlled by DoDEA Headquarters. DoDEA's Research, Accountability, and Evaluation Division reviews DoDEA's more than 50 curricular programs on a five-year review cycle. Research, Accountability, and Review, https://www.dodea.edu/education/research-accountability-and-evaluation. The Associate Director

---

[2] Available at
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/134220p.pdf?ver=2020-07-07-110814-893.

for Education has final authority to approve all new courses and to remove courses from DoDEA's curriculum. DoDEA Regulation 2011.02, Encl. 1.

In the DoDEA global school system, each school has the discretion to select the books for the information centers (*i.e.*, libraries) in its schools. DEX 1 at 7-8. Similarly, DoDEA teachers review and select classroom supplemental materials consistent with DoDEA policy. DEX 1 at 6 at 6. When curating the libraries' collections, information specialists (*i.e.,* librarians) or teachers at each school take a wide-range of factors into account. DEX 1 at 7. Among other considerations, DoDEA evaluates the book's educational significance, contribution of the subject matter to the curriculum and interests of students, reviews and recommendations, integrity, and presentation of cultural diversity, particularly as "it relates to the host nation, state, or local community." DEX 1 at 8.

## A. DoDEA Initiates a Book and Curricular Review Following the President's and Secretary of Defense's Directives

On January 20, 2025, the President issued Executive Order No. 14168, "Defending Women from Gender Ideology Extremism and Restoring Truth to the Federal Government." 90 Fed. Reg. 8615 (Jan. 30, 2025). The Executive Order prohibited the use of federal funds "to promote gender ideology." *Id.*

A week later, on January 27, 2025, the President issued Executive Order No. 14185, "Restoring America's Fighting Force." 90 Fed. Reg. 8763. In relevant part, it directed the Secretary of Defense to "carefully review the leadership, curriculum, and instructors of the United States Service Academies and other defense academic institutions . . . to ensure alignment with this order." *Id.*

Finally, on January 29, 2025, the President signed Executive Order No. 14190, "Ending Racial Indoctrination in K-12 Schooling." 90 Fed. Reg. 8853. The President directed that the

Secretary of Defense, along with other cabinet members, recommend a plan for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." *See id.* The Executive Order defined "discriminatory equity ideology" as, among other definitions, that "[m]embers of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex or national origin" or "[a]n individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin." *Id.*

Apart from these three Executive Orders, on January 31, 2025, Secretary of Defense Pete Hegseth issued guidance directing that "Department of Defense Components will not use official resources, to include man-hours, to host celebrations or events related to cultural awareness months[.]" Ex. 16, Pls.' Mot. for Prelim. Injun. (Dkt. 10-18). "Service members and civilians remain permitted to attend these events in an unofficial capacity outside of duty hours." *Id.*

Following these Executive Orders and guidance from Secretary Hegseth, DoDEA set to work implementing them. DoDEA canceled cultural awareness months. Ex. 12, Pls.' Mot. for Prelim. Injun. (Dkt. 10-15). DoDEA "conduct[ed] an operational compliance review to ensure alignment with the applicable Executive Orders." *Id.* "As part of this review, DoDEA-adopted instructional resources and Information Center (library) books potentially related to gender ideology or discriminatory equity ideology topics were examined." *Id.* At each school in the DoDEA global network, instructional systems specialists identified books in their library collections and in their classrooms that required further review. This identification process was carried out based on the terms used in the Executive Orders and based on educational professionals' determinations that certain materials may not comport with the purpose of the EOs

and Departmental objectives. DEX 4 ¶ 15-17. A similar process led by DoDEA's curriculum and instruction team ensued at DoDEA Headquarters, which centrally controls the curriculum. DEX 4 ¶ 14-17; *see also* DEX 3 ¶ 8.

>    **B.    DoDEA Engages in Focused Review By Subject Matter Experts to Assess the Educational and Pedagogical Interests of Books and Curriculum Identified for Review**

Once materials matching keywords and subjects had been identified, those materials were then reviewed by a subject matter expert at DoDEA Headquarters to ensure that "uses of key words implied a potential for noncompliance with the EOs before a resource was selected for review." DEX 4 ¶ 16. "Following the selection of resources for review, subject matter experts at DoDEA Headquarters in each content area gathered the resources proposed for review and provided an initial recommendation for each resource." DEX 4 ¶ 17. Division Chiefs and the Office of Civil Rights also reviewed. DEX 4 ¶ 17. After this subject matter expert review is complete, "it will be followed by an even more focused review that assesses the educational and pedagogical value of each resource prior to making a recommendation for final disposition of these materials." DEX 4 ¶ 19; *see also* DEX 3 ¶ 11. This focused review is ongoing. No final recommendations have been made to the DoDEA Director as to any material. DEX 3 ¶ 12.

When this focused review is complete, the subject matter experts will provide their recommendations, along with an analysis of the materials' suitability for schoolchildren, to the DoDEA Director. DEX 4 ¶ 20. In turn, the DoDEA Director will provide her assessment and recommendations to the Assistant Secretary of Defense for Manpower and Reserve Affairs, who will conduct the final review and approval of the disposition of those materials. DEX 2 ¶ 10.

## ARGUMENT

>    **I.    Plaintiffs Fail to Show that They Have Satisfied the Four Factors to Justify the Requested Mandatory Injunctive Relief.**

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). To obtain a preliminary injunction, Plaintiffs must make a "clear showing" of each of the four factors: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in their favor; and (4) that the public interest favors the requested equitable relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) ("The standard for granting either a TRO or a preliminary injunction is the same.").

"Ordinarily, preliminary injunctions are issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *See Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012). Plaintiffs here, however, do not seek a preliminary injunction solely for its generally intended purpose—to maintain the status quo. Instead, Plaintiffs seek the extraordinary and *disfavored* relief of a "mandatory" injunction asking this Court to preclude Defendants from being able develop their curricula and to curate their library collections and in a manner consistent with DoDEA's educational standards for its schoolchildren. *See Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

To obtain this extraordinary and disfavored relief, courts require "a heightened showing of the four factors." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 (10th Cir. 2009); *Vollette v. Watson*, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012) (explaining that the *Winter* standard "becomes even more exacting" for mandatory injunctive relief). As shown below, Plaintiffs cannot muster a regular showing—let alone a heightened showing—of the four factors required for a

preliminary injunction.

### A. Factor 1: Plaintiffs cannot show they are likely to succeed on the merits.

No injunction should issue to Plaintiffs because they cannot establish that they have a "clear and convincing probability of success" on the merits of their First Amendment claims in the school setting. *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000).

At the outset, "public education in our Nation is committed to the control of state and local authorities," and as such, federal courts should not "intervene in the resolution of conflicts which arise in the daily operation of school systems." *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). To that end, the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority" of the schools and their officials "to prescribe and control conduct in the schools." *Id.* (citation omitted). "This standard is consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Yet despite these clear principles, Plaintiffs nevertheless ask this Court to weigh the specific educational merits of DoDEA's ongoing review of its curriculum and library book collections in the five DoDEA schools that Plaintiffs attend before the final disposition of *any* library or curricular resource has been determined.

Consistent with the above principles, the Supreme Court's First Amendment jurisprudence reflects restraint—ensuring that the sovereign, as educator, retains its authority to teach its values to schoolchildren, while preserving the expressive rights of schoolchildren to import outside ideas and information into their schools. As such, "there are three main categories of speech that occur within the school setting." *Fleming v. Johnson Cnty. Sch. Distr. R-1*, 298 F.3d 918, 923 (10th Cir. 2002). Student speech that occurs on school grounds is governed by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). *Tinker* provides that schools must

tolerate pure student expression unless that expression will lead to "substantial disruption of or material interference with school activities." *Id.* "At the opposite end of the spectrum" from pure student speech is government speech. *Fleming*, 298 F.3d at 923. "When the government speaks, it may choose what to say and what not to say." *Id.* (quotation omitted); *see also Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 792 (4th Cir. 2004) (holding that "when the government speaks for itself and is not regulating the speech of others, it may discriminate based on viewpoint"). In between these two poles is "school sponsored speech," which is governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). School-sponsored speech is student speech that a school "affirmatively . . . promote[s]," as opposed to speech that it "tolerate[s]." *Hazelwood*, 484 U.S. at 270-71. "[E]xpressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute school-sponsored speech, over which the school may exercise editorial control, "so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273.

Despite Plaintiffs' demand, they have no recourse under the First Amendment's Free Speech Clause to challenge DoDEA schools' reviews of their curricula and their library collections. Both activities are government speech and therefore "do not . . . trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

### 1. Plaintiffs' First Amendment Claim Regarding Curriculum

"The first and most basic question" to answer is whether curriculum is government speech. *Shuertleff v. City of Boston*, 596, U.S. 243, 251 (2022). As demonstrated by Supreme Court and Fourth Circuit precedent, curriculum squarely represents an instance in which the government speaks for itself. The Free Speech Clause of the First Amendment thus does not apply to DoDEA's curriculum review and recission of cultural heritage months.

"The First Amendment's Free Speech Clause does not prevent the government from declining to express a view." *Shurtleff*, 596 U.S. at 251. "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Id.* And "when the government speaks for itself, it 'may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted.'" *Planned Parenthood of S.C., Inc.*, 361 F.3d at 792 (quoting *Rosenberger*, *v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).

Establishing curriculum is perhaps the quintessential example of government speech in the public school context. Curriculum "'concerns educators' authority over school sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.'" *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir. 1998) (en banc) (quoting *Hazelwood*, 484 U.S. at 271). These activities are part of school curriculum, "whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences[.]" *Id.* (quotation omitted). In this case, Plaintiffs agree that resources used in the classroom and cultural heritage month celebrations constitute curriculum. *See* Compl. (Dkt. 1) ¶ 57 ("The curricular changes extend to cultural celebrations as well."); *compare id.* ¶¶ 83-92 (Count I, relating solely to books), *with* ¶¶ 93-101 (Count II, relating to curriculum generally); *see also Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 825-26 (E.D. Va. 2006) (holding teacher's posting of materials on classroom wall was curricular speech not entitled to Free Speech clause protection).

In *Boring*, the Fourth Circuit, sitting en banc, held that a public school teacher did not have a First Amendment right to participate in the establishment of school curriculum through the

selection and production of a play. 136 F.3d 364, 366 (4th Cir. 1998) (en banc). "In the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities[.]" *Id. Boring* followed a line of decisions that explicitly held that teachers do not have a First Amendment right to choose their own curriculum in contravention of school policy. *See Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990) (citing cases); *see also Downs v. Los Angeles Unified Sch. Distr.*, 228 F.3d 1003, 1015-16 (9th Cir. 2000) (citing cases, including *Boring*). *Boring* and related cases stand for the proposition that school authorities (such as school boards)—not teachers, parents, or students—maintain control over the curriculum.

Here, it is entirely proper for DoDEA to review its curriculum after receiving instructions to do so from the Secretary of Defense, who has statutory authority over DoDEA, and via the executive power of the President of the United States. As Plaintiffs accurately allege, DoDEA "operates like any other public school district, except that it is run by the federal government, and it is not geographically contiguous." Compl. (Dkt. 1) ¶ 20. In *Boring* and related cases, courts have consistently held, in the face of constitutional challenges, that school boards are the appropriate arbiters of school curriculum. *See Evans-Marshall v. Bd. of Educ. of Tipp. City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) ("The Constitution does not prohibit a State from creating elected school boards and from placing responsibility for the curriculum of each school district in the hands of each board."). And, of course, school boards do not operate in a vacuum; they are subject to state laws and regulations promulgated by the political branches. *See, e.g.*, *Walls v. Sanders*, 733 F. Supp. 3d 721, 728 (E.D. Ark. 2024) (describing state law). DoDEA is led by a civilian Director, who reports up the chain of supervision to the Secretary of Defense. 20 U.S.C. § 922(a); DoDD 1342.20 § 1.3(a). The Secretary of Defense is charged with issuing regulations to

"prescribe the educational goals and objectives" of DoDEA, as well as regulations to "establish standards for the development of curricula for the system and for the selection of instructional materials." 20 U.S.C. § 931(1), (2). In turn, the Secretary of Defense is beholden to the Commander-in-Chief, the President of the United States. The President serves, in conjunction with DoDEA, in the role occupied by an elected local school board and thus can establish educational policy that DoDEA must then implement. *See Evans-Marshall*, 624 F.3d at 340 ("Only the school board has ultimate responsibility for what goes on in the classroom, legitimately giving it a say over what teachers may (or may not) teach in the classroom."). As Timothy D. Dill, the official performing the duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs attested, DoDEA, "as the organization responsible for K-12 education in the Department [of Defense], is best position to establish an identification and review process of information center and curricular materials." DEX 2 ¶ 7. As such, he is relying on DoDEA's "subject matter expertise in childhood education and school administration when developing and implementing policy directives impacting DoDEA schools." DEX 2 ¶ 7. That is apparent in how DoDEA's curricular review is structured. DoDEA librarians and educators have and will continue to review selected materials for their educational suitability in light of the directives in the Executive Orders. DEX 2 ¶ 9; DEX 4 ¶¶ 19-20. In other words, simply because the directive to review materials originated from outside of DoDEA does not mean that the review is divorced from pedagogical interests.

Plaintiffs rely on *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) for the proposition that the changes to the curriculum—which have not yet been finalized—violate the students' First Amendment right to receive information. Pl. Mem. (Dkt. 10) at 22-23. As an initial matter, such a right was only recognized by a plurality of three justices of the Supreme Court, and thus is not binding authority and did not create any

constitutional entitlement for students to receive information. *See infra,* Section I.2.d. But even on the assumption that *Pico* did establish such a right for students, the *Pico* plurality specifically carved out school authorities' ability to set curriculum—a fact that Plaintiffs avoid, *see* Pl. Mem. at 22-23. "The Court has long recognized that local school boards have broad discretion in the management of school affairs," and even the *Pico* plurality was in "full agreement" that school boards must be permitted to establish and apply their own curriculum and do so in such a way "as to transmit community values." *Id.* at 863, 864.

The cases cited by Plaintiffs do not change this interpretation of *Pico*. *See* Pl. Mem. at 22-23. Rather, the cases demonstrate that there is a circuit split over whether *Pico* creates a Free Speech right for schoolchildren to receive information, with the Fourth Circuit not yet wading into the fray. In *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015), the Ninth Circuit highlighted the circuit split on this issue, *id.* at 982-83, before ultimately determining two sections of a state law prohibiting courses or classes that "promote resentment toward a race of class or people" or "advocate ethnic solidarity instead of treatment of pupils as individuals" were not overbroad in violation of the First Amendment and advanced a legitimate pedagogical interest, *id.* at 973, 990. The Eighth Circuit decided *Pratt v. Independent School District No. 831, Forest Lake*, 670 F.2d 771 (8th Cir. 1982) six months before the Supreme Court decided *Pico*, *compare Pratt* (decided January 13, 1982), *with Pico* (decided June 25, 1982), and thus did not address the *Pico* plurality opinion.[3] And in *Virgil v. School Board of Columbia County*, 862 F.2d 1517 (11th Circ. 1989), the

---

[3] Indeed, at least one district court has cast doubt over *Pratt*'s continuing validity in light of the modern government speech doctrine. *See Walls v. Sanders*, 733 F. Supp. 3d 721, 745 (E.D. Ark. 2024) ("Make no mistake: *Pratt* is something akin to zombie precedent."). In *Walls*, the defendants argued that curriculum was government speech, and as such the Free Speech clause did not apply. *Id.* at 744-45. "The Court is convinced that, were it writing on a clean slate, the Defendants' legal position would carry the day." *Id.* at 745. Ultimately, "bound to apply the basic holding of *Pratt*," the district court issued a narrowly-tailored preliminary injunction that did not prohibit teachers
*Footnote continued*

Eleventh Circuit recognized that "[i]n matters pertaining to the curriculum, educators have been accorded greater control over expression than they may enjoy in other spheres of activity," while also recognizing that courts "have failed to achieve a consensus on the degree of discretion to be accorded school boards to restrict access to curricular materials." *Id.* at 1520, 1521 (citing cases). Ultimately, the Eleventh Circuit recognized the right of schoolchildren to receive information under *Pico*, applied *Hazelwood*'s "legitimate pedagogical concerns" test, and upheld a school board's decision to remove a previously-approved textbook. The school board's actions were "reasonably related to its legitimate concerns regarding the appropriateness (for this high school audience) of the sexuality and vulgarity in these works." *Id.* at 1523-25. In short, none of these out of circuit cases are binding precedent on this Court. And there is no Fourth Circuit case holding that students have a constitutional entitlement to receive information under the Free Speech clause of the First Amendment.

In each of the cases cited by Plaintiffs, the court erroneously treated the *Pico* plurality as a binding majority opinion. In other words, citing *Pico*, those courts recognized a First Amendment right of schoolchildren to receive information pursuant to the Free Speech Clause. Those courts then applied *Hazelwood*'s "legitimate pedagogical concerns" test to determine whether the contested school action was constitutional. Even assuming that the cases cited by Plaintiffs correctly recognized such a constitutional right, DoDEA's curriculum review still satisfies *Hazelwood*'s "legitimate pedagogical concerns" test. *See infra,* Section I.2.c.

---

"from teaching about, using, or referring to Critical Race Theory or any other theory, ideology, or idea so long as the teachers do not compel their students to accept as valid such theory, ideology, or idea." *Id.* at 752.

### 2. Plaintiffs' First Amendment Claim Regarding Library Reviews

**a.** *Standing.* As to their book claims, Plaintiffs have failed to establish Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that standing requires: (1) injury in fact that is (2) fairly traceable to the challenged action and is (3) likely to be redressed by a favorable decision).[4] More specifically, Plaintiffs failed to put forward any evidence to show that they sought the information temporarily withdrawn from DoDEA's bookshelves pending further review. A failure to do so means that Plaintiffs have failed to establish a particularized injury resulting from the DoDEA schools' allegedly unconstitutional decisionmaking process. *See Cousins v. Sch. Bd. of Orange Cnty.*, 687 F. Supp. 3d 1251, 1277 (M.D. Fla. Aug. 16, 2023) (finding that plaintiffs lacked standing in First Amendment right to receive information claim involving removal of books because the complaint did "not allege that any of the Student Plaintiffs have sought out the materials"); *see also PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1329-30 (N.D. Fla. 2024) (holding that student plaintiffs established standing in First Amendment information claim regarding removal of books because allegations showed "that the children intended to check out specific removed and restricted books during the upcoming (now, ongoing) school year, but they are unable to do so" (citing *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1194-95 (11th Cir. 2009))).

A review of the evidence Plaintiffs submitted to support their motion for a preliminary injunction shows that only one of the named Plaintiffs (L.K.3) has come close to meeting the required showing to establish standing in connection with the book claim. *See* Pl. Mem. at 9. Indeed, apart from L.K.3, none of the Plaintiffs have indicated that they visited their school

---

[4] Of course, the "standing requirement applies to each claim that a plaintiff seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014).

libraries or otherwise sought to read the books that have been allegedly removed. *Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when some day will be—do not support a finding of the 'actual or imminent' injury that our cases require" (citations omitted)); *see also Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013) (plaintiff bears the burden of establishing each element of constitutional standing, supported by specific facts). In effect then, all these Plaintiffs (save L.K.3), have merely asserted a generalized grievance in response to the new educational suitability determinations reflected in the challenged Executive Orders and memoranda. But that is not sufficient to meet the particular and individualized injury requirement to establish Article III standing. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974) ("[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share."); *Froelich v. FEC*, 855 F. Supp. 868, 870 (E.D. Va. 1994) ("Courts refuse to adjudicate abstract questions of wide public significance." (cleaned up)).

But even L.K.3 lacks standing due to the traceability requirement. There is no evidence to confirm that DoDEA's ongoing book reviews prevented L.K.3 from obtaining the four books she wanted from her school's library. Nor could Plaintiff L.K.3 ever make that showing. Each of the four books L.K.3 sought to check out are not available because they have been checked out by another patron and are well overdue. DEX 4 ¶ 28. The Executive Orders and directives had nothing to do with the unavailability of those four titles. *Id.* Thus, there is no "genuine nexus" between her asserted injury and DoDEA's alleged unconstitutional conduct. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). As such, L.K.3 has not established sufficient Article III standing to pursue her First Amendment claim against DoDEA in connection

with its book reviews.

As no Plaintiff can establish standing in connection with their book claim, they necessarily cannot succeed on the merits of such claim.[5]

    **b.**    ***Government Speech.*** There is no doubt that curating a library is an expressive act performed by the government. Curating a library collection for schoolchildren accounts for, among other things, selecting age-appropriate materials that are suitable for schoolchildren's educational needs. DEX 1 at 7. At DoDEA specifically, "the library in each school is individual to the school" and all libraries "endeavor to provide a well-balanced collection that supports the school's curriculum, reflects the interests of the local school community, and supports special needs and programs." DEX 4 ¶ 8. As the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) illustrates, curation qualifies as an expressive act. *Id.* ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). Indeed, "[d]eciding on the third-party speech that will be included in or excluded from a compilation— and then organizing and presenting the included items—is expressive activity of its own." *Id.* at 731. This is what DoDEA librarians and educators do when curating their library collections, evaluating a host of criteria to determine whether a book is educationally appropriate. DEX 4 ¶ 8 ("DoDEA seeks to align the learning objections and the collection by selecting resources that are appropriate to the maturity level of the users," among other considerations); *PETA, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("[I]n the case of a public library . . . there is still government

---

[5] Separately, there is no evidence to suggest that any Plaintiff lacks the means to obtain or otherwise read the books their school libraries do not have, which further underscores that a preliminary injunction is not appropriate. *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022) ("The removal of the books at issue from the District's schools does not stop any student from reading or discussing the book, which surely would raise a more serious issue.").

speech . . . . [T]he government speaks through its selection of which books to publish on the shelves and which books to exclude."); *see also Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, government speech can include not only the words of government officials but also compilation of the speech of third parties by government entities such as libraries, broadcasters, newspapers, museums, schools, and the like." (cleaned up)).

The inclusion, or exclusion, of certain materials reflects DoDEA's expressive act of speech that it wishes to convey to its audience—here, schoolchildren. DoDEA's libraries are thus like the social media platforms in *Moody*, for DoDEA's libraries "combin[e] 'multifarious voices' to create a distinctive expressive offering." 603 U.S. at 738. *Cf. United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204 (2003) (Rehnquist, C.J., plurality op.) ("[L]ibraries collect only those materials deemed to have the requisite and appropriate quality." (quotation omitted)); *Chiras v. Miller*, 432 F.3d 606, 613 (5th Circ. 2005) (holding that plaintiff failed to state First Amendment claim regarding Texas's selection of a textbook because "when a governmental entity must exercise editorial judgment in choosing among private speakers to facilitate the government's own message, the government's decision is not subject to forum analysis or the viewpoint neutrality requirements"); *see also Ill. Dunesland Pres. Soc'y v. Ill. Dept' of Nat. Res.*, 584 F.3d 719, 721-22, 725 (7th Cir. 2009) (holding that government's placement of brochures published by third parties on tourism display rack constituted government speech).

Accordingly, DoDEA's expressive act of curating its libraries is a form of government speech exempted from significant scrutiny under the Free Speech Clause of the First Amendment. As such, DoDEA "has the right to speak for itself" and may thus curate its library collection in the

manner it sees best for educating its schoolchildren. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (quotation omitted).

Under Plaintiffs' theory, every individual book acquisition and removal are potentially subject to judicial scrutiny if a library patron believes there has been an act of viewpoint discrimination. If this were so, understandably, such challenges would grind DoDEA's educational mission to halt—slowing the process by which DoDEA schools curate their collections at best, or at worst, incentivizing DoDEA to cease providing libraries to its schoolchildren altogether. *See Ill. Dunesland Pres. Soc'y*, 584 F.3d at 721-22, 725. The First Amendment's Free Speech Clause does not work in this way. "Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government, that through words and deeds, will reflect its electoral mandate." *Walker*, 576 U.S. at 207.

As courts have repeatedly recognized, DoDEA (like any other State or local educational institution) is fully equipped and entitled, as a matter of government speech, to determine the books for its library collections. Though Plaintiffs may disagree with the Government's current speech in this context, it is "the democratic electoral process" that nevertheless "first and foremost provides a check on government speech." *Id.* Otherwise, "it is not easy to imagine how government could function if it lacked this freedom." *Summum*, 555 U.S. at 468. What's more, Plaintiffs have recourse to raise their concerns with DoDEA directly. *See* DEX 1 at 9-10 (establishing set of procedures for challenging inclusion of book in DoDEA collection).

In sum, Plaintiffs' efforts to disrupt the electoral mandate and DoDEA's choices for its library collections in these five schools must fail.

      **c.**      **Hazelwood *and DoDEA's pedagogical interest***. Assuming the Court finds that DoDEA schools' curation of their libraries is not government speech, the challenged book reviews

are nevertheless permissible under *Hazelwood*. The Supreme Court has acknowledged that "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment." *Hazelwood*, 484 U.S. at 266 (cleaned up). Indeed, "children, whose minds and values are still developing, have traditionally been afforded less First Amendment protection, particularly within the context of public high schools." *Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Libr.*, 2 F. Supp. 2d 783, 795 (E.D. Va. 1998). Accordingly, "educators do not offend the First Amendment by exercising editorial control over the style and content of speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273.

As *Hazelwood*, makes plain, its holding reaches those activities that "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* at 271. In effect, it is anything in which "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.*; *see also Newton v. Slye*, 116 F. Supp. 2d 677, 684 (W.D. Va. 2000) ("The Fourth Circuit emphasized the broad definitional contours of 'curriculum' outlined by the Supreme Court in *Hazelwood*[.]" (citing *Boring*, 136 F.3d at 368)). Indeed, if the school band, drama club, and choir are constitutional adjuncts of a school's curriculum, *Board of Education of Westside Community Schools v. Mergens By & Through Mergens*, 496 U.S. 226, 246 (1990), then surely school libraries are within the curricular activities or resources "that affect learning." *Fleming*, 298 F.3d at 925; *see also GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024) ("The purpose of public school libraries is to advance the school

curriculum—that is, to facilitate the pedagogical missions of the school, which may involve some limitation of expression[,]" and as such the sovereign "is not required to tolerate speech that undermines or is inconsistent with its central mission of educating" children); *Boring*, 136 F.3d at 368 (holding play selection bore imprimatur of school because "it was supervised by a faculty member"; "was performed in interscholastic drama competition"; and "the theater program at the high school was obviously intended to impart particular skills"). That is especially so with respect to the five libraries here because their collections are designed to "meet the [schoolchildren's] educational needs" and "enrich and support the curriculum." DEX 4 ¶ 6. Thus, under *Hazelwood*, Plaintiffs must show that DoDEA's book reviews are wholly unrelated to legitimate pedagogical concerns. *Boring*, 136 F.3d at 369-70.

Plaintiffs cannot meet their burden under *Hazelwood* as the evidence firmly establishes that DoDEA schools' ongoing book reviews stem from a reasonably related pedagogical interest. Binding precedent establishes that a pedagogical interest is one that is broadly "relating to teaching or pedagogy." *Boring*, 136 F.3d at 370; *Fleming*, 298 F.3d at 295 (similarly confirming breadth of pedagogical interest and concluding that this standard "give[s] substantial deference to educators' stated pedagogical concerns"); *supra* at 10-12. As *Hazelwood* illustrates, this standard empowers the school to refuse speech that "might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct inconsistent with the 'shared values of a civilized order' or to associate the school with any position other than neutrality on matters of political controversy." 484 U.S. at 272 (quotation omitted); *id.* at 274-75 (holding that the principal's choice to remove article on students' experiences on pregnancy was not "unreasonable" given his conclusion that "such frank talk was inappropriate in a school-sponsored publication distributed to 14-year-old freshmen and presumably taken home to be read by students' even younger brothers and sisters").

DoDEA's ongoing review efforts are borne of its compliance with the President's Executive Orders and Departmental educational objectives, which in turn, were borne out of a desire to implement its pedagogical standards and priorities. *See* DEX 4 ¶ 14; DEX 2 ¶¶ 5, 8-9. This understandably meant the removal of books "on gender ideology and discriminatory equity ideology," 90 Fed. Reg. at 8853, and those books that engaged in "invidious race and sex discrimination," *id.* at 8763—both concepts that have been a part of national discourse for some time. And as the reviews continue, the DoDEA schools will continue to employ a method of analysis that assesses: (1) educational suitability and value; (2) the factual nature of the materials; (3) and whether material contains discriminatory or divisive content. DEX 4 ¶ 9. All to say, the evidence establishes that significant pedagogical concerns drive the review process of the five schools' book collections.

If a school principal can unilaterally pull an article in the school newspaper on teen pregnancy and the impact of divorce on students, surely the five DoDEA schools can identify books in its collection that need to be further reviewed to ensure they are consistent with the pedagogical concerns identified in the Executive Orders and by Department leadership—even if Plaintiffs, as did their counterparts in *Hazelwood*, personally disagree with those pedagogical assessments. In the end, "*Hazelwood* entrusts to educators these decisions," *Fleming*, 298 F.3d at 928, and consistent with that entrustment, DoDEA's reviews fully comport with *Hazelwood*.

      **d.**      ***Precedential Weight of* Pico *Plurality*.** Plaintiffs are incorrect that the Supreme Court's decision in *Board of Education Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), governs this case. Pl. Mem. at 15-20. Indeed, Plaintiffs erroneously assert that "a majority of Justices on the *Pico* Court agreed that removing books from school libraries implicates students' First Amendment rights." Pl. Mem. at 18. At best, *Pico*'s precedential holding

is as follows: given the factual disputes in the record, summary judgment was not properly granted to the school district. *See Pico*, 457 U.S. at 883-84 (White, J., concurring in the judgment).

Under *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977) (quotation omitted). Applying this analysis to *Pico*, Justice White's opinion concurring in the judgment dictates the precedential holding of the Supreme Court. Justice White observed that the court of appeals held that "there was a material issue of fact that precluded summary judgment sought by petitioners" and concluded that he was "not inclined to disagree with the Court of Appeals on such a fact-bound issue" and concurred in the judgment. *Pico*, 457 U.S. at 883. In voting to affirm the reversal of summary judgment, Justice White reasoned that it would result "in a trial and the making of a full record and findings on the critical issues." *Id.*[6] Accordingly, Justice White's decision is best read to mean that the precedential holding of *Pico* is that disputes of fact in that case's record prevented entry of summary judgment.

Many courts agree that *Pico* supplies no precedential value. *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022) ("[I]t is not clear, what, if anything, from *Pico* is binding on the case here."); *Griswold v. Driscoll*, 616 F.3d 53, 57 (1st Cir.

---

[6] This does not mean that Justice White viewed those disputes of fact as "material" to the legal issues presented in *Pico*. 457 U.S. at 883 (White, J., concurring the judgment). Citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948) and *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967), Justice White invoked the principal of "good judicial administration" as the basis for vacating summary judgment. *See id.* at 884. In other words, Justice White required a trial to develop the factual record even though summary judgment might have been properly granted to the party under the ordinary application of Rule 56. *See id.* at 883-84. Justice White's opinion thus does not establish or otherwise signal that the identified fact disputes were material to the action. Instead, Justice White sought a completed record so that the Supreme Court would "not decide constitutional questions until it is necessary to do so." *Id.*

2010) (Souter, J.) (observing that "Justice White concurred in the judgment without announcing any position on the substantive First Amendment claim"); *Walls v. Sanders*, 760 F. Supp. 3d 766, 779 n.49 (E.D. Ark. 2024) ("Moreover, Justice White's decisive concurrence in the judgment (which controls under *Marks v. United States*, 430 U.S. 188, 193 (1977)), was anodyne enough that nearly nothing of substance was actually done in *Pico*."); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 (5th Cir. 1982) (en banc) (plurality op.) ("[W]e conclude that *Pico* is of no precedential value as to the application of the First Amendment to these issues."); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009) ("With five different opinions and no part of any of them gathering five votes from among the nine justices— only one of whom is still on the Court—*Pico* is a non-decision as far as precedent is concerned. It establishes no standard."). Thus, the plurality opinion does not control this case.

e.     ***Pico Plurality and DoDEA's Preliminary Educational Suitability Determination.***

Even if Plaintiffs were correct that *Pico*'s plurality opinion applies, DoDEA's reviews of the five libraries' resources withstand scrutiny under that standard. Per the *Pico* plurality, school boards cannot constitutionally exercise their discretion to determine the content of school libraries "in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870 (Brennan, J., plurality op.). Not only must the school board's motive be "narrowly partisan or political," but this "unconstitutional" intent must be "the decisive factor in the [the board's] decision." *Id.* at 871. Stated differently, the constitutionally impermissible motive was the but for cause of the decision. *See id.* at 871 n.22. Examples of impermissible motives the plurality identified were: "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of *all* books written by or in favor of Republicans;" or "if an all-white school board, motivated by racial animus, decided to remove *all* books authored by blacks or advocating racial equality and integration." *Id.* at 870-71 (emphases

added). By contrast, the *Pico* plurality indicated that it would be "perfectly permissible" for a school board to remove books based on the "educational suitability" of the book. *Id.* at 871.

Plaintiffs have not identified that any decision—notwithstanding that no final determination has been made—that was "narrowly partisan" or politically motivated. In Plaintiffs' view, without much by way of supporting evidence, the Executive Orders are based on what "the current presidential administration deems to be politically incorrect." Pl. Mem. at 20-21. But such a conclusory assertion does not definitively establish that "narrowly partisan" motivations were the "decisive factor" as to any one book. *See Pico*, 457 U.S. at 871 (plurality op.). As noted above, only the pedagogical concern of ensuring that students receive instruction on the biological binary of sex and promoting inclusivity values through merit (and thereby eliminating any remaining vestiges of discrimination) motivated the change in course and drive the continued reviews until final decisions are made. *See, e.g.*, DEX 4 ¶ 9.

It is a significant logical leap to conclude that teaching students about the binary sexes is a "narrowly partisan" act—as the *Pico* plurality defined the term—given the state of debate and discourse of the last several years.[7] *See Pico*, 457 U.S. at 869 (acknowledging that it is appropriate to consider "educational suitability, good taste, relevance, and appropriateness to age and grade level"). The same is true with respect to teaching and building an inclusive environment based on

---

[7] Were Plaintiffs' approach adopted, any issue that has a connection to the subject matter of a child's education discussed in an election or more generally in political discourse—be it local, state, or national level—becomes a partisan subject to *Pico*-plurality scrutiny. After all, what is "politically correct" for one person, may well be "politically incorrect" for another. This cannot be the proper reading of the plurality for it would starve voters of their ability to empower their educational leaders to make the voters' preferred educational choices. *Pico*, 457 U.S. at 891 ("Through participation in the election of school board members, the parents influence, if not control, the direction of their children's education.") (Berger, C.J., dissenting). Consistent with this practical reality, the partisanship analysis must be "narrow" as the plurality indicated and mirror the two examples the plurality identified such that the challenged decision was utterly untethered from an educational concern. *See Pico*, 457 U.S. at 871-72 (plurality op.).

values and merit rather than immutable traits. The former is grounded in established scientific understanding and the latter comports with the Supreme Court's understanding of equal treatment in federally-funded school systems. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 231 (2023) ("In other words, the student must be treated based on his or her experiences as an individual—not on the basis of race."); *see also* 90 Fed. Reg. at 8615 (indicating that there will be a return to "ordinary and longstanding use and understanding of biological and scientific terms" as they had been replaced by "an internal, fluid, and subjective sense of self unmoored from biological facts").

Plaintiffs' claims of partisanship are further dispelled given the systematic reviews that DoDEA is employing for the collections in the five schools. With the identification for review complete, subject matter experts at DoDEA in each content area made a recommendation for each identified material that was further vetted. DEX 4 ¶ 17. As that process has concluded, each of the identified materials is then subjected to a "even more focused review that assesses the educational and pedagogical value of each resource prior to making a recommendation for final disposition of these materials." DEX 4 ¶ 19. Once the entirety of these reviews is completed, final recommendations will be presented to the Director of DoDEA, who will in turn provide her final assessments and recommendations to the deciding official, Assistant Secretary of Defense for Manpower and Reserve Affairs. DEX 4 ¶ 20; DEX 3 ¶ 11; DEX 2 ¶ 10. In sum, DoDEA supplied at *least* three layers of secondary review for each of the materials to assess their educational and pedagogical value before a determination is made. This three-layer review makes this case quite different from *Pico* and thereby underscores the lack of narrowly partisan motivations in this case. *Pico*, 457 U.S. at 874 ("This would be a very different case if the record demonstrated that [the

school board] had employed established, regular, and facially unbiased procedures for the review of controversial materials.").

B.   **Factor 2: Plaintiffs cannot show they will be irreparably harmed absent an injunction.**

As iterated above, Plaintiffs have not established the likelihood of success on their claims. Accordingly, Plaintiffs have failed to establish any irreparable injury—especially when, as noted, Plaintiffs have alternative access to the books and curricular information. *See* DEX 4 ¶ 21 (explaining that nothing prevents DoDEA schoolchildren from reading these materials). But Plaintiffs' request for this extraordinary relief fails for yet another reason separate from the merits: Plaintiffs have not diligently pursued the requested relief and have slept on their rights.

Binding precedent confirms that this Court must consider whether Plaintiffs engage in "reasonable diligence" in seeking a preliminary injunction. *Benisek v. Lamone*, 585 U.S. 155, 159 (2018); *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020) ("No matter if this delay would have been dispositive, the district court erred by ignoring it entirely."). The Court cannot make such a finding here given that Plaintiffs seek a mandatory preliminary injunction well after the five DoDEA schools began their review of their curricula and library resources. Indeed, the identified Executive Orders were all issued by January 29, 2025, Dkts. 10-7, 10-8, 10-9; the DoD guidance ending cultural awareness months issued on January 31, 2025, Dkt. 10-18; DoDEA completed its preliminary curriculum review in February, Dkt. 10-21; and DoDEA completed its preliminary identification of resources that require further review on March 7, 2025 (a process that started in February), Dkt. 10-17. Yet, Plaintiffs did not initiate this civil action until April 15, 2024, Dkt. 1, and did not perfect service on the government almost two weeks later on April 28, 2025, Dkt. 8. Then, only a week after serving the government (*i.e.*, three weeks after filing suit), Plaintiffs moved this Court for the extraordinary relief of a mandatory preliminary

injection on May 7, 2025. Dkts. 9-10. That does not reflect diligence on Plaintiffs' part. *See Perry v. Judd*, 471 F. App'x 219, 220 (4th Cir. 2012). Plaintiffs' lack of diligence is compounded by the fact that the school year ends for all five schools that Plaintiffs attend by June 10 (if not sooner). DoDEA Americas: SY 2024-2025 Regional Calendar[8]; DoDEA Europe, SY 2024-2025 Regional Calendar[9]; DoDEA Pacific: SY 2024-2025 Regional Calendar.[10] As such, these students—assuming that they remain in DoDEA school systems for the next school year—will not feel the effects of any injunction until the following school year. This Court should therefore decline to enter any injunction given Plaintiffs' failure to diligently pursue relief.

C.    **Factors 3 & 4: The balance of equities and the public interest favor Defendants.**

As Plaintiffs correctly state, the balance of equities and public interest factors merge when the government opposes injunctive relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see* Pl. Mem. at 30. While "upholding constitutional rights surely serves the public interest," *Giovani Carandola Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002), that proposition is of limited relevance here, where Plaintiffs are unlikely to establish a constitutional violation. *See* Section I.A, *supra*.

Furthermore, Plaintiffs stand neither to lose or gain much of anything by the imposition or withholding of a preliminary injunction at this point in time, as the school year is rapidly drawing to a close. Indeed, the last day of school at Barsanti Elementary School, where Plaintiffs O.H., S.H., and H.H. were enrolled, was May 22, 2025. DoDEA Americas: SY 2024-2025 Regional Calendar. The remaining schools that Plaintiffs attended for the 2024-2025 school year have their

---

[8] Available at https://www.dodea.edu/regional-calendars/calendar/dodea-americas-sy-2024-2025-regional-calendar.

[9] Available at https://www.dodea.edu/regional-calendars/calendar/dodea-europe-sy-2024-2025-regional-calendar

[10] Available at https://www.dodea.edu/regional-calendars/calendar/dodea-pacific-sy-2024-2025-regional-calendar.

last day on June 10, 2025. DoDEA Europe, SY 2024-2025 Regional Calendar; DoDEA Pacific: SY 2024-2025 Regional Calendar. As stated *supra*, any injunctive relief would therefore make little difference to Plaintiffs, who have not alleged that they would otherwise use DoDEA resources over the summer break. Accordingly, these two factors weigh in favor of Defendants.

## II. Any Preliminary Injunction This Court Issues Should Address Bond and Be Limited to the Five DoDEA Schools the Named Plaintiffs Attend

Should the Court find that Plaintiffs have met their heightened burden under the *Winter* factors to receive the requested mandatory preliminary injunction, there are two additional considerations for the Court to address.

First, the Court must assess whether bond is appropriate for this injunction. Per Federal Rule of Civil Procedure 65(c), a "party seeking a preliminary injunction prior to the final adjudication of liability must post a bond in order to ensure a source of recovery in the event that the injunction is erroneous." *S&D Land Clearing v. D'Elegance Mgmt. Ltd.*, 34 F. App'x 885, 895 (4th Cir. 2022). The bond requirement must be expressly addressed by the Court and it cannot "disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (reversing district court's granting of injunction for failing to order bond in trade secret misappropriation action). The amount of bond "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party from harm it suffers as a result of an improvidently issued injunction or restraining order." *Id.* at 421 n.3. In keeping with this precedent, a bond order should reflect the disruption caused to DoDEA to recalibrate its school curricula to comply with any order that grants Plaintiffs' request for injunctive relief. DoDEA has made efforts to change its curricular course through the second half of the academic year and make changes for the next academic year. Any order would undo those efforts and require new planning for the 2025-2026 school year.

Second, this Court's relief should be limited to the five DoDEA schools at issue in this case. Though Plaintiffs seek an order "prohibiting Defendants from enforcing Executive Order Nos. 14168, 14185, and 14190 and related memoranda, directives, and guidance in DoDEA schools," Pl. Mem. at 25, this case does not involve *all* DoDEA schools. Indeed, this is not a putative class action suit and Plaintiffs are not making a facial challenge to any of the identified Executive Orders, memoranda, directives, and guidance. *See generally* Dkt. 1. As such, the reach of Defendants' challenged conduct in this case is limited to five specific schools in the DoDEA school system. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (confirming long-followed rule that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *accord Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 160-61 (2010); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: May 23, 2025

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney

By: /s/_____
MEGHAN E. LOFTUS
MATTHEW J. MEZGER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3757/3741
Fax: (703) 299-3983
Email: meghan.loftus@usdoj.gov
        matthew.mezger@usdoj.gov

*Counsel for Defendants*