# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

E.K. and S.K., minors, by and through their )
parent and next friend, LINDSEY KEELEY, *et* )
*al.*, )
           )
           Plaintiffs, )     Case No. 1:25-cv-637 (PTG/IDD)
           )
     v. )
           )
DEPARTMENT OF DEFENSE EDUCATION )
ACTIVITY, *et al.*, )
           )
           Defendants. )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

ERIK S. SIEBERT
United States Attorney

MEGHAN E. LOFTUS
MATTHEW J. MEZGER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3757/3741
Fax:     (703) 299-3983
Email:  meghan.loftus@usdoj.gov
           matthew.mezger@usdoj.gov

## INTRODUCTION

Plaintiffs, twelve students in five Department of Defense Education Activity ("DoDEA") schools, bring two claims under the First Amendment's Free Speech Clause challenging the five schools' decision to remove certain modules from their curricula and books from their library shelves. Their claims stem from certain Executive Orders and directives which require DoDEA to teach the biological sex binary and promote inclusivity through individual merit. In Plaintiffs' view, DoDEA's actions deprived them of their First Amendment "right to receive information." Because Plaintiffs have failed to establish standing and have otherwise failed to state a plausible claim for which relief can be granted, the Complaint must be dismissed.

This Court does not have subject matter jurisdiction over Plaintiffs' claims because they have failed to establish standing. Plaintiffs lack standing to challenge the changes to the curriculum because their speech has not been curtailed and there is no First Amendment right of students to receive information. Plaintiffs' standing in connection with their book claim fares no better. None of the twelve Plaintiffs have been unable to check out a book because of the book removals—let alone have expressed an interest in reading books that DoDEA schools removed from the shelves. In effect, Plaintiffs have raised a generalized grievance about the pedagogical shift that resulted from the 2024 Presidential election. That, however, does not confer Article III standing over their two claims.

Even assuming jurisdiction, Plaintiffs have not stated a plausible claim for relief. *First*, Plaintiffs' challenge to the curriculum fails to state a cognizable legal claim because the government speaks when it sets curriculum. Government speech is immune from scrutiny under the First Amendment's Free Speech Clause because when the government engages in speech, it is constitutionally permissible for it to select the message it wishes to convey. In the alternative, the curricular changes are borne of "legitimate pedagogical concerns" and thus are permissible under

Supreme Court jurisprudence. *Second*, Plaintiffs' claim in connection with DoDEA book reviews must also fail. The Supreme Court has never recognized the right to receive information in the way that Plaintiffs ask this Court to sanction in this case: that the government must affirmatively provide a specific message to its listeners. Rather, the Supreme Court has recognized that the right to receive information means that the government cannot interfere with one private individual expressing ideas to another. Plaintiffs' claim does not fit in this framework. Even if did, Plaintiffs' book review claim also challenges government speech immune from scrutiny under the Free Speech Clause of the First Amendment. The five DoDEA schools at issue here have engaged in an expressive act, in furtherance of their curricular goals, to curate a library collection that is factually accurate, non-discriminatory, and aligns with the values it wishes to impart on DoDEA schoolchildren. While schoolchildren have a right to critique the government's speech, they do not have a right to choose the government's message. And, even accepting Plaintiffs' proposed framework, no plausible claim has been stated. There are no non-conclusory allegations to establish the plausibility that the decision to review these books to determine their final disposition was based on a narrowly partisan motivation.

Accordingly, for these reasons and those below, this Court should grant Defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(1) or 12(b)(6).

## BACKGROUND

### I.    Factual Background[1]

**DoDEA**. The Department of Defense Education Activity ("DoDEA") was created to educate the dependents of military-connected families. It "is responsible for planning, directing,

---

[1] For purposes of this memorandum, Defendants accept as true Plaintiffs' well-pleaded factual allegations. However, conclusory allegations, unwarranted deductions of fact, unreasonable inferences, and legal conclusions are not entitled to this presumption. *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

coordinating, and managing prekindergarten through 12th grade educational programs on behalf of the Department of Defense." *DoDEA's 75 Year History*, https://www.dodea.edu/about/about-dodea/dodeas-75-year-history (last accessed June 27, 2025). DoDEA has two statutory sources of authority: 10 U.S.C. § 2164, which grants the Secretary of Defense the discretion to establish elementary or secondary education in the contiguous United States (including territories, possessions, and commonwealths), should "appropriate education programs" not be available through local authorities, and 20 U.S.C. § 921, *et seq.*, which directs the Secretary of Defense "to provide a free public education through secondary school for dependents in overseas areas." 20 U.S.C. § 921(a). The Secretary of Defense "shall ensure" that individuals entitled to an education under § 921(a) "receive an education of high quality." *Id.* § 921(b)(1).

The Secretary established DoDEA as a Department of Defense Field Activity pursuant to 10 U.S.C. § 191 to operate both the domestic school system and the overseas school system. DoDEA operates "under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, through the Assistant Secretary of Defense for Manpower and Reserve Affairs," Department of Defense Directive ("DoDD") 1342.20 § 1.3(a) (July 20, 2020).[2] It is led by a civilian director who is appointed by the Secretary of Defense and who reports directly to the Assistant Secretary of Defense for Manpower and Reserve Affairs. 20 U.S.C. § 922(a). Congress has authorized the Secretary of Defense to delegate DoDEA's operation to the Director of DoDEA. *Id.*

**Plaintiffs**. Plaintiffs are twelve students from six families attending five DoDEA schools in America and abroad. Compl. ¶ 4. They attend one of the following five schools: Crossroads

---

[2] Available at https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/134220p.pdf?ver=2020-07-07-110814-893.

Elementary School in Quantico, Virginia, *id.* ¶ 10 (plaintiffs E.K. and S.K.); Barsanti Elementary School in Fort Campbell, Kentucky, *id.* ¶¶ 11-12 (plaintiffs O.H., S.H., H.H., and E.G.); Aviano Middle-High School in Aviano, Italy, *id.* ¶¶ 13, 15 (plaintiffs C.Y., E.Y., and M.T.); Sollars Elementary School in Misawa, Japan, *id.* ¶ 14 (plaintiffs L.K.1 and L.K.2); and Edgren Middle High School in Misawa, Japan, *id.* (plaintiff L.K.3). They maintain that DoDEA has violated their First Amendment right to receive information in two respects: (1) the removal of books from their schools' libraries, *id.* ¶¶ 83-92; and (2) the removal of certain curriculum modules in their five schools, *id.* ¶¶ 93-101.

**Executive Orders and Other Directives**. On January 20, 2025, the President issued Executive Order No. 14168, "Defending Women from Gender Ideology Extremism and Restoring Truth to the Federal Government." 90 Fed. Reg. 8615 (Jan. 30, 2025). The Executive Order ("EO") prohibited the use of federal funds "to promote gender ideology." *Id.*; *see also* Compl. ¶ 25. A week later, on January 27, 2025, the President issued EO No. 14185, "Restoring America's Fighting Force." 90 Fed. Reg. 8763. In relevant part, it directed the Secretary of Defense to "carefully review the leadership, curriculum, and instructors of the United States Service Academies and other defense academic institutions . . . to ensure alignment with this order." *Id*; *see also* Compl. ¶ 26. Finally, on January 29, 2025, the President signed EO No. 14190, "Ending Radical Indoctrination in K-12 Schooling." 90 Fed. Reg. 8853. The President directed that the Secretary of Defense, along with other cabinet members, recommend a plan for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." *See id.* The EO defined "discriminatory equity ideology" as, among other definitions, that "[m]embers of one race, color, sex, or national origin are morally or inherently superior to members of another race, color,

sex or national origin" or "[a]n individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin." *Id.*; *see also* Compl. ¶ 27. Apart from these three EOs, on January 31, 2025, Secretary of Defense Pete Hegseth issued guidance directing that "Department of Defense Components will not use official resources, to include man-hours, to host celebrations or events related to cultural awareness months[.]" Compl. ¶ 57 & n.21.

**Curricular changes.** Plaintiffs allege DoDEA teachers were instructed by DoDEA leadership to cease using certain curricular materials after the enactment of the EOs and Secretary Hegseth's guidance. Compl. ¶ 51. Those materials included a module on sexuality taught in the Advanced Placement® ("AP") Psychology course for high school students, *id.* ¶¶ 51-53; certain chapters from health education textbooks designed for middle school students, *id.* ¶¶ 55-56; and chapters on immigration to the United States, *id.* ¶ 51. Plaintiffs also allege that all cultural heritage months, like Women's History Month and Black History Month, were cancelled. *Id.* ¶¶ 57-59. Plaintiffs allege that these materials and cultural heritage months "have educational value and are educationally suitable for Plaintiffs and other students at DoDEA schools," and that "there has been no assertion by DoDEA that any of the removed materials are obscene or otherwise unprotected by the First Amendment." *Id.* ¶ 97. Rather, the EOs "on their face and as implemented by Defendants violate the First Amendment because they ban curricular materials about specific concepts on the topics of race, gender, and sex, and impose restrictions on the ideas that students may be exposed to in public schools." *Id.* ¶ 95.

**Book Reviews.** Following these EOs and directives, the five DoDEA schools developed a method for identifying books from their collections. *See generally* Compl. ¶¶ 32-41. Once books were identified, as the Complaint indicates, the five schools removed those books from the shelves

to undergo further review. *See, e.g.*, *Id.* ¶¶ 34, 45, 46. Plaintiffs maintain that these removals violate their First Amendment rights. *Id.* ¶ 67. In their view, the removals "do not stem from rational, age-appropriate, evidence-based concerns, but rather from animus" such that they are suppressing "minority and dissenting viewpoints and experiences." *Id.* ¶ 68. Accordingly, per the Complaint, these book removals are unconstitutional "because they prohibit books to promote a narrowly partisan, political, or racially biased agenda to the detriment of Plaintiffs." *Id.* ¶ 85.

## II.    Procedural History

Plaintiffs initiated this civil action on April 15, 2025, and served the U.S. Attorney's Office with a copy of the Complaint and Summons on April 28, 2025. Dkts. 1, 8. Accordingly, Defendants' deadline to respond to this Complaint is June 27, 2025. Fed. R. Civ. P. 12(a)(2).

Three weeks after filing this action, on May 7, 2025, Plaintiffs moved for a preliminary injunction. Dkt. 9. That motion is fully briefed. The Court heard arguments from the parties on June 3, 2025, and the motion remains pending before the Court. Dkt. 37.

### STANDARD OF REVIEW

**Rule 12(b)(1)**. A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's jurisdiction over the subject matter of the suit. The motion may either attack the court's subject matter jurisdiction by asserting "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," or may assert that as a factual matter, the plaintiff cannot meet his burden of establishing a jurisdictional basis for this suit. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Under the latter approach, this Court "may consider evidence outside the pleadings" to determine whether subject matter jurisdiction exists. *In re KBR, Inc.*, 744 F.3d 326, 333 (4th Cir. 2014) (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)). Moreover, "[i]t is to be presumed that a cause lies outside" a federal court's limited

jurisdiction, and the "burden of establishing the contrary rests upon" the plaintiff. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

**Rule 12(b)(6)**. A complaint is subject to dismissal if it fails to allege facts that state a plausible claim for relief rising "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Legal conclusions, "naked assertions devoid of further factual enhancement," and "a formulaic recitation of the elements of a cause of action" are insufficient to state a plausible claim. *Id.* (internal quotation marks omitted); *Twombly*, 550 U.S. at 555.

## ARGUMENT

## I.    Plaintiffs Lack Standing to Bring their Claims.

"Standing is an 'irreducible constitutional minimum' that must be satisfied in all cases. *Ali v. Hogan*, 26 F.4th 587, 595–96 (4th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In order to establish Article III standing, a plaintiff must establish: "(1) an injury in fact; (2) a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the defendant's actions; and (3) a likelihood that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560. A lack of standing deprives the federal courts of subject-matter jurisdiction to entertain a claim. *See Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017).

"The party attempting to invoke federal jurisdiction bears the burden of establishing standing." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). Consistent with the discussion provided in Defendants' pending motion for reconsideration (Dkt. 42 at 6-12) and as further

explained in Defendants' memorandum in opposition to Plaintiffs' motion for a preliminary injunction (Dkt. 29 at 4-7), the Department of Defense has not rendered final decisions on any change to DoDEA curriculum and or library offerings. As such, in the absence of such final decisionmaking, there remains the question of whether Plaintiffs' claims are sufficiently ripe for this Court's review. But assuming the claims are sufficiently ripe, this Court still lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs cannot establish they have standing to bring suit on either claim.

### A.    Plaintiffs Cannot Establish Injury in Fact as to Their Curriculum Claim.

No Plaintiff has demonstrated an injury in fact as to the curriculum claim. A plaintiff demonstrates an injury in fact when she has "sustained or [is] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). The Complaint lacks any allegation that the *speaking* rights of any one Plaintiff were curtailed by changes in the curriculum.[3] And there is no constitutional entitlement of students to receive information under the Free Speech Clause. As such, no Plaintiff has been injured by the changes to the curriculum.

A review of school speech jurisprudence is necessary to understanding why Plaintiffs lack standing. "[T]here are three main categories of speech that occur within the school setting." *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 923 (10th Cir. 2002). Student speech that occurs on school grounds is governed by *Tinker v. Des Moines Independent Community School*

---

[3] In moving for a preliminary injunction, H.H., via her next friend and parent, testified that she was denied the opportunity to speak when her presentation on Maya Angelou, which was part of the Black History Month curriculum, was cancelled. *See* Dkt. 10-24 ¶ 13. However, that statement does not appear in the Complaint. The Complaint *only* alleges that the students' right to *receive* information was curtailed and seeks relief on that basis only. *See* Compl. ¶¶ 87, 96. It contains no allegation that any student, like H.H., was prevented from speaking. Therefore, even though H.H. was purportedly unable to present her report on Maya Angelou, this has no impact on whether she has established an injury in fact on her ability to *receive* information.

*District*, 393 U.S. 503 (1969). *Tinker* provides that schools must tolerate pure *student* expression unless that expression will lead to "substantial disruption of or material interference with school activities." *Id.* "At the opposite end of the spectrum" from pure student speech is government speech. *Fleming*, 298 F.3d at 923. "When the government speaks, it may choose what to say and what not to say." *Id.* (quotation omitted); *see also Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 792 (4th Cir. 2004) (holding that "when the government speaks for itself and is not regulating the speech of others, it may discriminate based on viewpoint"). In between these two poles is "school sponsored speech," which is governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). School-sponsored speech is student speech that a school "affirmatively . . . promote[s]," as opposed to speech that it "tolerate[s]." *Hazelwood*, 484 U.S. at 270-71. "[E]xpressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute school-sponsored speech, over which the school may exercise editorial control, "so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273. An example is the student newspaper in *Hazelwood*, which was (a) produced by students as part of a journalism class that the school offered; (b) paid for by the Board of Education; and (c) distributed to students, school personnel, and members of the community. *Id.* at 262.

Unlike *Tinker* or *Hazelwood*, Plaintiffs are *not* alleging that they are speakers whose speech has been curtailed.[4] Indeed, Plaintiffs concede that their challenge is not one to their ability to speak. *See* Compl. ¶ 72 ("Plaintiffs L.K.2 and L.K.3 . . . have suffered irreparable harm from

---

[4] Plaintiffs allege that they "and, upon information and belief, other DoDEA students are increasingly afraid to discuss race and gender in their classrooms, because they fear being silenced by teachers fearful of violating the EOs and DoDEA guidance." Compl. ¶ 80. This allegation is nothing more than an "[a]bstract injury" which "is not enough" to establish injury in fact. *Lyons*, 461 U.S. at 101-02.

having important information *withheld* from their health curriculum, as well as changes to independent reading and Black History Month."); *id.* ¶ 73 ("Plaintiffs L.K. 1, S.K., O.H., and E.G. . . . are being *denied access* to information based on directives from the President"); *id.* ¶ 71 ("Plaintiffs C.Y. and M.T. are currently enrolled in AP® Psychology . . . [they] suffer especially acute harm *by not learning* about how gender and sex impact psychology.") *id.* ¶ 75 ("[A]ll Plaintiffs were and continue to be *denied the right to learn* about important Black leaders and activists and the history of Black people in the United States because Black History Month was canceled throughout DoDEA and library displays and curricula were removed from the school.") (emphasis added to each prior citation).[5] Therefore, neither *Tinker* nor *Hazelwood* applies here. *See Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 821 (E.D. Va. 2006) (noting different tests in First Amendment jurisprudence in the school setting depending on identity of the speaker). Rather, Plaintiffs claim they have a First Amendment Free Speech right to *receive* information. *See* Compl. ¶ 96. As detailed below, no such right exists.

Notwithstanding that Plaintiffs have conceded they are not speakers, Plaintiffs cite *Hazelwood* as authority supporting the creation of a constitutional entitlement to receive information in the classroom. *Id.* ¶ 96. In *Hazelwood*, the school principal decided to remove articles from the student newspaper on students' experiences with pregnancy and divorce. 484 U.S. at 274-75. Critically, *students* wrote and edited the articles that the principal found had to be removed from the school newspaper, *id.*, and the students alleged their First Amendment rights had been violated *because* of the removal of *their* speech, *id.* at 262; essentially, the *Hazelwood* Plaintiffs asserted that the school principal prevented them, as *students*, from speaking when he

---

[5] This allegation assumes that the *only* time DoDEA students learn about "important Black leaders and activists and the history of Black people in the United States" is during Black History Month.

removed the articles from the school newspaper. Nowhere does *Hazelwood* address students' right to *receive* those newspaper articles. The Supreme Court's analysis was focused on the student journalists who wrote the articles, *not* on the student body that was deprived of an opportunity to read those articles. *See id.* at 262 ("Respondents are three former Hazelwood East students who were staff members of Spectrum, the school newspaper."). *Hazelwood* is thus a far cry from the facts in this case, where the gravamen of the Plaintiffs' alleged harm is that they could not *receive* information.

Nor does *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), the case Plaintiffs rely on for the right to receive information in in their book claim, *see* Compl. ¶ 85, create a constitutional entitlement of students to receive information. *Pico* did not result in a majority opinion. Only three of the nine justices recognized students' right to receive information vis-à-vis library books. It is therefore not binding authority, and as such did not create any constitutional right. *See also infra* at 23-24. But even on the assumption that *Pico* did establish students' right to receive information, the *Pico* plurality specifically carved out curriculum from this right. "The Court has long recognized that local school boards have broad discretion in the management of school affairs," and even the *Pico* plurality was in "full agreement" that school boards must be permitted to establish and apply their own curriculum and do so in such a way "as to transmit community values." *Id.* at 863, 864.

Because Plaintiffs cannot establish that any of their rights to speak were curtailed, nor is there any binding Supreme Court authority creating a right for students to receive information in the classroom, Plaintiffs have failed to establish injury in fact. Thus, Plaintiffs lack standing as to their curriculum claim.

**B.      None of the Plaintiffs Have Standing to Challenge the Five DoDEA Schools' Book Reviews As None Have Tried to Obtain A Removed Book.**

Whether considering Plaintiffs' Complaint or the evidence submitted in connection with their motion for a preliminary injunction, Dkts. 10-1 through 10-27, Plaintiffs have failed to establish standing to challenge the five DoDEA schools' book removals and subsequent reviews. Plaintiffs failed to put forward any factual basis to establish that they sought the information temporarily withdrawn from DoDEA's bookshelves pending further review. A failure to do so means that Plaintiffs have not established a particularized injury resulting from the five DoDEA schools' allegedly unconstitutional decisionmaking process. *See Cousins v. Sch. Bd. of Orange Cnty.*, 687 F. Supp. 3d 1251, 1277 (M.D. Fla. Aug. 16, 2023) (finding that plaintiffs lacked standing because the complaint did "not allege that any of the Student Plaintiffs have sought out the materials"); *see also PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1329-30 (N.D. Fla. 2024) (holding that student plaintiffs established standing because allegations showed "that the children intended to check out specific removed and restricted books during the upcoming (now, ongoing) school year, but they are unable to do so" (citation omitted)); *see also Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Libr.*, 2 F. Supp. 2d 783, 792 (E.D. Va. 1998) (holding adult plaintiffs established standing in First Amendment right to receive information claim because they tried to access website on the public library internet that the challenged policy blocked).

Here, none of the twelve Plaintiffs have made any showing that they have an interest in reading the books under review—let alone have tried to check them out but could not because of the review process. Indeed, a review of the Complaint shows that Plaintiffs have only put forward allegations about how the curricular changes *might* have affected them, Compl. ¶¶ 52-61, 71-77, but there are no allegations that establish Plaintiffs have tried to access the books under review and could not because of the policy. A review of the evidence Plaintiffs submitted in support of

their motion for a preliminary injunction fares no better. Except for Plaintiff L.K.3, all other Plaintiffs have not adduced a single fact to support standing: there are no facts to show an interest in reading the removed materials or an attempt to check out the materials that were removed by DoDEA's review procedures.[6] In fact, there are no allegations regarding an injury to E.G. regarding Plaintiffs' book claim; instead, Plaintiffs have only detailed the concerns of E.G.'s parent. Dkt. 10-24 ¶ 21. Given the absence of these key facts, Plaintiffs have only put forward a generalized grievance challenging Executive Orders and the directives. That is not enough to establish standing. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action.").

Plaintiff L.K.3 stands out from the other 11 Plaintiffs, because unlike the rest, Plaintiff L.K.3 tried to check out four books, but could not do so. Dkt. 10-26, ¶ 9. Had the EOs and the directives prevented those books from being available to Plaintiff L.K.3, she would have established sufficient Article III standing. However, as the evidence shows, each of the four books Plaintiff L.K.3 tried to check out were not available because they had been checked out by another patron and are well overdue. Dkt. 29-4 ¶ 28. Accordingly, Plaintiff L.K.3 likewise fails to establish her standing to challenge the book removals.

## II.    Plaintiffs Have Failed to State Any Plausible Claim for Relief.

### A.    Plaintiffs Have Failed to State a Plausible Claim for Relief as to Their Curriculum Claim.

---

[6] The extent of their evidence to support standing is as follows: Dkt. 10-23 ¶ 16 (parent of Plaintiffs E.K. and S.K. averring that impact of book removals "will be immediate" on the two students); Dkt. 10-24 ¶ 9 (parent of Plaintiffs O.H., S.H., and H.H. noting that these schoolchildren "frequently avail themselves of age-appropriate books" at their library "on various topics"); Dkt. 10-25 ¶ 7 (parent of Plaintiffs E.Y. and C.Y., stating that E.Y. has interest in "historical fiction and classic novels"); Dkt. 10-26 ¶ 10 (parent of L.K.1 and L.K.2 stating that these students have "had dozens of books purportedly related to 'gender ideology' removed from their school library").

Even assuming that every Plaintiff had standing to challenge the changes to the curriculum, Plaintiffs fail to state a cognizable claim for relief because curriculum is government speech and thus immune from First Amendment scrutiny. In the alternative, assuming that the Court finds that curriculum is not government speech, the changes to the curriculum stemming from the President's EOs meet *Hazelwood*'s "legitimate pedagogical concerns" test.

1.  <u>Curriculum is Government Speech and Therefore Immune From First Amendment Scrutiny.</u>

"The first and most basic question" to answer is whether curriculum is government speech. *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). As demonstrated by Supreme Court and Fourth Circuit precedent, curriculum squarely represents an instance in which the government is the speaker. The Free Speech Clause of the First Amendment thus does not apply to DoDEA's curriculum review and recission of cultural heritage months.

"The First Amendment's Free Speech Clause does not prevent the government from declining to express a view." *Shurtleff*, 596 U.S. at 251. "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Id.* And "when the government speaks for itself, it 'may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted.'" *Planned Parenthood of S.C., Inc.*, 361 F.3d at 792 (quoting *Rosenberger*, *v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).

Establishing curriculum is perhaps the quintessential example of government speech in the public school context. Curriculum "concerns educators' authority over school sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir. 1998) (en banc) (quotation omitted).

These activities are part of school curriculum, "whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences[.]" *Id.* (quotation omitted). In this case, Plaintiffs agree that resources used in the classroom and cultural heritage month celebrations constitute curriculum. *See* Compl. ¶ 57 ("The curricular changes extend to cultural celebrations as well."); *compare id.* ¶¶ 83-92 (Count I, relating solely to books), *with id.* ¶¶ 93-101 (Count II, relating to curriculum generally); *see also Lee*, 418 F. Supp. 2d at 825-26 (holding teacher's posting of materials on classroom wall was curricular speech not entitled to Free Speech clause protection).

In *Boring*, the Fourth Circuit, sitting en banc, held that a public school teacher did not have a First Amendment right to participate in the establishment of school curriculum through the selection and production of a play. 136 F.3d 364, 366 (4th Cir. 1998) (en banc). "In the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities[.]" *Id. Boring* followed a line of decisions that explicitly held that teachers do not have a First Amendment right to choose their own curriculum in contravention of school policy. *See Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990) (citing cases); *see also Downs v. L.A. Unified Sch. Distr.*, 228 F.3d 1003, 1015-16 (9th Cir. 2000) (citing cases, including *Boring*). *Boring* and related cases stand for the proposition that school authorities (such as school boards)—not teachers, parents, or students—maintain control over the curriculum. *See also Griswold v. Driscoll*, 616 F.3d 53, 59 (1st Cir. 2010) (Souter, J.) ("there is no denying that the State Board of Education may properly exercise curricular discretion"); *Chiras v. Miller*, 432 F.3d 606, 614-15 (5th Cir. 2005)

("Designing the curriculum and selecting textbooks is a core function of the [State Board of Education].").

Two decisions from the First and Fifth Circuits, utilizing reasoning on which the Supreme Court would also later rely, illustrate how curriculum is government speech. In *Griswold*, the First Circuit affirmed the dismissal of a challenge to a guide to choosing classroom materials, holding that there was "no denying that the State Board of Education may properly exercise curricular discretion, and the only question on the motion to dismiss is whether the pleadings allow for any doubt about the status of the Guide as an element of curriculum." 616 F.3d at 59 Finding no such doubt, the First Circuit affirmed. *Id.* Similarly, in *Chiras v. Miller*, the Fifth Circuit affirmed the dismissal of a complaint alleging that the Texas State Board of Education violated the Free Speech Clause of the First Amendment when it refused to approve the plaintiff's environmental science textbook for state funding. 432 F.3d at 606. As part of its holding, the Fifth Circuit found that the State Board of Education was created by the state legislature with a "wide degree of authority over education policy in Texas," including establishing curriculum and graduation requirements and purchasing textbooks. *Id.* at 607-08.

Here, it is entirely proper for DoDEA to review its curriculum after receiving instructions to do so from the head of the Executive Branch, the President of the United States, through the Secretary of Defense, who has statutory authority over DoDEA. In *Boring* and related cases, courts have consistently held, in the face of constitutional challenge, that school boards are the appropriate arbiters of school curriculum. *See Evans-Marshall v. Bd. of Educ. of Tipp. City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) ("The Constitution does not prohibit a State from creating elected school boards and from placing responsibility for the curriculum of each school district in the hands of each board."). And, of course, school boards do not operate in

a vacuum; they are subject to state laws and regulations promulgated by the state's own political branches. *See, e.g.*, *Walls v. Sanders*, 733 F. Supp. 3d 721, 728 (E.D. Ark. 2024) (describing state law).

As Plaintiffs allege, DoDEA is no different—it "operates like any other public school district, except that it is run by the federal government, and it is not geographically contiguous." Compl. ¶ 20. DoDEA is led by a civilian Director, who ultimately reports up the chain of command to the Secretary of Defense. 20 U.S.C. § 922(a); DoDD 1342.20 § 1.3(a). The Secretary of Defense is charged with issuing regulations to "prescribe the educational goals and objectives" of DoDEA, and to "establish standards for the development of curricula for the system and for the selection of instructional materials." 20 U.S.C. §§ 931(1), (2). In turn, the Secretary of Defense is beholden to the individual that the Constitution vests with authority as Commander-in-Chief, the President of the United States. *See* U.S. Const. art.II, § 2, cl.2. And as such, the President serves, for purposes of the federal government's schools for military dependents, in the role occupied by an elected local school board and thus can establish educational policy that DoDEA must then implement. *See Evans-Marshall*, 624 F.3d at 340 ("Only the school board has ultimate responsibility for what goes on in the classroom, legitimately giving it a say over what teachers may (or may not) teach in the classroom."). Simply because the directive to review curricular materials originated from outside of DoDEA does not change the unequivocal constitutional reality that the government speaks through curriculum.

The principle that curriculum constitutes government speech for First Amendment purposes finds support in the Supreme Court's decision in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022). While that case did not involve school curriculum, it did provide a methodology for how courts should evaluate what constitutes government speech. *Shurtleff* concerned "a flagpole

17

outside of Boston City Hall. For years, Boston has allowed private groups to request use of the flagpole to raise flags of their choosing." 596 U.S. at 248. "The city did not deny a single request to fly a flag" until 2017, when Harold Shurtleff asked to fly a Christian flag. *Id.* at 248. The key question in the case was whether "Boston reserved the pole to fly flags that communicate governmental messages," in which case the flagpole and its flag would be considered government speech such that Boston could refuse flags based on viewpoint, "or instead opened the flagpole for citizens to express their own views." *Id.* To resolve this question, the Supreme Court held that courts must "conduct a holistic inquiry designed to determine whether," in the particular instance, "the government intends to speak for itself or regulate private expression." *Id.* at 252. That inquiry includes factors like "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the message." *Id.* Applying those factors, the Supreme Court held that Boston's flag-raising program was not government speech. *Id.* at 259.

The application of the *Shurtleff* factors to the instant case leads to one conclusion: curriculum is government speech. "States have a long history of running public schools, the public is likely to believe that the government is speaking when it selects and implements curricula, and the state actively shapes and controls the selection and implementation of curricula." *Walls v. Sanders*, 733 F. Supp. 3d 721, 746 n.196 (E.D. Ark. 2024).[7] Here, there is no doubt that the federal government, acting via the Department of Defense, is responsible for running DoDEA schools.

---

[7] In *Wells*, the district court was constrained by *Pratt v. Independent Sch. Dist. No. 831*, 670 F.2d 771 (8th Cir. 1982), which it termed "something akin to zombie precedent," and which predated the modern government-speech doctrine. *Walls*, 733 F. Supp. 3d at 745. "If the Court were working on a blank slate, there is little doubt it would find, like courts in several other circuits have found, that the state is speaking when it selects and implements curricula." *Id.* at 746 n. 196 (citing *Griswold*, 616 F.3d at 58–59; *Chiras*, 432 F.3d at 616.

*See* Compl. ¶ 20 ("DoDEA is a civilian agency within the Department of Defense that operates like any other public school district, except that it is run by the federal government, and it is not geographically contiguous."). "Like any other public school district," the public is likely to believe that the government—through both the Commander-in-Chief and Department of Defense—is speaking when DoDEA establishes its curriculum, and that the federal government actively shapes DoDEA's curriculum. Indeed, statutory language identifies the Secretary of Defense, a Federal Cabinet official, as responsible for "prescrib[ing] the educational goals and objectives" of DoDEA, as well as regulations to "establish standards for the development of curricula for the system and for the selection of instructional materials." 20 U.S.C. § 931(1), (2). Under *Shurtleff*, then, there is no doubt that DoDEA's curriculum is government speech immune from First Amendment scrutiny.

2. Under Curriculum Meet *Hazelwood*'s "Legitimate Pedagogical Concerns" Test.

In the alternative, should the Court adopt Plaintiffs' position and hold that curriculum is *not* government speech, the changes to the curriculum here are nevertheless permissible under *Hazelwood*.

The Supreme Court has acknowledged that "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment." *Hazelwood*, 484 U.S. at 266 (cleaned up). Indeed, "children, whose minds and values are still developing, have traditionally been afforded less First Amendment protection, particularly within the context of public high schools." *Mainstream Loudoun*, 2 F. Supp. 2d at 795. Accordingly, "educators do not offend the First Amendment by exercising editorial control over the style and content of speech in

school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazlewood*, 484 U.S. at 273.

As *Hazelwood*, makes plain, its holding reaches those activities that "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* at 271. In effect, it is anything in which "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.*; *see also Newton v. Slye*, 116 F. Supp. 2d 677, 684 (W.D. Va. 2000) ("The Fourth Circuit emphasized the broad definitional contours of 'curriculum' outlined by the Supreme Court in *Hazelwood*[.]" (citing *Boring*, 136 F.3d at 368)). Thus, assuming *Hazelwood* applies, Plaintiffs must allege that changes to DoDEA's curriculum are wholly unrelated to legitimate pedagogical concerns. *Boring*, 136 F.3d at 369-70.

Plaintiffs have not made any non-conclusory factual allegations to support their theory that the curriculum changes are divorced from pedagogy. *Cf.* Compl. ¶ 29 ("Upon information and belief, the President's references to 'wokeness' relate directly to 'gender ideology' and 'divisive concepts' as described in the EOs."). Binding precedent establishes that a pedagogical interest is one that is broadly "relating to teaching or pedagogy." *Boring*, 136 F.3d at 370; *Fleming*, 298 F.3d at 925 (similarly confirming breadth of pedagogical interest and concluding that this standard "give[s] substantial deference to educators' stated pedagogical concerns"); *supra* at 14-15. As *Hazelwood* illustrates, this standard empowers the school to refuse speech that "might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct inconsistent with the 'shared values of a civilized order' or to associate the school with any position other than neutrality on matters of political controversy." 484 U.S. at 272 (quotation omitted); *id.* at 274-75 (holding

20

that the principal's choice to remove article on students' experiences on pregnancy was not "unreasonable" given his conclusion that "such frank talk was inappropriate in a school-sponsored publication distributed to 14-year-old freshmen and presumably taken home to be read by students' even younger brothers and sisters").

DoDEA's ongoing review efforts are borne of its compliance with the President's Executive Orders and Departmental educational objectives, which, as described *supra at* 18, the President, as head of DoDEA, is empowered to articulate. This meant the removal of curriculum "on gender ideology and discriminatory equity ideology," 90 Fed. Reg. at 8853, and those curricular materials that engaged in "invidious race and sex discrimination," *id.* at 8763—both concepts that have been a part of national discourse for some time.

If a school principal can unilaterally pull an article in the school newspaper on teen pregnancy and the impact of divorce on students, surely DoDEA is permitted to review identify curricular materials used in the classroom that need further review to ensure they are consistent with the pedagogical concerns identified in the Executive Orders and by Department leadership— even if Plaintiffs, as did their counterparts in *Hazelwood*, personally disagree with those pedagogical assessments. In the end, "*Hazelwood* entrusts to educators these decisions," *Fleming*, 298 F.3d at 928, and consistent with that entrustment, DoDEA's curriculum review fully comports with *Hazelwood*.

**B. Plaintiffs Cannot Establish a Plausible Claim for Relief in Connection With DoDEA's Removal of Books from its Shelves.**

Plaintiffs' First Amendment claim in connection with DoDEA's book removals fails for three reasons. First, there is no First Amendment right for students to "receive information" from the government in government-owned libraries. Second, curating the five library collections at issue in this case is an act of government speech that, as explained above, is immune to scrutiny

under the First Amendment's Free Speech Clause. Third, even if Plaintiffs' desired alternative legal framework were applicable here, they have not adduced sufficient facts to plausibly conclude that the determinative factor for the book removals was "narrowly partisan."

      1.   The First Amendment's Right to Receive Information Does Not Extend to a Library's Decision to Remove Books.

The Supreme Court has never held that First Amendment's Free Speech Clause mandates that the government affirmatively provide information to another individual. Accordingly, there is no legal basis for Plaintiffs to insist that the First Amendment's Free Speech Clause extends to preventing schools from removing library books from their shelves. *Little v. Llano County*, 138 F.4th 834, 842-51 (5th Cir. 2025) (en banc).

As those Supreme Court decisions that have obtained a majority reflect, the right to receive information under the Free Speech Clause consists only of an individual's right not to have the government restrict her or his receipt of another individual's speech. *See, e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (holding law prohibiting door-to-door distribution of flyers unconstitutional as it restricted "right to distribute literature" and another's "right to receive it"); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306 (1965) (holding government could not restrict right of individuals to receive political pamphlets in their mailboxes); *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (holding that university students had right "receive [the] information and ideas" of foreign scholar they invited to speak at their school). That does not mean that a plaintiff has "right to receive information from the *government*." *Little*, 138 F.4th at 843.

Applying these principles here, restricting or removing from circulation a book from a library does not fall within the only "right to receive information" rubric actually recognized by the Supreme Court. And here, the government has not burdened or otherwise cut off any individual's access to the book, including that of the Plaintiffs here. *Id.* at 848 ("You could buy

the book online or from a bookstore. You could borrow it from a friend. You could look for it at another library."). At most, the government has eliminated the convenience of one means of reading a particular text—students otherwise retain the ability to get it elsewhere. *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022) ("The removal of the books at issue from the District's schools does not stop any student from reading or discussing the book, which surely would raise a more serious issue."). Accordingly, no Free Speech Clause claim has been stated.

The entirety of Plaintiffs' book removal claim, and the nature of their asserted right to receive information, is predicated on the Supreme Court's plurality opinion in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 870 (1982). Contrary to Plaintiffs' assertion, *Pico* cannot be read in this way as it supplied no precedential holding. *See, e.g.*, *C.K.-W.*, 619 F. Supp. 3d at 913 ("[I]t is not clear, what, if anything, from *Pico* is binding on the case here."). Since *Pico*, no Circuit Court has held that the *Pico* plurality opinion is binding precedent. To the contrary, multiple circuits have found, applying the *Marks* analysis,[8] that *Pico* offers no binding First Amendment precedential holding. *Little*, 138 F.4th at 849 ("*Pico* lacks precedential value."); *Griswold*, 616 F.3d at 57 (observing that "Justice White concurred in the judgment without announcing any position on the substantive First Amendment claim"); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009) ("*Pico* is a non-

---

[8] Under *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977) (quotation omitted). Applying this analysis to *Pico*, Justice White's opinion concurring in the judgment dictates the precedential holding of the Supreme Court.

decision as far as precedent is concerned. It establishes no standard."). *Pico* cannot serve as a basis to establish Plaintiffs' claims.

Compounding these pleading deficiencies is Plaintiffs' attempt to do more than simply prevent DoDEA from removing books from shelves of five schools; rather, Plaintiffs ask this Court to preclude the "exclusion of materials" writ large from these five libraries. Compl. ¶ 90. In other words, Plaintiffs seek to control what the government affirmatively provides them to read; *i.e.*, what the government *adds* to its library collections and what it *removes* from the same. Indeed, there is otherwise no basis for Plaintiffs to request this Court to "enjoin Defendants from enforcing Executive Orders 14168, 14185, and 14190" unless they also want to seek to challenge DoDEA's library purchasing decisions. *Id.* Were Plaintiffs' claim solely limited to the removal of books already on the shelves, their request for equitable relief would have been equally tailored. But in seeking to enjoin the Executive Orders in their entirety, which prohibit the expenditure of funds on certain subjects as a general matter, Plaintiffs' claim in Count I also strikes at the five DoDEA schools' purchasing decisions. Exec. Order No. 14190 § 3, 90 Fed. Reg. 8853 (Jan. 29, 2025).

But even the *Pico* plurality—which Plaintiffs' embrace as *the* seminal authority, *see, e.g.*, Compl. ¶ 85—made plain that "nothing in our decision today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools." 457 U.S. at 871 (plurality op.). That Plaintiffs bypass this express carveout for acquisitions only confirms the soundness of *Pico*'s dissents and *Little*'s reasoning. *Pico*, 457 U.S. at 892 (Burger, C.J., dissenting) ("It does not follow that the decision to *remove* a book is less official suppression; than the decision not to acquire a book desired by someone."); *id.* at 895 (Powell, J., dissenting) ("If a 14-year-old child may challenge a school board's decision to remove a book from the library, upon what theory is a court to prevent a like challenge to a school board's decision not to purchase that identical

24

book."); *id.* at 916 (Rehnquist, J., dissenting) ("The failure of a library to acquire a book denies access to its contents just as effectively as does the removal of the book from the library's shelves."); *Little*, 138 F.4th at 845 ("A library just as surely denies a patron's right to receive information by not purchasing a book in the first place as it does by pulling an existing book off the shelves." (cleaned up)). At bottom, Plaintiffs' claims concerning DoDEA's book reviews asserts a right over what DoDEA might acquire to place on its shelves *and* remove from its shelves. But the First Amendment's Free Speech Clause supplies no such right. Each Plaintiff is, at best, a "disappointed patron [that] are kept from 'receiving' [a] book of their choice at taxpayer expense," but the "[t]hat is not a right guaranteed by the First Amendment." *Little*, 138 F.4th at 848.

      2.   <u>Assuming the Right to Receive Information Exists as Plaintiffs Claim, the Five DoDEA Schools' Curation of Their Libraries is Government Speech.</u>

"The Free Speech clause . . . does not regulate government speech." *Summum*, 555 U.S. at 467. Yet that is what Plaintiffs put at issue here in this case: the expression of five DoDEA schools through the curation of their library collections.

The five DoDEA libraries' act of compiling the speech of others (*i.e.*, the books) transforms the speech into DoDEA's own. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024); *Hurley v. Irish-Amer. Gay Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995) (holding that parade organizers were speakers because they "present[ed] . . . an edited compilation of speech generated by other persons"). That is reflected in the work of library curation. The goal of any library collection is to "provide materials that would be of the greatest direct benefit or interest to the community," to "collect only those materials deemed to have requisite and appropriate quality," and to "identif[y] suitable and worthwhile material." *United States v. Am. Libr. Ass'n*,

539 U.S. 194, 204 (2003) (plurality op.). In the educational setting, that goal is further refined to curate a collection that "inculcate[s] social values and knowledge in relatively impressionable young people" based the "personal or moral values" of the school board members. *Pico*, 457 U.S. at 909 (Rehnquist, J., dissenting); *see also Mainstream Loudoun*, 2 F. Supp. 2d at 795 ("Public libraries lack the inculcative mission that is the guiding purpose of public high schools."); *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024) ("The purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school, which may involve some limitation of expression."). All told, that act of library curation undoubtedly reflects an expressive message, which is government speech.

This conclusion is buttressed by other courts who have similarly held that monument selections for public parks (*Summum*), exhibit choices for museums (*PETA*), and pamphlet selection for tourism brochure racks (*Dunesland Preservation Society*) are all government speech. *PETA, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("[I]n the case of a public library . . . there is still government speech . . . . [T]he government speaks through its selection of which books to publish on the shelves and which books to exclude."); *see also Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719, 721-22, 725 (7th Cir. 2009) (holding that government's placement of brochures published by third parties on tourism display rack, a type of "mini library," constituted government speech); *Summum*, 555 U.S. at 473 (holding that city's decision to solicit private donations for monuments in park and then selecting them for display was an act of government speech). Of significance, the D.C. Circuit, home to the Smithsonian Institution and the Library of Congress, has held that curation in museums and libraries constitutes government speech. *PETA*, 414 F.3d at 28 (noting that a public museum "may decide to display busts of Union Army generals of the Civil War, or the curator may decide to exhibit only busts of Confederate

generals[,]" and "[t]he First Amendment has nothing to do with such choices"); *see also, e.g.*, *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 254 (D.D.C. 2017) (rejecting artist's First Amendment claim challenging the removal of painting from Congressional art competition); *Raven v. Sajet*, 334 F. Supp. 3d 22, 25 (D.D.C. 2018) (rejecting First Amendment claim to require display of portrait of the then-President-Elect at the National Portrait Gallery). In the end, as noted above, Congress empowered the Executive Branch—through the Department of Defense—to build a school system and with that authority and monetary appropriation comes with it the ability of the government to make the decisions on how it wishes to run that school system (including, *inter alia*, whether to have school libraries, and if so, what to house in those libraries). *See supra* at 16-18; *Cf. Mahmoud v. Taylor*, No. 24-297, slip op. 22 (U.S. June 27, 2025) ("Like many books targeted at young children, the books are unmistakably normative," and "present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected."); *Mainstream Loudoun*, 2 F. Supp. 2d at 795 (noting that library furthers the objectives of "the curriculum of a high school classroom"). To that end, there is no mistaking that the curation of the five DoDEA libraries at issue in this case is an act of the government and therefore government speech. *Little*, 138 F.4th at 860-65 (explaining how even under *Shurtleff* analysis, the curation of a library collection met the standard for government speech).

In short, Plaintiffs have challenged government speech in connection with DoDEA's book reviews. Thus, because such speech is immune from scrutiny under First Amendment's Free Speech Clause, Plaintiffs have failed to state a plausible claim for relief.

3. In the Alternative, Assuming that *Pico* Applies, Plaintiffs' Allegations Do Not Plausibly Establish that DoDEA Acted because of "Narrowly Partisan" Reasons.

Even if the Court disagreed with the above, Plaintiffs have failed to establish a plausible claim for relief under the *Pico* framework.[9] The *Pico* plurality concluded that school authorities cannot use their discretion to determine the content of school libraries in a "narrowly partisan or political manner." 457 U.S. at 870. While that motivation must be "narrowly partisan or political," this unconstitutional intent must also be "the decisive factor in the [the board's] decision." *Id.* at 871. Stated differently, the constitutionally impermissible motive (*i.e.*, "partisan or political") must be the "but for" cause of the decision. *See id.* at 871 n.22. Examples *Pico* provided were: "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of *all* books written by or in favor of Republicans;" or "if an all-white school board, motivated by racial animus, decided to remove *all* books authored by blacks or advocating racial equality and integration." *Id.* at 870-71 (emphasis added). By contrast, the *Pico* plurality indicated that it would be "perfectly permissible" for schools to remove books based on their "educational suitability." *Id.* at 871.

Plaintiffs' allegations fall short of establishing the plausibility that the "decisive factor" for the five DoDEA schools' book reviews was a "narrowly partisan" motivation. Of course, on a motion to dismiss, Plaintiffs' conclusory assertion that Defendants "remov[ed] library books for purely partisan, political reasons," cannot be considered. Compl. ¶ 87; *see also Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 434 (4th Cir. 2020) (explaining that "a formulaic recitation of the elements of a cause of action" will not advance a complaint beyond dismissal (quoting *Twombly*, 550 U.S. at 555)). Similarly, Plaintiffs' assertion that the President's Executive Orders and

---

[9] Defendants do *not* concede that the *Pico* framework is the appropriate standard for Plaintiffs' claim in connection with DoDEA's book removals. This argument is included in the alternative should the Court not accept Defendants' arguments in Section II.B.1-2.

implementing directives were based on "animus" towards the two subjects at issue also fares no better. Compl. ¶ 67. *Pico* permits school authorities to disfavor and dislike certain ideas in books, and school authorities can remove those books on that basis. 457 U.S. at 871 (holding that it is constitutionally permissible for school authorities to remove books based on an "educational suitability" determination). Indeed, "deeming a book 'inaccurate' or 'unsuitable' is often *the same thing* as disliking its 'content' and 'viewpoint.'" *Little*, 138 F.4th at 847. For that reason, Plaintiffs must do more than put forward allegations that views are disliked—their allegations must rise to the level to show that only narrowly partisan motivations are captured. Otherwise, the ordinary debates in the electoral process are elevated to potential constitutional violations—which is exactly what Plaintiffs have attempted here. *Hazelwood*, 484 U.S. at 273 ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges."); *Esquivel v. S.F. Unified Sch. Dist.*, 630 F. Supp. 2d 1055, 1062 (N.D. Cal. 2008).

In the end, there is nothing in Plaintiffs' Complaint to show that the book removals were borne of some narrowly partisan decisive factor that was intended to impose some type of "religious or scientific orthodoxy or a desire to eliminate a particular kind of inquiry generally." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir. 1980). Indeed, there are no allegations that Plaintiffs are prohibited from discussing matters of general identity and racial identity in school or bring in the removed books from home. And there is no basis to suggest that focusing on the biological sex binary and inclusivity through merit are inherently partisan when the Supreme Court has acknowledged that those issues are part of widespread public discourse or inherent in the Constitution. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 231 (2023) ("In other words, the student must be treated based on

his or her experiences as an individual—not on the basis of race."). *Cf. United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025) (observing, in case involving medical care choices for transgender persons and persons suffering with gender dysphoria, the topic "carrie[d] with it the weight of fierce scientific and policy debates" on the issue). Indeed, were these topics to fit within *Pico*'s limited "partisan or political" rubric, that rubric would be drained of any meaning whatsoever given the breadth of issues that have entered, or will enter, the modern public discourse.

Thus, all Plaintiffs can fall back on is their assertion that "a new presidential administration finds certain viewpoints on those topics to be politically incorrect." Compl. ¶ 4. That too is insufficient to state a plausible basis that the decisive factors for the book removals were narrowly partisan reasons. After all, what is "politically correct" for one person, may well be "politically incorrect" for another. Thus, Plaintiffs must do more to establish the plausibility that an a constitutionally impermissible motive—*i.e.*, a "narrowly partisan" motive was the "decisive factor" for the five DoDEA schools to initiate their book reviews and remove books from the shelves. As their Complaint lacks these core allegations, the Complaint must be dismissed.

In sum, Plaintiffs' challenge is with the result of the democratic process. *See Esquivel*, 630 F. Supp. 2d at 1062. Their personal choices and preferences are no longer favored by a majority of the national electorate, and thus they seek relief from this Court to have their preferences restored. As one district court aptly noted, "[d]ecisions of that nature are properly vested in democratically elected officials with public accountability." *Id.* This Court should therefore dismiss Plaintiffs' claim for relief in Count I.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss and dismiss Plaintiffs' Complaint in its entirety.

//

Dated: June 27, 2025

Respectfully submitted,

ERIK S. SIEBERT
UNITED STATES ATTORNEY

By: _____/s/_____
MEGHAN E. LOFTUS
MATTHEW J. MEZGER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3757/3741
Fax:    (703) 299-3983
Email: meghan.loftus@usdoj.gov
          matthew.mezger@usdoj.gov

*Counsel for Defendants*