## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

E.K. and S.K., *minors, by and through their* )
*parent and next friend Lindsey Keeley, et al.,* )
)
    *Plaintiffs,* )
)
v. )    Civil Action No. 1:25-cv-637 (PTG/IDD)
)
DEPARTMENT OF DEFENSE )
EDUCATION ACTIVITY, *et al.,* )
)
)
    *Defendants.* )

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs E.K. and S.K., *et al.*'s Motion for Preliminary Injunction. Dkt. 9. In this suit, twelve students of military families at five Department of Defense Education Activity ("DoDEA") schools bring First Amendment claims against Defendants DoDEA, Director of DoDEA Dr. Beth Schiavano-Narvaez, and Secretary of Defense Peter Brian Hegseth (collectively, "Defendants"). Dkt. 1 ("Compl.") ¶¶ 4, 10-15, 17-18. The Complaint alleges that Defendants violated Plaintiffs' First Amendment rights by removing library books at DoDEA schools and making changes to curricular material in implementation of various Presidential Executive Orders. *Id.* ¶¶ 51, 83-101. Plaintiffs seek a preliminary injunction from this Court ordering DoDEA to "cease its classifications and removals of educational books and curricular content" and "restore the status quo to how it existed" prior to the Executive Orders. Dkt. 10 at 25-26. For the reasons that follow, the Court grants in part and denies in part Plaintiffs' preliminary injunction.

## Background

The following facts are taken from the parties' pleadings and attached exhibits and declarations as well as admissions made during oral argument. Plaintiffs in this suit include the following students of DoDEA schools who bring suit through their respective parents and next friends: E.K. (first grade) and S.K. (fourth grade) from Crossroads Elementary School in Quantico, Virginia; O.H. (fourth grade), S.H. (kindergarten), H.H. (pre-kindergarten), and E.G. (fourth grade) from Barsanti Elementary School in Fort Campbell, Kentucky; C.Y. (eleventh grade), E.Y. (ninth grade), and M.T. (eleventh grade) from Aviano Middle-High School in Aviano, Italy; L.K. 1 (fourth grade) and L.K. 2 (sixth grade) from Stollars Elementary on the Misawa Air Base in Japan; and L.K. 3 (eighth grade) from Egdren Middle High School on the Misawa Air Base (collectively, "Plaintiffs"). Compl. ¶¶ 4, 10-15. Defendant DoDEA is an entity within the Department of Defense ("DoD") "responsible for, *inter alia*, planning, directing, coordinating, and managing federally-funded pre-kindergarten to twelfth grade ('Pre-K-12') schools" for dependents of military personal and DoD civilian employees. *Id.* ¶ 16. DoDEA provides education to "approximately 67,000 children in 161 accredited schools . . . rank[ing] DoDEA among the nation's 60 largest school districts by enrollment." Dkt. 10 at 2 (citing Dkt. 10-2, Callahan Decl., Ex. 1). Defendant Dr. Beth Schiavino-Narvaez is the Director of DoDEA and exercises oversight over all DoDEA schools, "including those attended by Plaintiffs." Compl. ¶ 17. Defendant Secretary Hegseth maintains "control over and administration of DoDEA." *Id.* ¶ 18.

In January 2025, during the first few weeks of his second term, President Donald Trump issued three Executive Orders ("EOs") removing and prohibiting statements promoting gender ideology, "divisive concepts" around "race or sex stereotyping," and "indoctrination . . . based on gender ideology and discriminatory equity ideology." *Id.* ¶¶ 25-28. EO 14168, issued on January

2

20, 2025, directs federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that **promote or otherwise inculcate gender ideology**, and . . . cease issuing such statements, policies, regulations, forms, communications or other messages." Dkt. 1-1 (emphasis added) (Exec. Order No. 14,168, 90 Fed. Reg. 8615, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Jan. 20, 2025)). EO 14168 defines "gender ideology" as an "internally inconsistent" concept, including "the idea that there is a vast spectrum of genders that are disconnected from one's sex[,]" and the "false claim that males can identify as and thus become women and vice versa." 90 Fed. Reg. 8615 § 2(f).

The second EO, EO 14185, issued on January 27, 2025, bars DoD from:

> promoting, advancing, or otherwise inculcating the following **un-American, divisive, discriminatory, radical, extremist, and irrational theories:** (i) "divisive concepts," as defined in section 3(c) of this order, and "race or sex stereotyping," or "race or sex scapegoating" as both terms are defined in section 2 of Executive Order 13950, as amended; (ii) that America's founding documents are racist or sexist; and (iii) "gender ideology," as defined in section 3(b) of this order.

Dkt. 1-2 (emphasis added) (Exec. Order No. 14,185, 90 Fed. Reg. 8763, Restoring America's Fighting Force (Jan. 27, 2025)).[1]

---

[1] The definition of "divisive concepts" stems from EO 13950, issued on September 22, 2020, and includes the following ideas:

> (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a

3

Finally, EO 14190, issued on January 29, 2025, directs agencies to provide, within 90 days, "an Ending Indoctrination Strategy to the President . . . containing recommendations and a plan for: (i) **eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination** in K-12 schools, including based on gender ideology and discriminatory equity ideology . . . ." Dkt. 1-3 (emphasis added) (Exec. Order No. 14,190, 90 Fed. Reg. 8853, Ending Radical Indoctrination in K-12 Schooling (Jan. 29, 2025)).  EO 14190 defines "discriminatory equity ideology" as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations."[2] 90 Fed. Reg. 8853 § 2(b).

---

hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "divisive concepts" also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

Exec. Order No. 13950, 85 Fed. Reg. 60683, 60685 § 2(a) (Sept. 22, 2020)).

[2] EO 14190 defines the list of concepts barred under "discriminatory equity ideology" as including the following:

(i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin; (ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin; (iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin; (v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part; (vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion; (vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to

4

## A. Book Removals

In early February 2025, following the issuance of the EOs, DoDEA circulated a memorandum to "educators, administrators, and staff requiring schools to review their libraries and remove . . . 'books potentially related to gender ideology or discriminatory equity ideology topics'" from the student section to the professional collection for review. Compl. ¶ 32; Dkt. 1-4 (Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA administrators, educators, and staff (Feb. 5, 2025)). On February 10, 2025, DoDEA issued a letter to parents and guardians of students stating that staff had reviewed "books potentially related to gender ideology or discriminatory equity ideology topics," as required under the President's EOs, and that "books identified for review will be relocated to the professional collection for evaluation with access limited to professional staff." Dkt. 1-7 (Letter from Michelle Howard-Brahaney, DoDEA Europe Director for Student Excellence, to Parents and Students (Mar. 7, 2025)).

In early March 2025, DoDEA schools began to implement the EOs on a school-by-school basis. Compl. ¶ 37-38. For example, at DoDEA Wiesbaden Middle School in Germany, the principal notified teachers that "[n]o books will be able to be checked out from the library" during the librarian's review and removal of books related to gender ideology or discriminatory equity ideology topics. *Id.* ¶ 38. The email further directed teachers to remove such books from their classrooms. *Id.* At another DoDEA high school in Germany, an online training for school librarians instructed them "to scan their collection for books referencing 'gender ideology' or 'gender identity' to identify necessary quarantines." *Id.* ¶ 40.

---

oppress members of another race, color, sex, or national origin; or (viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

90 Fed. Reg. 8853-8854 § 2(b) (Jan. 29, 2025).

Throughout this process, Plaintiffs' parents repeatedly requested a copy of the materials that would be removed. For example, on February 12, 2025, Plaintiffs "C.Y. and E.Y.'s parent requested a copy of the materials selected for review/removal at Aviano Middle-High School" in Italy, but the principal stated, "no books had yet been removed from the school" and did not respond to the parent's follow-up for a "list of materials relocated for review." *Id.* ¶ 35. In the absence of definitive information, Plaintiffs, their parents, and other sources attempted to compile information about the "quarantined" books. Dkt. 10 at 8; Compl. ¶¶ 44-47. Plaintiff L.K. 3 further reported that she had been unable check out *A Handmaid's Tale* by Margaret Atwood, *The Giver* by Lois Lowry, *Nineteen Eighty-Four* by George Orwell, or *Ground Zero* by Alan Gratz.[3] Dkt. 10 at 9.

### B. Curricular Changes

On January 29, 2025, Secretary Hegseth issued a DoD memorandum establishing the "Restoring America's Fighting Force" Task Force to implement the EO and stating, "[n]o element within DoD will provide instruction on Critical Race Theory (CRT), DEI, or gender ideology as part of a curriculum or for purposes of workforce training." Dkt. 1-10 (Memorandum from Pete Hegseth, Secretary of Defense, U.S. Dep't of Defense, to Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency & DOD Field Activity Directors (Jan. 29, 2025)). Shortly thereafter, Lori Pickel, DoDEA Acting Chief Academic Officer, issued a list of specific curricular materials "potentially related to gender ideology or discriminatory equity ideology topics" and directed instructors to cease teaching them. Dkt. 1-11 at Attachment

---

[3] In a sworn declaration submitted by Defendants, Dr. Jayme Linton, Chief Academic Officer of DoDEA, stated "our integrated library system [] indicates that these four books have been unavailable because other library patrons have checked them out. These books are overdue and should be returned." Dkt. 29-4, Linton Decl. ¶ 28.

A.  Among other topics, the list removed all curricular material on gender and sex in Advanced Placement ("AP") Psychology.  *Id.*  Plaintiffs C.Y. and M.T., both enrolled in AP Psychology at the time of the Complaint, raised concerns "about the ability to obtain Advanced Placement [in Psychology] because they will be tested on content that is banned by DoDEA."  Compl. ¶ 71. DoDEA also removed substantial portions of health education courses, including chapters on sexuality, sexually transmitted diseases, the reproductive system, menstruation, fetal development, abuse, and puberty.  *Id.* ¶¶ 55-56.

The curricular changes at DoDEA schools extended to cultural celebrations as well.  On January 31, 2025, DoD released an internal guidance document titled "Identity Months Dead at DoD," which barred the use of official resources

> to host celebrations or events related to cultural awareness months, including National African American/Black History Month, Women's History Month, Asian American and Pacific Islander Heritage Month, Pride Month, National Hispanic Heritage Month, National Disability Employment Awareness Month, and National American Indian Heritage Month.

Compl. ¶ 57 (citing U.S. Dep't of Defense, *Identity Months Dead at DOD* (Jan. 31, 2025)).  In late February 2025, DoDEA Chief of Staff Taylor York issued a letter requiring schools to "cancel all planned special activities and non-instructional events related to former monthly cultural awareness month observances," except for "host national engagement" celebrations.[4]  Dkt.1-13 (Letter from Taylor York, DoDEA Civil Rights Analyst and Program Manager, to Jay M. Burcham, DoDEA Chief of Staff (Feb. 24, 2025)).  According to Plaintiffs E.K. and S.K. at

---

[4] Plaintiffs contend "[t]he difference between a banned cultural awareness month activity and an allowed 'host nation engagement' activity is unclear and amorphous."  Compl. ¶ 57.  For example, the memorandum specifically bans Black History Month assemblies and Women's History Month events but allows Guam History & Chamorro Heritage Day in Guam."  *Id.*  Guam is not a host "nation."  *Id.*

Crossroads Elementary School and O.H., S.H., H.H., and E.G., at Barsanti Elementary School, their schools "cancelled all Black History Month programming and removed curricula and library displays about Black people." Compl. ¶ 58. Plaintiff O.H. alleged that prior to the cancellations, she had selected Maya Angelou "as the subject of her Black History Month presentation." Dkt. 10 at 10-11. At Aviano Middle-High School, teachers were directed to remove posters of Malala Yousafzai and Frida Kahlo. *Id.* at 11. Plaintiff E.K.'s school in Quantico, Virginia cancelled Black History Month, Women's History Month, and Lunar New Year celebrations while "commemorat[ing] Valentine's Day, St. Patrick's Day, and Easter." *Id.* at 12. Plaintiffs L.K. 1, L.K. 2, and L.K. 3's school cancelled Holocaust Remembrance Day. *Id.*

In response to Defendants' actions, students have protested the removal of educational materials, including through "staged walkouts, carrying signs with messages like: 'Read Banned Books' and 'All History Matters.'" Compl. ¶ 62. Some students were threatened with punishments due to excessive "unexcused absences." *Id.* Plaintiffs assert that they are "increasingly afraid to discuss race and gender in their classrooms, because they fear being silenced by teachers fearful of violating the EOs and DoDEA guidance." *Id.* ¶ 80.

### C.  DoDEA Procedures for Book and Curricular Removal

DoDEA Reg. 2992.01 (2010) sets forth the process for selecting materials used in classrooms and libraries of DoDEA schools. Dkt. 29-1 at 7. The Regulation permits each school to select books for the information centers (i.e., libraries) in the schools. *Id.* at 12. DoDEA teachers have discretion over the materials in their classrooms. *Id.* The criteria for selecting classroom and library materials include educational significance, contribution of the subject matter to the curriculum and interests of students, reviews and recommendations, integrity, and presentation of cultural diversity—particularly as "it relates to the host nation, state, or local

8

community." *Id.* at 7-8.  The Regulation includes mechanisms for challenging selected material. *Id.* at 9-11, 13-14 ("Procedures for Challenging Materials").

Following the issuance of the EOs, DoDEA launched an "Administrative Operational Compliance Review" of all classroom resources and library books to comply with the EOs.  Dkt. 29-4, Linton Decl. ¶ 14.  Per the review process, any library books "potentially related to gender ideology or discriminatory equity ideology topics as defined in the Executive Orders were relocated to the professional collection for evaluation." *Id.* ¶ 15.  With respect to curricular resources "potentially related to gender ideology or discriminatory equity ideology topics as defined the in the Executive Orders," DoDEA "directed staff not to use them for instruction while the review is ongoing." *Id.*  To determine resources for potential review, DoDEA first used subject headings and key words, and then relocated or paused use of the identified materials. *Id.* ¶ 16. Next, "subject matter experts at DoDEA headquarters in each content area gathered the resources proposed for review and provided an initial recommendation for each resource," with additional review from Division Chiefs and the Office of Civil Rights. *Id.* ¶ 17.  This review by subject matter experts is ongoing.  After the current stage of the process, DoDEA will conduct "an even more focused review that assesses the educational and pedagogical value of each resource prior to making a recommendation for final disposition of these materials." *Id.* ¶ 19.  Thereafter, the recommendation will be sent to the DoDEA Director for her final assessment, and then to the Assistant Secretary of Defense for Manpower and Reserve Affairs, Timothy D. Dill, for final review and decision. *Id.* ¶ 20.

**D. Procedural History**

On April 15, 2025, Plaintiffs filed their Complaint against Defendants in this Court.  Dkt. 1.  The Complaint alleges violations of Plaintiffs' First Amendment right to receive information and seeks declaratory judgment on Defendants' First Amendment violations as well as preliminary and permanent injunctive relief barring Defendants from enforcing the EOs.  *Id.* ¶¶ 83-101.  On May 7, 2025, Plaintiffs filed the instant Motion for Preliminary Injunction seeking to enjoin "Defendants from enforcing Executive Order Nos. 14168, 14185, and 14190 and related memoranda, directives, and guidance in DoDEA schools."  Dkt. 10 at 25.  The Motion further requests the Court to order the Government to "return[] all books and curriculum already quarantined or removed based on potential violation of the Executive Orders to their preexisting shelves, classrooms, and instructional units."  *Id.* at 26.  Plaintiffs' Motion is fully briefed.  *See* Dkts. 10, 29, 36.

On June 3, 2025, this Court held a hearing on the motion for preliminary injunction.  Dkt. 37.  In both their briefing and at the hearing, Plaintiffs repeatedly stated that they requested the list of books removed from DoDEA libraries to no avail and instead "compiled the current reported list of books removed . . . through their own observation."  Dkt. 10 at 8; *see also* Dkt. 47 ("Tr.") at 7:24-8:1, 14:12-13, 16:19-25.  Consequently, the Court ordered that Defendants submit all information available regarding the centralized list of removed books to the Court and to Plaintiffs. Tr. at 32:17-33:3.  On June 6, 2025, Defendants moved for a six-day extension to produce the list of library books, which the Court subsequently granted.  Dkts. 38, 40.  On June 11, 2025, Defendants filed a motion asking the Court to reconsider its order to produce the list of removed books.  Dkt. 41.  Defendants reasoned that the list was protected under the "deliberative process privilege" and, thus, not a necessary part of the record for preliminary injunction.  Dkt. 42 at 4-12.

Defendants proposed that, in the alternative, the Court could conduct an *in camera* review of the list *ex parte* to adjudicate the privilege issue. *Id.* at 12.

On June 16, 2025, the Court issued an order permitting Defendants to produce the list of books *ex parte* for *in camera* review, and Defendants filed the list that same day. Dkts. 45, 46. Upon conducting its *in camera* review of the list of books, this Court issued a Memorandum Order on July 11, 2025 denying the Motion for Reconsideration (Dkt. 41) on the grounds that (1) the deliberative process privilege did not apply and (2) the list was germane to the record for preliminary injunction. Dkt. 54. The Court attached the list of books, as submitted by Defendants, to its Order. *Id.* at Attachment A.

### Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship,* 918 F.3d 353, 366 (4th Cir. 2019)). To obtain a preliminary injunction, a movant must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm absent preliminary relief, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The failure to show any one of the relevant factors mandates denial of the preliminary injunction." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016).

Generally, "preliminary injunctions are issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *See Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012). However, the standard for a preliminary injunction "becomes even more exacting when a

11

plaintiff seeks a preliminary injunction *that mandates action,* as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial." *Vollette v. Watson,* No. 2:12-cv-231, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012). Finally, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).

<div align="center">

**Discussion**

</div>

As an initial matter, Defendants seek to apply a heightened legal standard to Plaintiffs' request for an injunction on the basis that Plaintiffs seek a mandatory, as opposed to prohibitory, injunction. Dkt. 29 at 7. The Court finds otherwise. "Whereas mandatory injunctions alter the status quo, prohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" *League of Women Voters of N. Carolina v. North Carolina,* 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Pashby v. Delia,* 709 F.3d 307, 319 (4th Cir. 2013)). The "status quo" refers to "the last uncontested status between the parties which preceded the controversy." *Id.* Here, Plaintiffs' Motion expressly asks the Court to order the Government "to restore the status quo to how it existed on January 19, 2025, by returning all books and curriculum already quarantined or removed based on potential violation of the Executive Orders to their preexisting shelves, classrooms, and instructional units." Dkt. 10 at 26; *see also Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.,* 775 F. Supp. 3d 1160, 1174 (D. Colo. 2025), *appeal filed,* No. 25-1105 (10th Cir. 2025) (holding that plaintiffs' requested relief to order a school district to return removed books to libraries did not constitute a mandatory injunction). Accordingly, the Court finds that Plaintiffs seek a prohibitory injunction, and the ordinary *Winter* factors apply.

<div align="center">

12

</div>

## A. Standing

The Court must first address whether Plaintiffs have standing to raise a claim. "Standing 'is a threshold jurisdictional question' that ensures a suit is 'appropriate for the exercise of the [federal] courts' judicial powers.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (alteration in original) (quoting *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001)). While Defendants contend that Plaintiffs lack standing on their challenge to the book removals, they raise no such challenge with respect to Plaintiffs' claims regarding the curricular changes. Dkt. 29 at 15. Nevertheless, because standing is a constitutional requirement bearing on jurisdiction, the Court must address it *sua sponte* even where the parties have not properly raised the issue. *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020).

To establish Article III standing, a plaintiff must show (1) a concrete, particularized, and actual or imminent injury-in-fact that is (2) fairly traceable to the challenged action by the defendant, and is (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Where there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 581 U.S. at 439.; *see also Rumsfeld v. Forum for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n. 2 (2006) ("The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" and does not require the Court to also "determine whether the other plaintiffs have standing."). Furthermore, parties "must demonstrate standing 'with the manner and degree of evidence' required at the relevant 'stage[ ] of the litigation.'" *Fernandez v.*

*RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561).  "At the preliminary injunction stage, then, [Plaintiffs] must make a 'clear showing' that [they are] 'likely' to establish each element of standing."  *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citing *Winter*, 555 U.S. at 22).

The Complaint here concerns twelve plaintiffs raising two separate First Amendment claims that seek injunctive relief.  *See* Dkt. 1.  Therefore, to satisfy Article III, Plaintiffs must establish that at least one Plaintiff is likely to satisfy the standing requirements for the First Amendment claims with respect to both book removals and curricular changes.  The Court finds that Plaintiffs meet this standard for standing on both claims.

Defendants do not dispute that Plaintiffs have standing as to the curricular changes claim.  Indeed, Defendants expressly acknowledge Plaintiffs' loss of curricular material.  Dkt. 29-4, Linton Decl. ¶¶ 22-30.  The Court finds that at least one plaintiff, if not more, is likely to establish an injury-in-fact from these losses of curricular material under Article III standing.  For example, Plaintiff O.H. was denied the opportunity to present her research project on Maya Angelou after her school cancelled Black History Month in compliance with DoDEA guidance barring celebrations or events related to Black History Month.  Dkt. 10 at 10.  Plaintiffs C.Y. and M.T. stated injuries from the removal of the "Gender and Sex" module in their AP Psychology courses, both because of the impact on their Advanced Placement exams as well as the harm of "not learning about how gender and sex impact psychology."  Compl. ¶ 71.  Plaintiffs L.K. 1, S.K., O.H., and E.K. assert injuries from the removal of immigration materials from their curricula, which will affect their fifth-grade curriculum in the coming school year.  *Id.* ¶ 73.  Accordingly, the alleged injuries are not "generalized grievances" about the ability to access curricula.  *Lujan*,

504 U.S. at 575. Defendants' pleadings further confirm that they implemented the curricular changes core to Plaintiffs' injuries, thus satisfying traceability. Dkt. 29-4, Linton Decl. ¶¶ 22-30.

Defendants' principal challenge to standing concerns whether Plaintiffs have demonstrated an injury that is traceable to Defendants' actions with respect to the book removals. Dkt. 29 at 15. Defendants argue that "Plaintiffs have failed to establish a particularized injury" because they have not shown "that they sought the information temporarily withdrawn from DoDEA's bookshelves pending further review." *Id.* The Court does not agree. On the evidence presented, the Court finds, for the following reasons, that Plaintiffs are likely to succeed on establishing standing for the book removal claims.

### i.    *Injury-in-fact from book removals*

First, the Court finds that at least one plaintiff has established an injury with respect to the book removals at this stage. An injury-in-fact must be "concrete and particularized[,]" meaning that the injury alleged "must affect the plaintiff in a personal and individual way" and "must actually exist." *Wright v. Cap. One Bank (USA)*, No. 1:21-cv-803, 2024 WL 920057, at *3 (E.D. Va. Mar. 4, 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). A plaintiff seeking injunctive relief may establish an injury-in-fact by asserting adverse effects in the future, but the plaintiff must describe concrete plans to be considered "actual or imminent." *Lujan*, 504 U.S. at 564. "[S]ome day intentions . . . without a description of concrete plans, or indeed even any specification of *when* that some day will be" do not support an "actual or imminent" injury. *Id.*

In First Amendment contexts, both the Supreme Court and Fourth Circuit have asserted that "standing requirements are somewhat relaxed," especially with respect to the injury requirement. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citing *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)); *see also Lopez v. Candaele*, 630 F.3d 775,

781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing."). Accordingly, courts have said "it is sufficient to show one's First Amendment activities have been chilled" to establish an injury-in-fact. *Cooksey*, 720 F.3d at 235-36 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).

Here, as Defendants concede, at least Plaintiff L.K. 3 is likely to establish an injury-in-fact from the removal of library books. Dkt. 29 at 15 ("A review of the evidence Plaintiffs submitted to support their motion for a preliminary injunction shows that only one of the named Plaintiffs (L.K.3) has come close to meeting the required showing to establish standing in connection with the book claim."). Plaintiff L.K. 3 attempted to check out four books from the library that had been removed: *A Handmaid's Tale* by Margaret Atwood, *The Giver* by Lois Lowry, *Nineteen Eighty-Four* by George Orwell, or *Ground Zero* by Alan Gratz. Dkt. 10 at 9. Courts addressing analogous facts around book removals have similarly found that a plaintiff's inability to check out a particular book, even if in the future, satisfies the injury-in-fact requirement. For example, in *PEN American Center, Inc. v. Escambia County School Board*, which Defendants directly rely upon, the court held that student-plaintiffs had established standing on a First Amendment challenge to book removals where "the children intended to check out specific removed and restricted books during the upcoming (now, ongoing) school year, but they are unable to do so." 711 F. Supp. 3d 1325, 1329-30 (N.D. Fla. 2024); *see also* Dkt. 29 at 15. Similarly, in *ACLU of Florida, Inc. v. Miami-Dade County School Board*, the Eleventh Circuit found that a student had established an injury for standing purposes when he alleged that the school's policy of removing books prevented him from checking out a particular book "after school resumed in six weeks." 557 F.3d 1177, 1194-95 (11th Cir. 2009).

The injury asserted here for L.K. 3 is no different from these precedents. L.K. 3's allegation that a librarian subsequently scolded them for seeking out these books further establishes the injury-in-fact. Dkt. 10 at 9 (citing Dkt. 10-26, Kenkel Decl. ¶ 9). It is glaring to this Court that an adult scolding a middle schooler for her choice of books would be especially "chilling" and injurious to the student's First Amendment rights. Accordingly, the Court finds that Plaintiffs have established an injury for standing purposes as to the book removal claim.

***ii. Traceability of Plaintiffs' injuries to Defendants' actions regarding book removals***

The Court further finds that Plaintiffs have established traceability between their injuries and Defendants' actions with respect to the book removals. "Traceability may be satisfied if Plaintiffs sufficiently allege that Defendants' conduct was a plausible source of the injury . . . suffered." *Wright*, 2024 WL 920057, at *4 (citing *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018)). Defendants aver that even if L.K. 3 suffered an injury from her inability to access her library books, she did not demonstrate "traceability" between her injury and Defendants' actions. Dkt. 29 at 16. In a sworn declaration submitted by Defendants, Dr. Jayme Linton, Chief Academic Officer of DoDEA, stated "our integrated library system [] indicates that these four books have been unavailable because other library patrons have checked them out." Dkt. 29-4, Linton Decl. ¶ 28.

However, the Court finds that there is sufficient evidence demonstrating a plausible nexus between L.K. 3's injury and Defendants' actions in removing books. At the outset, Dr. Linton's declaration does not expressly confirm that the books L.K. 3 sought had never been quarantined. *Id.* (inferring that the books were not accessible to L.K. 3 "because another student is accessing them," not "because of DoDEA's ongoing resource reviews"). To the contrary, Plaintiffs' submitted evidence indicates that at least one of the books L.K. 3 attempted to check out, *A*

*Handmaid's Tale*, had been removed from at least one DoDEA library. *See* Dkt. 10-22 (Exhibit

20 to Callahan Decl.) at 4 (depicting scans of a binder titled "Quarantined Books," in which *A

Handmaid's Tale* is listed); Dkt. 10-2, Callahan Decl. ¶ 21 ("Although DoDEA has not yet

published lists, a binder of books reported to have been removed is attached as Exhibit 20."). It is

further puzzling that a librarian would "scold" L.K. 3 for attempting to access books that were

merely checked out by another student. Dkt. 10-26, Kenkel Decl. ¶ 9. The librarian's response

insinuates that L.K. 3's attempt to check out books was impermissible in some other way.

Accordingly, in light of Plaintiffs' submitted evidence, Dr. Linton's declaration alone does not

defeat traceability for L.K. 3's claim.

The Court notes that Defendants do not challenge the redressability question on the book

removal claim. Nonetheless, the Court finds that Plaintiffs' requested relief would redress their

injuries. An injunction ordering Defendants to halt the policy of book and curricular removal and

reinstate any removed materials would result in Plaintiffs' ability to exercise their First

Amendment right to information. *See Lujan*, 504 U.S. at 569-70 (finding no redressability where

a favorable action would not necessarily mitigate plaintiffs' asserted injuries).

### iii.    *Justiciability*

There is the additional question of whether Defendants' July 2025 list of removed books—

of which, none of L.K. 3's sought-after books are included—impacts justiciability. *See* Dkt. 42 at

10-11. For standing purposes, the Court finds that the list is not dispositive; "[s]tanding is to be

determined as of the commencement of the suit." *Lujan*, 504 U.S. at 570 n.5. Defendants'

submitted list was filed three months after the commencement of the suit, and nowhere do

Defendants aver that that version of the list was in effect when Plaintiffs filed their Complaint.

For the reasons stated above, the list does not impact the standing analysis.

The Court further concludes that the recently submitted list cannot render L.K. 3's injuries moot either. *Eden, LLC v. Just.*, 36 F.4th 166, 169 (4th Cir. 2022) (quoting *Fleet Feet, Inc. v. NIKE, Inc.*, 986 F.3d 458, 463 (4th Cir. 2021)) (stating the mootness doctrine bars the Court "from advising on legal questions 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'"); *see also* U.S. Const. art. III, § 2, cl. 1. A matter "does not become moot when a defendant voluntarily ceases its . . . behavior, if there is a reasonable chance that the behavior will resume." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021). In the context of L.K. 3's claim, the Court has no assurance that L.K. 3's desired books will not be removed from the libraries in the future or, to the extent they are currently removed, made available again to L.K. 3.

The evidence before this Court overwhelmingly suggests that the implementation of the book removal process has been inconsistent and opaque. The Court is uncertain whether the list of books Defendants submitted in July 2025 provides a comprehensive, accurate, and timely picture of the book removals at Plaintiffs' individual schools in the first instance. At the time they submitted the list, Defendants provided little detail to this Court on how the submitted list was prepared. Assistant Secretary Dill's declaration posits that "[t]he list is maintained in a digital shared drive file to which a number of DoDEA professionals have continuous live access." Dkt. 42-1, Dill Decl. ¶ 4.[5] It is not clear who these professionals are, or how much autonomy they possess to edit the list on an ongoing basis.

Furthermore, Defendants' submission of one consolidated list of removed books implies a centralized repository of removed library books. *See* Dkt. 54 at Attachment A. At several points,

---

[5] The declaration was attached as part of the government's Motion for Reconsideration of the Court's order to submit the list of removed books. Dkt. 42-1.

however, Defendants represented to Plaintiffs and the Court that part of the decision-making on book quarantines would be made regionally or at the school level. *See* Dkt. 10-27, Tolley Decl. ¶ 10 ("At this meeting, the principal informed all parents that decision-making regarding book quarantines is being done at a regional level."); Dkt. 29 at 4 ("In the DoDEA global school system, each school has the discretion to select the books for the information centers (*i.e.*, libraries) in its schools."); *id.* at 5 ("At each school in the DoDEA global network, instructional systems specialists identified books in their library collections and in their classrooms that required further review."). Accordingly, it is unclear whether the July 2025 list accurately captures all book removals at Plaintiffs' schools, including at L.K. 3's school. And it is further uncertain who, among the DoDEA professionals with "continuous live access" to the list, is responsible for consolidating the list or ensuring its accuracy and comprehensiveness. Dkt. 54 at Attachment A.

In Defendants' own words, the book removal process has been "iterative" and "dynamic." Dkt. 42 at 10-11. Assistant Secretary Dill's declaration asserts that "[b]ooks continue to be added for a number of reasons, including the arrival of books previously ordered or newly identified." Dkt. 42-1, Dill Decl. ¶ 4. As stated, even if the books are not on the current list, it does not mean they were not on the previous list or, for that matter, will not be included in some future iteration. For these reasons, the Court finds that L.K. 3's claim meets the justiciability thresholds of the standing and mootness doctrines.

To the extent any previously removed books are no longer "quarantined," Defendants have provided no information suggesting that these books were subsequently restored and made available to students. Nor do they suggest that books that are no longer on the list going forward will be restored then. Where the implementation process of book removals appears to this Court

to be inconsistent, unstructured, and nontransparent, the Court declines to defer exclusively to Defendants' one submitted list when assessing justiciability.

In the broader scheme, it is troubling to the Court that Defendants continue to question Plaintiffs' standing on the basis that they failed to identify specific books while persistently refusing to share that relevant information with them in the first place. Plaintiffs detail, in great length, the numerous instances in which they asked Defendants for a list of removed books, to no avail. *See, e.g.*, Dkt. 10-23, Keeley Decl., Ex. D at 27-38 (email chain between E.K. and S.K.'s parent and DoDEA Americas Communications Director Michael O'Day in which the parent requested the list of removed books three times before Defendants directed him to file a FOIA request); *id.* ¶¶ 24-25 ("As of the date of this declaration [May 7, 2025], the status of our February 11 FOIA is still listed as 'Assigned for Processing' . . . [since then] my husband has filed five more FOIA requests . . . [and] only two have been even partially fulfilled."); Dkt. 10-25, Young Decl. ¶ 12 ("On February 12, 2025, I requested a copy of the materials selected for review/removal at Aviano Middle-High School. The school principal told me that items were under operational review and that no books had yet been removed from the school. I followed-up but was never provided with a list of materials relocated for review."); Dkt. 10-26, Kenkel Decl. ¶ 20 ("Although I was promised a response within 20 days [of submitting my FOIA request], as required by the administrative rules of the FOIA program, I have not received any of the requested information."); Dkt. 10-27, Tolley Decl. ¶ 12 ("On March 14, 2025, I emailed the librarian to ask if we could discuss the DoDEA guidance on book removals. She responded on March 21, 2025, telling me that all communication on this topic would come from our principal."); Dkt. 10-24, Henninger Decl. ¶ 18 ("I directed several emails to Barsanti Elementary administrators requesting clarification about what changes were occurring as a concerned parent, but have not received

specific responses about what materials have been removed from the library or what other changes were occurring . . .").

Despite this lack of transparency, Plaintiffs nevertheless collected ample evidence on the book removals and filed their suit with the information available to them within a few months of the initial Executive Orders.  *See* Dkt. 10-1 (index of exhibits submitted with Plaintiffs' preliminary injunction motion).  It is impermissible for Defendants to take an action implicating constitutional rights, fail to provide information on that action, and then accuse the parties of lacking precise information for standing in their claims challenging that action.  Accordingly, based on the evidence provided by both parties, the Court finds that Plaintiffs have established standing because at least one has shown standing and this matter is justiciable.

### B.  Likelihood of Success on the Merits of the First Amendment Claims

The Court now turns to whether Plaintiffs' First Amendment claims satisfy the *Winter* factors for a preliminary injunction.  The Fourth Circuit has asserted that where "the irreparable harm that [the plaintiff] has alleged is inseparably linked to his claim of a violation of his First Amendment rights . . . analysis of [the plaintiff's] likelihood of success on the merits becomes the first and the most important factor for a court to consider."  *Imaginary Images Inc. v. Evans*, 593 F. Supp. 2d 848, 853-54 (E.D. Va. 2008), *aff'd,* 612 F.3d 736 (4th Cir. 2010) (quoting *Ctr. for Individual Freedom, Inc. v. Ireland*, 2008 WL 1837324, at *2 (S.D. W. Va. Apr. 22, 2008)).

Here, a preliminary—and fundamental—dispute between the parties concerns whether the First Amendment applies in the first instance.  At the outset, Defendants declare that the First Amendment does not apply to either the book removals or the curricular changes because these actions constitute government speech.  Dkt. 29 at 17-19.  Plaintiffs, however, contend that both policies run afoul of the First Amendment.  Dkt. 10 at 15-24.  On the book removals, Plaintiffs

22

argue that the Court should rely on the Supreme Court's plurality in *Board of Education v. Pico*, which precludes the regulation of school library books in a "narrowly partisan or political manner." Dkt. 10 at 17 (citing 457 U.S. 853 (1982)). On the curricular changes, Plaintiffs argue that Defendants' actions violate students' right to receive curricular information and lack a legitimate pedagogical interest under *Hazelwood School District v. Kuhlmeier*, which governs school curricula. Dkt. 10 at 21-24 (citing 484 U.S. 260 (1988)). The Court first addresses the book removals and then the curricular changes.

### i. *Book Removals*

#### a. Government Speech Doctrine

Defendants attempt to circumvent the First Amendment entirely by asserting that the removal of books from DoDEA libraries constitutes government speech. Dkt. 29 at 17. On Defendants' theory, "[t]he inclusion, or exclusion, of certain materials reflects DoDEA's expressive act of speech that it wishes to convey to its audience—here, schoolchildren." *Id.* at 18. Therefore, Defendants contend that as DoDEA's speech, library curation is exempt from the First Amendment. The Court is unpersuaded.

Ordinarily, the First Amendment's Free Speech Clause "restricts government regulation of private speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). Under the "government speech doctrine," "[t]he Free Speech Clause . . . does not regulate government speech." *Id.*; *see also Page v. Lexington Country Sch. Dist. One,* 531 F.3d 275, 280 (4th Cir. 2008) ("The Government's own speech . . . is exempt from First Amendment scrutiny.") (internal quotation and citation omitted). The doctrine posits that when the government speaks, "it naturally chooses what to say and what not to say" without the restrictions of viewpoint neutrality under the First Amendment. *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022).

23

To determine the "boundary between government speech and private expression," the Supreme Court uses a "holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* at 252. This inquiry considers evidence of "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.*

Despite Defendants' arguments to the contrary, DoDEA school libraries lack the quintessential elements of government speech. Public school libraries have historically been loci of intellectual freedom, where students are "free to inquire, to study and to evaluate, to gain new maturity and understanding.'" *Pico*, 457 U.S. at 868 (plurality opinion) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)); *see also PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 ("[T]he traditional purpose of a library is to provide information on a broad range of subjects and viewpoints."). Viewing public school libraries as places of academic freedom and intellectual pursuit conflicts with the United States' notion that school libraries represent government speech.

It is furthermore doubtful that the public—or DoDEA students, for that matter—perceives the books in school libraries as conveying a government message. *See PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 ("[T]he Court simply fails to see how any reasonable person would view the contents of the school library . . . as the government's endorsement of the views expressed in the books on the library's shelves.").

Here, library books are different in kind from established government speech, such as a set of limited public monuments displayed on government property or license plate designs that the government actively controls. *Summum*, 555 U.S. at 470-73 (finding permanent monuments in a public park were government speech because they "are meant to convey and have the effect of

24

conveying a government message."); *Walker v. Tx. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209-14 (2015) (holding license plate designs by private groups were government speech because state "maintain[ed] direct control over the messages conveyed" by "actively" reviewing designs and rejecting over a dozen proposals.). A city's efforts to present an image through "selective receptivity" of displayed monuments in a public park is "closely identified in the public mind with the government unit that owns the land." *Summum*, 55 U.S. at 472-73. License plates expressly display the state's imprimatur. *Walker*, 576 U.S. at 212 ("The governmental nature of the [license] plates is clear from their faces: The State places the name 'TEXAS' in large letters at the top of every plate."). Conversely, the hundreds of library books in DoDEA libraries, from a wide range of authors, have neither of these characteristics. *See* Dkt. 29-1 at 4, 7-9 (stating DoDEA schools have discretion to select the books and consider factors such as "educational significance, contribution of the subject matter to the curriculum and interests of students, reviews and recommendations, integrity, and presentation of cultural diversity," among others); Dkt. 54 at Attachment A (listing over 500 books that existed in DoDEA libraries and were removed—even if temporarily—to comply with the Executive Orders); *see also Shurtleff*, 596 U.S. at 256 (finding flag raisings did not constitute government speech where the city did not maintain control over the flags' content and approved over 50 unique flags to "accommodate all applicants.").

While Defendants maintain that "courts have repeatedly recognized" that school library curation is government speech, the weight of the case law suggests otherwise. Dkt. 29 at 19. While the Supreme Court has not definitely ruled on this question, sister courts have overwhelmingly found that the government speech doctrine does not pertain to public school libraries. *See Crookshanks*, 775 F. Supp. 3d at 1175-76 (citing case law supporting this proposition); *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) ("Contrary to

Defendants' contention, the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries."); *Virden v. Crawford Cnty., Arkansas*, 2024 WL 4360495, at *5 (W.D. Ark. Sept. 30, 2024) ("[T]he Supreme Court has not extended [the government speech] doctrine to the placement and removal of books in libraries . . . "); *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331.[6]

Defendants claim that *Moody v. NetChoice, LLC* supports their position that "curating a library is an expressive act." Dkt. 29 at 17; 603 U.S. 707, 728 (2024). *Moody* involved First Amendment challenges to Florida and Texas state laws that restricted social media platforms' ability to control third-party posts. 603 U.S. at 717. The Supreme Court held that "[a] private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment." *Id.* at 729-30. Thus, *Moody* concerned the expressiveness of *private* curation; it did not concern the government speech doctrine. *See id.* at 719. Rather, the Court made explicit that "it is no job for government to decide what counts as the right balance of private

---

[6] The Fifth Circuit recently stated in *Little v. Llano County* that the curation of a public library constitutes government speech. 138 F.4th 834, 865 (5th Cir. 2025). However, only a plurality of the en banc panel joined that portion of the opinion. *Id.* The plurality's opinion reasoned that "libraries curate their collections for expressive purposes." *Id.* at 837-38. The majority opinion rested on plaintiffs' lack of standing to challenge public library book removals. *Id.* at 835 (majority opinion). Not only did the government speech theory fail to receive a majority, but it also contravened the weight of precedent in other jurisdictions. *See Penguin Random House v. Gibson*, 2025 WL 2408178, at *22 (M.D. Fla. Aug. 13, 2025) ("There is some conflicting authority among other circuits, but the argument that it is government speech has yet to obtain endorsement by a majority opinion."). Moreover, public school libraries pose a different context than public libraries in general. Indeed, the Supreme Court has observed that in a school setting, students' First Amendment rights must be construed "in light of the special characteristics of the school environment." *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969). At the hearing before this Court on June 3, 2025, the government further distinguished between a public library and a school library. Tr. at 27:8-15. Accordingly, the Court finds *Llano County* unpersuasive here.

expression." *Id.* (stating that it is not up to government to "'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences.").

Finally, Plaintiffs note that "the government speech doctrine requires the Government to *add* its own message to the marketplace of ideas, and not to wield Government power in order to regulate or *suppress* private speech rights." Dkt. 36 at 6 (citing *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024)). Indeed, in *National Rifle Association of America v. Vullo*, the Supreme Court made clear that even in "government speech" contexts, where "the complaint plausibly alleges coercive threats aimed at punishing or suppressing disfavored speech, the plaintiff states a First Amendment claim." 602 U.S. 175, 197 (2024). In their Complaint, Plaintiffs note that students have been threatened with punishments for protesting the removal of educational materials, and that Plaintiffs "are increasingly afraid to discuss race and gender in their classrooms, because they fear being silenced by teachers." Compl. ¶¶ 62, 64, 80. The Court has recognized that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). This presents an even greater justification for the First Amendment's application here.

Where other courts have declined to extend the government speech doctrine to the public library context, this Court follows suit. The Supreme Court has cautioned that the government speech doctrine is "susceptible to dangerous misuse," and, therefore, "we must exercise great caution before extending our government speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Accordingly, this Court heeds that warning and finds that Defendants have not shown that the government speech doctrine shields them from application of the First Amendment.

b.  First Amendment Standard for Book Removals

In applying the First Amendment, the Court must still determine the appropriate legal standard. Here, the parties disagree once again. Plaintiffs rely extensively on the Supreme Court's plurality opinion in *Pico*, which concerned a similar First Amendment challenge to book removals in public school libraries. Dkt. 10 at 17-19 (citing 457 U.S. 853). In *Pico*, a plurality of Supreme Court Justices asserted that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'"[7] 457 U.S. at 872 (plurality opinion) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Concurring with the judgment in full and the reasoning in part, Justice Blackmun agreed that schools could not impermissibly suppress books based on the ideas within them, though he rejected a constitutional "right to receive information." *Id.* at 877-78 (Blackmun, J., concurring). Justice White's concurrence, on the other hand, concurred only in the judgment and found it unnecessary to "issue a dissertation on . . . the First Amendment" absent further findings of fact from the district court. *Id.* at 883 (White, J., concurring). On Plaintiffs' read, taking the plurality and concurrences together, "a majority of Justices . . . agreed that removing books from school libraries implicates students' First Amendment rights." Dkt. 10 at 18.

Conversely, Defendants contest applying *Pico* here on the basis that it lacks precedential value. Dkt. 29 at 23-24. Instead, Defendants maintain that if the Court were to reject the government speech doctrine—which it does—then the Supreme Court's standard in *Hazelwood School District v. Kuhlmeier* governs this case. *Id.* at 19-22 (citing 484 U.S. 260 (1988)). In

---

[7] Justices Brennan, Marshall, and Stevens joined the plurality opinion of the court. Justice Blackmun concurred in part and concurred in the judgment.  Justice White concurred in the judgment.  Chief Justice Burger and Justices Powell, Rehnquist, and O'Connor dissented.

*Hazelwood*, the Supreme Court held that schools have discretion to regulate school-sponsored speech, defined as "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. However, the school's actions must be "reasonably related to legitimate pedagogical concerns." *Id.* at 273. Defendants aver that the book reviews implement "pedagogical standards and priorities" underlying the EOs: removing books on "gender ideology," "discriminatory equity ideology," and "invidious race and sex discrimination" as they define those terms. Dkt. 29 at 22.

This Court is not the first to address whether *Pico* or *Hazelwood* provides the appropriate First Amendment standard to a public school library book removal challenge. In the absence of a Supreme Court majority, "the precedential value of *Pico* has perplexed courts for years, including in the recent years." *Crookshanks*, 775 F. Supp. 3d at 1178; *see also PEN Am. Ctr.*, 711 F. Supp. 3d at 1331 ("The applicable legal standard for evaluating alleged First Amendment violations in the school library context is not entirely clear . . . ."); *K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022) ("[I]t is not clear, what, if anything, from *Pico* is binding on the case here.").

Justice White's concurrence, which set forth the narrowest grounds for a holding, has contributed, in part, to the puzzle of *Pico*'s precedential value. Under *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). On one hand, Justice White's concurrence may be read as implicitly seeking to understand the motivation behind the school board's removal decision. *Pico*, 457 U.S. at 883 (White, J., concurring) ("The unresolved factual

29

issue, as I understand it, is the reason or reasons underlying the school board's removal of the books."); *Crookshanks*, 775 F. Supp. 3d at 1179 ("Justice White preferred to return the case to the district court to determine why the school board removed the books."). As Defendants aver, another read of Justice White's decision interprets it "to mean that the precedential holding of *Pico* is that disputes of fact in that case's record prevented entry of summary judgment." Dkt. 29 at 23; *see also Griswold v. Driscoll*, 616 F.3d 53, 57 (1st Cir. 2010) (Souter, J.) (observing that "Justice White concurred in the judgment without announcing any position on the substantive First Amendment claim"); *Walls v. Sanders*, 760 F. Supp. 3d 766, 779 n.49 (E.D. Ark. 2024) ("Moreover, Justice White's decisive concurrence in the judgment . . . was anodyne enough that nearly nothing of substance was actually done in *Pico*.").

Nevertheless, because *Pico* provides the sole Supreme Court precedent on book removals in public school libraries, courts have long relied on it for guidance in public school book removal cases. *Case v. Unified Sch. Dist. No. 233*, 895 F. Supp. 1463, 1469 (D. Kan. 1995) (*Pico* "is the only Supreme Court decision dealing specifically with removal of books from a public school library" and "must be used as a starting point"); *see also Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001, 1020 (S.D. Iowa, Mar. 25, 2025) ("Notwithstanding the splintered nature of the decision, *Pico* provides some guidance that remains applicable today. Almost all justices agreed that school boards can violate the First Amendment in *some* circumstances when making decisions about the removal of books from the school library.").[8]

---

[8] Additionally, while not addressing book removals, the Fourth Circuit has repeatedly relied on the plurality opinion in *Pico*. *See Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) (citing *Pico* for the proposition that the First Amendment "protects *both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas."); *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 353 (4th Cir. 2001) (citing *Pico* for proposition that "the First Amendment guarantees viewers and listeners the right to receive information.").

*Hazelwood*'s application to a school library book matter similarly remains unclear given that it was decided in the context of school-sponsored speech in a school newspaper. *Compare ACLU of Fla.* 557 F.3d at 1202 ("[A school newspaper situation and school library book situation] may be sufficiently analogous to extend the *Hazelwood* standard here, or they may not be.") *with GLBT Youth in Iowa Schs. Task Force,* 114 F.4th at 670 ("The purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical missions of the school, which may involve some limitation of expression.").

Accordingly, in reviewing challenges to public school library book removals, most courts have simply declined to resolve the *Pico* and *Hazelwood* dilemma and, instead, applied both cases. *See PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1325 (holding that the common theme in *Pico* and *Hazelwood* asserts that "school officials cannot remove books solely because they disagree with the views expressed in the books"); *ACLU of Fla.*, 557 F.3d at 1202 ("The question of what standard applies to school library book removal decisions is unresolved. And for reasons that will become apparent later we have no need to resolve it here."); *Crookshanks*, 775 F. Supp. 3d at 1179-84 (applying both *Pico* and *Hazelwood* in book removal case). This Court also declines to resolve it. Accordingly, the Court will evaluate Defendants' removal of DoDEA library books under both *Pico* and *Hazelwood* to determine (1) whether the underlying motivation for removal is improper, and (2) whether legitimate pedagogical interests justify the book removals. *See PEN Am. Ctr., Inc*, 711 F. Supp. 3d at 1331; *ACLU of Fla.*, 557 F.3d at 1202; *Crookshanks*, 775 F. Supp. 3d at 1179-84. Under both decisions, the Court finds that Plaintiffs will likely succeed in proving that Defendants' removal of DoDEA library books runs afoul of the First Amendment.

First, in applying the *Pico* framework, the Court focuses on Defendants' stated motivations for removing the books. Taken together, *Pico*'s plurality opinion and concurrences support the

31

proposition that the First Amendment bars schools from removing books to "prescribe what shall be orthodox" or because of the impermissibility of the underlying ideas. *Pico*, 457 U.S. at 872 (plurality opinion) (quoting *Barnette*, 319 U.S. at 642); *id.* at 875, 881-82 (Blackmun, J., concurring) ("[T]he State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons."); *id.* at 883 (White, J., concurring) ("The unresolved factual issue, as I understand it, is the reason or reasons underlying the school board's removal of the books."); *see also Crookshanks,* 775 F. Supp. 3d at 1179 ("Under the *Pico* framework, the Court looks to the District's stated motivations behind removing the 19 books."); *Pen Am. Ctr.*, 711 F. Supp. 3d at 1331 ("[T]he common theme in all of the potentially relevant standards (e.g., *Pico* plurality . . . ) is that school officials cannot remove books solely because they disagree with the views expressed in the books."). Here, Plaintiffs have demonstrated a likelihood of showing that Defendants' stated motivations for removing over 500 library books set forth an impermissible partisan or political motivation. Plaintiffs contend, and Defendants concede, that the book removals stem directly from the President's Executive Orders. Dkt. 1-4 (Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA administrators, educators, and staff (Feb. 5, 2025)) ("DoDEA will conduct an operational compliance review to ensure alignment with the applicable Executive Orders" . . . including by relocating "books potentially related to gender ideology or discriminatory equity ideology topics as defined in the Executive Orders . . . ").

To further demonstrate the partisan motivation, Plaintiffs point to the President's own words as a direct link between his EOs and his war on "wokeness." Dkt. 10 at 7. In a March 6, 2025 statement to Congress, the President proclaimed:

> [W]e're getting wokeness out of our schools and out of our military, and it's already out, and it's out of our society. We don't want it. Wokeness is trouble. Wokeness

is bad.  It's gone.  It's gone.

Dkt. 10-10 at 15.   However, Defendants contend:

> It is a significant logical leap to conclude that teaching students about the binary sexes is a "narrowly partisan" act . . . given the state of debate and discourse of the last several years . . . Were Plaintiffs' approach adopted, any issue that has a connection to the subject matter of a child's education discussed in an election or more generally in political discourse—be it local, state, or national level—becomes a [sic] partisan subject to *Pico*-plurality scrutiny.

Dkt. 29 at 25; *id.* n.7.  The Court disagrees.

The *Pico* plurality asserted that "[i]f [the school district] *intended* by their removal decision to deny [students] access to ideas with which petitioners disagreed, and if this intent was the decisive factor in [the school district's] decision, then [the school district has] exercised [its] discretion in violation of the Constitution." *Pico*, 457 U.S. at 870-71 (plurality opinion); *id.* at 879 (Blackmun, J., concurring) ("[T]he State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons."). The Executive Orders— and by extension, Defendants' book removals—do exactly this.  The record is clear that by removing books, Defendants intended to deny Plaintiffs access to ideas that they, by virtue of the Presidential EOs, found distasteful, "radical" or "divisive." Dkt. 1-2 at 3.

The Court recognizes that it would be different if DoDEA sought to remove library books solely upon the "educational suitability" of the books.  *Pico*, 457 U.S. at 871 (plurality opinion) (finding it valid to remove books for educational suitability); *Crookshanks*, 775 F. Supp. 3d at 1182 (finding the record showed that book removal process sought to maintain conservative values, rather than an "educational mission," in violation of *Pico*).  And indeed, Defendants contend that the removal of library books arises from "only the pedagogical concern of ensuring that students receive instruction on the biological binary of sex and promoting inclusivity values through merit (and thereby eliminating any remaining vestiges of discrimination) . . . ." Dkt. 29

33

at 25. However, the Court is not persuaded. The Executive Orders set forth generalized directives, without any particular focus on educational suitability. Similarly, the book removals do not focus on books that "contain[] offensive language" or are "psychologically or intellectually appropriate for the age group," or "manifestly inimical to the public welfare"—reasons deemed to be proper bases for book removal in Justice Blackmun's *Pico* concurrence. *Pico*, 457 U.S. at 893 (Blackmun, J., concurring) (citations omitted).

Moreover, the faulty implementation of the removals suggests that the removals were not rooted in pedagogical concerns. Defendants purport to have one standard list of "quarantined books" across all DoDEA schools. *See* Dkt. 54 at Attachment A. As previously discussed, the list does not differentiate between the appropriateness and pedagogical interests across different age groups. *Id.* Defendants also maintain that the list of removed books submitted to the Court is tentative and pending further review. Dkt. 42 at 10-11 (stating the list of removed books is "iterative," "dynamic," and "non-final"). Thus, that Defendants removed books with any inkling of the partisan ideas central to the EOs, without even completing the detailed review process, further evinces the improper partisan motivation underlying their actions. It raises additional concerns that the completion of the book review process may simply set forth *post hoc* pedagogical justifications. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004) (footnote omitted) ("Although we do not second-guess the *pedagogical* wisdom or efficacy of an educator's goal, we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was *pretextual*."). Accordingly, the Court finds that under the principles of *Pico*'s plurality and concurrences, Plaintiffs have demonstrated a likelihood of proving that Defendants were impermissibly motivated by a partisan interest when removing DoDEA library books.

Defendants' arguments do not fare any better under the *Hazelwood* standard. At the outset, it is unclear whether book removals constitute school-sponsored speech under *Hazelwood*. *Hazelwood* recognized schools' ability to control student expression "that might reasonably [be] perceive[d] to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. "These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* Per Defendants, the DoDEA libraries are "designed to 'meet the [schoolchildren's] educational needs' and 'enrich and support the curriculum.'" Dkt. 29 at 21 (citing Dkt. 29-4, Linton Decl. ¶ 6). However, Defendants provide no authority to support their argument that school library book collections constitute "school-sponsored speech." *See Crookshanks*, 775 F. Supp. 3d at 1183. Rather, Defendants go to great lengths to analogize library collections to other types of school activities that the Fourth Circuit and Supreme Court have deemed to be school-sponsored speech. Dkt. 29 at 20 (quoting *Fleming v. Johnson Cnty. Sch. Distr. R-1*, 298 F.3d 918, 925 (10th Cir. 2002)) ("[I]f the school band, drama club, and choir are constitutional adjuncts of a school's curriculum, then surely school libraries are within the curricular activities or resources 'that affect learning.'").

This Court is skeptical whether library books can reasonably be said to "bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. As stated earlier, libraries are intended to provide a breadth of information to students, and like with government speech, it strains credulity that the curation of a library collection would bear the school's imprimatur. *See PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 ("[T]he traditional purpose of a library is to provide information on a broad range of subjects and viewpoints . . . ."); *see also Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723 (2d Cir. 1994) ("[T]he distinguishing factor

35

between library resources and curriculum is that library resources are something that students voluntarily may view at their leisure, whereas curriculum is required material for students.").

Even if *Hazelwood* provided the proper standard here, Defendants have not demonstrated legitimate pedagogical interests behind the book removals. Defendants assert that "DoDEA's ongoing review efforts are borne of its compliance with the President's Executive Orders and Departmental educational objectives, which in turn, were borne out of a desire to implement its pedagogical standards and priorities." Dkt. 29 at 22. As stated earlier, the book removals implement, in whole, the President's EOs, which are not limited to or inclusive of any "pedagogical standards and priorities." *Id.* The February 2025 memo to DoDEA administrators set a clear directive to remove any books related to the EOs, without any additional pedagogical considerations. Dkt. 1-4 (Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA administrators, educators, and staff (Feb. 5, 2025)).

*Hazelwood* recognized several legitimate pedagogical interests, including preventing encouragement of "drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the 'shared values of a civilized order,'" and speech that would "associate the school with any position other than neutrality on matters of political controversy." 484 U.S. at 272 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986)). The Fourth Circuit has added that a pedagogical interest is one broadly "relating to teaching or pedagogy." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998) (en banc). Merely limiting books "on gender ideology and discriminatory equity ideology" and ones with "invidious race and sex discrimination," as these concepts are defined by the EOs, is not sufficient to establish a pedagogical concern. Dkt 29 at 22. If anything, Defendants' stated pedagogical interests, which

36

they concede are "part of national discourse," alone "associate the school with any position other than neutrality on matters of political controversy." *Id.* at 21-22.

Furthermore, as stated earlier, the fact that Defendants do not differentiate the quarantined books among different schools and age groups evinces the lack of pedagogy here. Surely, if Defendants were concerned with pedagogical interests through book removals, they would be able to tender evidence of the age-level perspective they consider and detailed information on the specific pedagogical standards at issue. "It is only when the decision to censor . . . has no valid educational purpose that the First Amendment is so directly and sharply implicate[d] . . . as to require judicial intervention to protect students' constitutional rights." *Hazelwood*, 484 U.S. at 273 (internal quotation marks omitted).

Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success that Defendants' actions with respect to the removal of library books are unconstitutional under the First Amendment.

### ii. *Curricular Removal*

Next, the court will address the First Amendment challenge to the curricular changes. Courts have long acknowledged the state's control over public education. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities."). That being said, the government's control over education is not limitless; it must be "reasonable." *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923). Indeed, the Supreme Court has struck down governmental attempts to "forbid[] the teaching in school of any subject except in English," *id.* at 400, as well as bars on teaching evolution "for the sole reason that it is deemed to conflict with a particular religious doctrine" held by those in power, *Epperson*, 393 U.S. at 103, 106. In *Hazelwood*, the Court reiterated that schools are still limited by the First

37

Amendment, in that they can only regulate school-sponsored speech when "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273.

Neither party disputes that *Hazelwood* applies to Defendants' curricular changes at DoDEA schools.[9]  Dkt. 10 at 21-22; Dkt. 29 at 10.  *Hazelwood* directly concerned educators' ability to "exercise editorial control" over school-sponsored speech, specifically "activities [that] may fairly be characterized as part of the school curriculum." 484 U.S. at 262, 271; *see also Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) (applying *Hazelwood* to students' right to access curricular materials); *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989) (applying *Hazelwood* to curricular restrictions).  Under *Hazelwood*, the Court finds that Plaintiffs are likely to establish that Defendants' curricular changes fall short of the First Amendment.

While *Hazelwood* permitted educators to exercise control over school-sponsored speech, DoDEA's curricular changes stem from a directive from the President of the United States.  Unlike other public schools, DoDEA schools lack school boards.  Defendants, however, purport to characterize the President as being "in the role occupied by an elected local school board." Dkt. 29 at 12.  At the hearing before this Court, Defendants contended that just as school boards are a byproduct of the electoral process, so too is the President.  The Court is unpersuaded.  While a school board is elected primarily based on their educational priorities, the President is not.  Moreover, the President is far removed from the operation of DoDEA schools.  Under the enabling statute of DoDEA, Congress granted the Secretary of Defense discretion to establish educational

---

[9] While Defendants appear to argue that curriculum constitutes government speech, their analysis rests entirely on the *Hazelwood* standard. Dkt. 29 at 10.  Furthermore, contrary to Defendants' representation, Plaintiffs do not suggest at any point that *Pico* provides the relevant standard to review the curricular changes. *Id.* at 12; Dkt. 10 at 10.

institutions for dependents of servicemembers.  *See* 10 U.S.C. § 101(a)(12)(A)-(B).  The Secretary

bears oversight over the Director of DoDEA, who oversees all DoDEA schools.  Compl. ¶ 18.

      Defendants further contend that "simply because the directive to review materials

originated from outside of DoDEA does not mean that the review is divorced from pedagogical

interests."  Dkt. 29 at 12.  In some instances, that could be true.  However, at this stage, the Court

finds that Plaintiffs will likely succeed in demonstrating that the curricular changes do not reflect

"legitimate pedagogical concerns."  *Hazelwood*, 484 U.S. at 273.  Plaintiffs have offered evidence

that shows that the Secretary of Defense and DoDEA administrators immediately deferred to the

President's directives absent any further pedagogical review or cited interest.  For example,

Secretary Hegseth issued a January 2025 memorandum barring DoD from "provid[ing] instruction

on Critical Race Theory (CRT), DEI, or gender ideology . . . ."  Dkt. 1-10 at 2 (Memorandum from

Pete Hegseth, Secretary of Defense, U.S. Dep't of Defense, to Senior Pentagon Leadership,

Commanders of the Combatant Commands, Defense Agency & DOD Field Activity Directors

(Jan. 29, 2025)).  Subsequently, Lori Pickel directed instructors to cease using any curricula

"potentially related to gender ideology or discriminatory equity ideology topics," which included

a list of prohibited curricular materials.  Dkt. 1-11 (Memorandum from Lori Pickel, DoDEA

Acting Chief Academic Officer, to DoDEA Administrators and School Level Employees (Feb. 5,

2025)).  The directives from Secretary Hegseth and Ms. Pickel include no specific pedagogical

interests, nor do they reflect a detailed pedagogical review process, given their immediacy.

      The Court agrees with Plaintiffs that Defendants have "not put forward any purported

pedagogical interests around the effectiveness or age appropriateness of curriculum to justify

removal . . . ."  Dkt. 10 at 24.  In all candor, the Court cannot contemplate the pedagogical basis

for banning the "Gender and Sex" module from Advanced Placement Psychology; lessons on

immigration in elementary school; chapters on "Human Reproductive System, Menstrual Cycle, and Fetal Development," "Abuse and Neglect," and "Adolescence and Puberty" from health education textbooks; and celebrations related to "identity months," including Black History and Women's History Months.  Compl. ¶¶ 52, 56-57; Dkt. 1-11 at Attachment A.

Consequently, the Court finds that Plaintiffs have established that they are likely to succeed on the merits of their First Amendment challenge to the curricular changes.

### C. Irreparable Injury

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 512 F. Supp. 2d 424, 429 (S.D. W. Va. 2007), *rev'd*, 553 F.3d 292 (4th Cir. 2009)). Defendants assert that "Plaintiffs have failed to establish any irreparable injury—especially when, as noted, Plaintiffs have alternative access to the books and curricular information." Dkt. 29 at 27. The Supreme Court, however, has made clear that "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Courts have also held that a "[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." *Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982).

The Court further rejects Defendants' argument that Plaintiffs did not engage in "reasonable diligence" prior to seeking this preliminary injunction. Dkt. 29 at 27.  Defendants aver Plaintiffs delayed their claims because they brought their Complaint months after Defendants' actions and just as the school year was set to end. *Id.* at 27-28.  It was not unreasonable for

40

Plaintiffs to dedicate time to "weigh their constitutional rights against the consequences of suing" DoDEA, including "public shaming and humiliation," especially where Plaintiffs remain enrolled in their respective schools. *Crookshanks*, 775 F. Supp. 3d at 1188. Any purported delay in bringing suit does not negate the irreparable injury to Plaintiffs.

Furthermore, as discussed earlier, any purported delay is especially reasonable given Defendants refused to provide Plaintiffs with their requested information about DoDEA's actions. *Supra*, at 20-21. Accordingly, in light of Defendants' lack of transparency, Plaintiffs required time to collect sufficient evidence to bring this suit. Therefore, the Court finds that Plaintiffs have established that they will suffer irreparable harm absent the relief they seek.

### D. Balance of Equities and Public Interest

The parties agree that "[w]hen the Government is the party opposing injunctive relief, the balance of equities and public interest factors 'merge.'" Dkt. 10 at 25 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); Dkt. 29 at 28. Defendants also do not dispute that "upholding constitutional rights surely serves the public interest;" rather, they aver that no constitutional violation exists here. Dkt. 29 at 28 (quoting *Giovani Carandola Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). As the Court stated earlier, Plaintiffs have shown they are likely to prevail on their constitutional claims.

Furthermore, any injury to the government from a preliminary injunction is minimal, given that all that is required of the government is to return the book collection and curricular materials to their status quo. *See Crookshanks*, 775 F. Supp. 3d at 1189. The Fourth Circuit has stated that the government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th

Cir. 2013). Conversely, a preliminary injunction would significantly benefit Plaintiffs, especially since the new school year has started. Accordingly, the Court finds that the balance of equities and public interest favor Plaintiffs.

Because each of the *Winter* factors substantially weigh in Plaintiffs' favor, the Court will grant a preliminary injunction.

### E. Bond and Scope of Injunctive Relief

Defendants raise two additional issues relevant to the Court's grant of a preliminary injunction. First, Defendants ask this Court to assess whether bond is required here. Dkt. 29 at 29. Defendants contend "a bond order should reflect the disruption caused to DoDEA to recalibrate its school curricula to comply with any order that grants Plaintiffs' request for injunctive relief." *Id.* Conversely, Plaintiffs argue that the Court has discretion to waive the bond requirement given "a fundamental constitutional right is at stake and where the bond requested 'would be an enormous financial barrier.'" Dkt. 36 at 17-18 (quoting *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 290 (D. Md. 2025), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025)).

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The purpose of Rule 65(c) seeks to "provide a mechanism for reimbursing an enjoined party from harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). The Court "has discretion to set the bond amount 'in such sum as the court deems

proper.'" *Id.* (quoting *District 17, UMWA v. A & M Trucking, Inc.,* 991 F.2d 108, 110 (4th Cir. 1993)).

While the Court cannot "disregard the bond requirement altogether," it may issue a waiver. *Id.*; *Pashby,* 709 F.3d at 332. Ordinarily, courts have waived the bond requirement in public interest cases or matters involving constitutional rights, where a bond may impact Plaintiffs' ability to seek judicial review. *Sustainability Inst. v. Trump,* 784 F. Supp. 3d 861, 879 (D.S.C. 2025) ("District courts often waive the bond requirement in public interest cases, recognizing that the failure to do so could prevent certain plaintiffs from obtaining meaningful judicial review."); *Nat'l Ass'n of Diversity Officers in Higher Educ.,* 767 F. Supp. 3d at 291 ("[B]ecause the Plaintiffs seek to protect their First and Fifth Amendment rights, and because a bond of the size Defendants appear to seek would essentially forestall Plaintiffs' access to judicial review, the Court will set a nominal bond of zero dollars."); *see also Honeyfund.com, Inc. v. DeSantis,* 622 F. Supp. 3d 1159, 1186 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com Inc. v. Governor,* 94 F.4th 1272 (11th Cir. 2024) ("[Considering the] unlawful impact on Plaintiffs' First Amendment rights weighs against requiring a bond, this Court waives the bond requirement.").

Defendants make no proffer of a proposed bond amount. And the Court finds that the "disruption caused to DoDEA," Dkt. 29 at 29, from an injunction is not only minimal, because the injunction restores the status quo, but also does not outweigh the impact on Plaintiffs' First Amendment rights. Accordingly, the Court waives the bond requirement.

Second, Defendants also challenge the scope of any injunctive relief. Plaintiffs contend that any injunction should apply to all DoDEA schools. Dkt. 36 at 18. Defendants counter that "relief should be limited to the five DoDEA schools at issue in this case." Dkt. 29 at 30. The Court agrees with Defendants. Plaintiffs likened DoDEA to a single school district. DoDEA,

however, is comprised of 161 schools across nine districts in eleven foreign countries, seven states, Guam, and Puerto Rico. Dkt. 1 at ¶ 19. Plaintiffs have brought neither a facial challenge nor a putative class action suit here. Furthermore, the Supreme Court recently held that universal injunctions likely exceed the power Congress granted to federal courts. *Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2551 (2025) ("A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power."). The Fourth Circuit has similarly disfavored nationwide injunctions. *See CASA de Md., Inc. v. Trump*, 971 F.3d 220, 256 (4th Cir. 2020) (Wilkinson, J.) ("Nationwide injunctions are plainly inconsistent with this conception of the judicial role and the proper scope of the federal courts' remedial power."). Therefore, the Court denies Plaintiffs' request for relief across all DoDEA schools.

## Conclusion

Accordingly, for the foregoing reasons, the Court finds that Plaintiffs have demonstrated that they are entitled to a preliminary injunction as to Plaintiffs' DoDEA schools. Accordingly, Plaintiffs' Motion for a Preliminary Injunction is granted. Dkt. 9. Defendants DoDEA, Dr. Beth Schiavano-Narvaez, and Secretary of Defense Peter Brian Hegseth are enjoined from further removal of educational books and curricular content in implementation of Executive Order Nos. 14168, 14185, and 14190 and any related memoranda, directives, and guidance at Plaintiffs' DoDEA schools: Crossroads Elementary School, Barsanti Elementary School, Aviano Middle-High School, Stollars Elementary School, and Egdren Middle High School. Defendants are furthermore ordered to immediately restore the books and curricular materials that have been removed since January 19, 2025, due to the Executive Orders, to their preexisting shelves, classrooms, and units at Plaintiffs' five schools.

Entered this 20th day of October, 2025.
Alexandria, Virginia

/s/
**Patricia Tolliver Giles**
**United States District Judge**